# EXHIBIT 14



March 7, 2007

Original Recipient

MAUREEN MCFADDEN
819 BANCROFT WAY
BERKELEY, CA 94710

MEGAN L KELLY
2009 MCGEE NO 2
BERKELEY, CA 94703-1448

RE:    Kelly, Megan L
       DOB: February 16, 1978
       Claim Number:    17180010
       Policy Number:   588097
       Unum Life Insurance Company of America

Dear Ms. Kelly:

We are writing about your claim for Long Term Disability benefits.  We previously contacted you requesting additional information that we needed to review your claim.

Enclosed is a copy of our February 07, 2007 letter for your review. We would appreciate it if you would promptly provide this information so that we may determine your continued eligibility for benefits.

Once we have received and reviewed the additional information requested, we will notify you of our decision.

Please note that if we do not receive the additional information by April 22, 2007, we may not be able to give further consideration to your claim.

As you may know, the policy provision applicable to our request states:

**"WHAT INFORMATION IS NEEDED AS PROOF OF YOUR CLAIM?**

Your proof of claim, provided at your expense, must show:

–   that you are under the regular care of a physician;
–   the appropriate documentation of your monthly earnings;
–   the date your disability began;
–   the cause of your disability;

Unum Life Insurance Company of America
The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843
Fax: 1-800-447-2498
www.unumprovident.com

KELLY 0253

1242-03

1242-03

Exhibit A-2

KELLY 0254

Claimant Name: Kelly, Megan L.
Claim Number: 17180t0
March 7, 2007
Page 2 of 2

—  the extent of your disability, including restrictions and limitations preventing you from
    performing your regular occupation; and
—  the name and address of any hospital or institution where you received treatment, including
    all attending physicians.

We may request that you send proof of continuing disability indicating that you are under the
regular care of a physician. This proof, provided at your expense, must be received within 45
days of a request by us.

In some cases, you will be required to give Unum authorization to obtain additional medical
information, and to provide non-medical information as part of your proof of claim, or proof of
continuing disability. Unum will deny your claim, or stop sending you payments, if the
appropriate information is not submitted."

If you fail to comply with this by the date included we will estimate and reduce what your Social
Security Disability (SSDI) benefit would be from your Long Term Disability benefit. Please
return the enclosed forms and proof of application for SSDI within the time period provided.

Please also have your attorney call us with an update in regards to your medical condition
concerning your recovery from your ankle surgery and your pending wrist surgery.

If you have already sent this information to us, please disregard this request.

Ms. Kelly, if you have any questions, please feel free to contact me at 1-800-858-6843.

Sincerely,

*Michael Leding*

Michael Leding
Lead Disability Benefits Specialist
Unum Life Insurance Company of America

Enclosures:    Disability Payment Options (1160-01)
               SSA-3288
CC:            Maureen McFadden

# EXHIBIT 15



UNUMPROVIDENT.

April 23, 2007

Original Recipient

MAUREEN MCFADDEN                    MEGAN L KELLY
819 BANCROFT WAY                    2009 MCGEE NO 2
BERKELEY, CA 94710                  BERKELEY, CA 94703-1448

RE:    Kelly, Megan L              DOB: February 16, 1978
       Claim Number:    1718010
       Policy Number:   588097
       Unum Life Insurance Company of America

Dear Ms. Kelly:

We are writing about your claim for Long Term Disability benefits. We previously contacted you requesting additional information that we needed to review your claim.

Enclosed is a copy of our March 07, 2007 letter for your review. We would appreciate it if you would promptly provide this information so that we may determine your continued eligibility for benefits.

Once we have received and reviewed the additional information requested, we will notify you of our decision.

Please note that if we do not receive the additional information by May 22, 2007, we will make a decision based on the information we have at that time.

As you may know, the policy provision applicable to our request states:

**"WHAT INFORMATION IS NEEDED AS PROOF OF YOUR CLAIM?**

Your proof of claim, provided at your expense, must show:

–   that you are under the regular care of a physician;
–   the appropriate documentation of your monthly earnings;
–   the date your disability began;
–   the cause of your disability;

Unum Life Insurance Company of America
The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843
Fax: 1-800-447-2498
www.unumprovident.com

1242-03

KELLY 0242

1242-03

*Exhibit 15 - 2*

KELLY 0243

Claimant Name: Kelly, Megan L.
Claim Number: 1718010

—    the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation; and
—    the name and address of any hospital or institution where you received treatment, including all attending physicians.

**We may request** that you send proof of continuing disability indicating that you are under the regular care of a physician. This proof, provided at your expense, must be received within 45 days of a request by us.

In some cases, you will be required to give Unum authorization to obtain additional medical information, and to provide non-medical information as part of your proof of claim, or proof of continuing disability. Unum will deny your claim, or stop sending you payments, if the appropriate information is not submitted."

If you have already sent this information to us, please disregard this request.

**Ms. Kelly, if you have any questions, please feel free to contact me at 1-800-858-6843.**

Sincerely,

*Michael Leding*

Michael Leding
Lead Disability Benefits Specialist
Unum Life Insurance Company of America

Enclosures:    Disability Payment Options (1160-01)
               SSA-3288

CC:            Maureen McFadden

# EXHIBIT 16

1242-03



June 11, 2007

MAUREEN MCFADDEN
819 BANCROFT WAY
BERKELEY, CA 94710

RE:  Kelly, Megan L.
     DOB: February 16, 1978
     Claim Number:   1718010
     Policy Number:  588097
     Unum Life Insurance Company of America

Dear Attorney McFadden:

We are writing about Ms. Kelly's Long Term Disability claim.

When we initially calculated Ms. Kelly's pre-disability earnings, we used information provided by Applera Corporation's eligibility feed; this did not include actual payroll records. Based on our customer agreement this was sufficient to complete our calculation unless there was a discrepancy. Ms. Kelly's policy states:

"Monthly Earnings" means your gross monthly income from your Employer in effect just prior to your date of disability. It includes your total income before taxes. It is prior to any deductions made for pre-tax contributions to a qualified deferred compensation plan, Section 125 plan, or flexible spending account. It includes commissions estimated by your Employer, but does not include bonuses, overtime pay or any other extra compensation."

On April 30, 2007, we received notification from Applera Corporation that Ms. Kelly's pre-disability earnings were calculated incorrectly. On May 23, 2007, the Employer had provided additional financial information that included detailed payroll records from March 26, 2004 through July 2, 2004. A recalculation of Ms. Kelly's pre-disability earnings was completed and subsequently her claim has been overpaid by $2,639.37 for benefits from January 3, 2005 through June 2, 2007.

If you or Ms. Kelly does not have questions regarding this matter, please forward a check made out to Unum Life Insurance Company of America by July 11, 2007 to reimburse us for this overpayment. Be sure to include your Social Security number or claim number on your check for identification.

Unum Life Insurance Company of America
The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843
Fax: 1-800-447-2498
www.unumprovident.com

KELLY 0240

KELLY 0241

*Exhibit 16-2*

1242-03

---

Claimant Name: Kelly, Megan L.
Claim Number: 1718010

June 11, 2007
Page 2 of 2

Otherwise, please contact us by June 25, 2007 to address your concerns and to answer any questions you may have regarding this overpayment.

Ms. Kelly's gross monthly benefit will now be $2,105.54 less any applicable taxes or deductible sources of income.

Ms. Kelly, if your benefits are taxable, and you have questions about tax issues, please contact our Tax Unit at 1-800-845-2290.

If you have any other questions, please contact me at 1-800-858-6843, extension 58292.

Sincerely,

*Jennifer McAvoy*

Jennifer McAvoy
Lead Disability Benefits Specialist
Unum Life Insurance Company of America

CC:      Megan Kelly

EXHIBIT 17



July 2, 2007

MAUREEN McFADDEN
819 BANCROFT WAY
BERKELEY, CA 94710

RE:   Kelly, Megan L.
      DOB: February 16, 1978
      Claim Number:   1718010
      Policy Number:   588097
      Unum Life Insurance Company of America

Dear Attorney McFadden:

As you know, we previously contacted you about the overpayment that exists on your client's Long Term Disability claim.  This letter is in response to your request that was received on June 28, 2007.  I have enclosed copies of the payroll records that were recently submitted from Ms. Kelly's Employer.  I have also enclosed a copy of the overpayment calculation.

According to your voice message I received on June 28, 2007, you have expressed that you are in disagreement with our re-calculation of Ms. Kelly's benefits and earnings.  Please refer to the attached letter I sent on June 11, 2007 in regards to the monthly earnings definition in the policy.

If you have additional information to support different monthly earnings prior to Ms. Kelly's disability, it must be sent to my attention for further review at the address noted on this letterhead, within 180 days of the date you receive this letter.

However, if you disagree with our determination and want to appeal this claim decision, you must submit a written appeal.  This appeal must be received by us within 180 days of the date you receive this letter.  You should submit your written appeal to the following address:

The Benefits Center Compliance Department
Appeals Unit
PO Box 9548
Portland, ME 04122-5058
Fax Number: 1-207-575-2354

KELLY 0214

Unum Life Insurance Company of America
The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843
Fax: 1-800-447-2498
www.unumprovident.com

1242-03

Exhibit 12-3

KELLY 0215

1242-03

A decision on appeal will be made not later than 45 days after we receive your written request for review of the initial determination. If we determine that special circumstances require an extension of time for a decision on appeal, the review period may be extended by an additional 45 days (90 days in total). We will notify you in writing if an additional 45 day extension is needed.

If an extension is necessary due to your failure to submit the information necessary to decide the appeal, the notice of extension will specifically describe the required information, and you will be afforded at least 45 days from receipt of the notice to provide the specified information. If you deliver the requested information within the time specified, the 45 day extension of the review period will begin after you have provided that information. If you fail to deliver the requested information within the time specified, we may decide your appeal without that information.

You will have the opportunity to submit written comments, documents, or other information in support of your appeal. You will have access to all relevant documents as defined by applicable U.S. Department of Labor regulations. The review will take into account all new information, whether or not presented or available at the initial determination. No deference will be afforded to the initial determination.

The review will be conducted by us and will be made by a person different from the person who made the initial determination and such person will not be the original decision maker's subordinate. In the case of a claim denied on the grounds of a medical judgment, we will consult with a health professional with appropriate training and experience. The health care professional who is consulted on appeal will not be the individual who was consulted during the initial determination or a subordinate. If the advice of a medical or vocational expert was obtained by the Plan in connection with the denial of your claim, we will provide you with the names of each such expert, regardless of whether the advice was relied upon.

If your request on appeal is denied, the notice of our decision will contain the following information:

a. the specific reason(s) for the appeal determination;
b. a reference to the specific Plan provision(s) on which the determination is based;
c. a statement disclosing any internal rule, guidelines, protocol or similar criterion relied on in making the adverse determination (or a statement that such information will be provided free of charge upon request);
d. a statement describing your right to bring a civil suit under federal law;
e. a statement that you are entitled to receive upon request, and without charge, reasonable access to or copies of all documents, records or other information relevant to the determination; and
f. a statement that "You or your plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor office and your State insurance regulatory agency."

Notice of the determination may be provided in written or electronic form. Electronic notices will be provided in a form that complies with any applicable legal requirements.

If you dispute this determination, you have the right to bring a civil action under section 502(a) of the Employee Retirement Income Security Act following an adverse benefit determination on

Exhibit 17-3

KELLY 0216

1242-03

Claimant Name: Kelly, Megan L.
Claim Number: 1718010

review. Unless there are special circumstances, this administrative appeal process must be completed before you begin any legal action regarding your claim.

If we do not receive your written appeal within 180 days of the date you receive this letter, our claim determination will be final.

In addition, you may also contact the California Insurance Department if you wish to have them review your claim. If you wish to contact the Department by telephone, you should ask for the Consumer Communications Bureau at 1-800-927-4357) or 213-897-8921. If you wish to write to the Insurance Department, your letter should be addressed to:

California Department of Insurance
Claims Service Bureau, 11th Floor
300 South Spring Street
Los Angeles, CA 90013

The policy under which you are insured for this claim has a provision which states, in part, that no lawsuit or legal action shall be brought to recover on the policy after the expiration of three years from the time the proof of loss is required.

Ms. Kelly, if you have any questions, please feel free to contact me at 1-800-858-6843, extension 58292.

Sincerely,

*Jennifer McAvoy*

Jennifer McAvoy
Lead Disability Benefits Specialist
Unum Life Insurance Company of America

Enclosures:   Financial: Benefit Calculation
              Financial: Benefit Calculation
              Financial: Income Verification
              -Claimant: Financial Recovery Unit

# EXHIBIT 18

UnumProvident

July 9, 2007

MAUREEN MCFADDEN
819 BANCROFT WAY
BERKELEY, CA 94710

RE:     Kelly, Megan L.
        DOB: February 16, 1978
        Claim Number:        1718010
        Policy Number:       588097
        Unum Life Insurance Company of America

Dear Attorney McFadden:

We have been informed by your employer you returned to work part time on June 18, 2007 with your same employer performing the same occupation as a production chemist with restrictions and limitations. Prior to releasing any further benefits we need copies of your payroll stubs since your return to work date and ongoing, to assess your eligibility for continued benefits. Your next benefit check for the period of June 3, 2007 through July 2, 2007 will not be released until we receive and review your payroll records for that time period.

If you return to work, yet remain disabled as defined by your policy, you may be eligible for continued benefits.  Your policy defines disability as:

**" HOW DOES UNUM DEFINE DISABILITY?**

You are disabled when Unum determines that:

–   you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

–   you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled.

Unum Life Insurance Company of America
The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843
Fax: 1-800-447-2498
www.unumprovident.com

**KELLY 0210**

1242-03

Exhibit 18-2

1242-03

KELLY 0211

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Unum Representative."

"Material and substantial duties means duties that:

– are normally required for the performance of your regular occupation; and
– cannot be reasonably omitted or modified."

"Regular occupation means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."

During the first 12 months of your return to work, you will be eligible for the Work Incentive Benefit. Under this provision, you would be provided with 12 months of unreduced benefits from the date you returned to work, provided your benefit plus your earnings do not exceed 100% of your pre-disability earnings.

As an example, if you were to return to work earning $1,500 per month, and your pre-disability earnings were $3,000 per month, benefits would be calculated as follows:

| | |
|---|---|
| Gross Monthly benefit | $1,800.00 |
| Current earnings | $1,500.00 |
| Total (benefit + earnings) | $3,300.00 |

| | |
|---|---|
| Work Incentive Benefit Offset | $300.00 |
| (3,300 – 3,000) | |

| | |
|---|---|
| Gross Monthly benefit | $1,800.00 |
| Less Work Incentive benefit offset | $300.00 |
| Net Benefit | $1,500.00 |

As you can see your net benefit plus your earnings would total $3,000.00.

Following this 12 month period, if you continue to meet all the plan provisions, benefits will be payable in proportion to the income loss you have incurred.

For example:

| | |
|---|---|
| Indexed Pre-disability earnings | $3,000.00 |
| Regular Monthly benefit | $1,800.00 |
| Earnings while disabled | $1,500.00 |

Benefit calculation:

[(3,000 – 1,500)/3,000] x 1,800 =          $900.00

Exhibit 18-3

KELLY 0212

Total Income:
1,500.00 (earnings) + 900.00          = $2,400.00

As you can see from the above example, your total income from us plus your earnings would be $2,400.00, or $600.00 more than your regular monthly benefit before you returned to work. Your benefits will continue under the above formula until the earliest of the following, as stated in your policy, occurs:

**"WHEN WILL PAYMENTS STOP?**

We will stop sending you payments and your claim will end on the earliest of the following:

– during the first 24 months of payments, when you are able to work in your regular occupation on a part-time basis but you choose not to;

– after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to;

– if you are working and your monthly disability earnings exceed 80% of your indexed monthly earnings, the date your earnings exceed 80%;

– the end of the maximum period of payment;

– the date you are no longer disabled under the terms of the plan, unless you are eligible to receive benefits under Unum's Rehabilitation and Return to Work Assistance program;

– the date you fail to cooperate or participate in Unum's Rehabilitation and Return to Work Assistance program;

– the date you fail to submit proof of continuing disability;

– after 12 months of payment if you are considered to reside outside the United States or Canada. You will be considered to reside outside these countries when you have been outside the United States or Canada for a total period of 6 months or more during any 12 consecutive months of benefits; or

– the date you die."

Additionally, we sent you a letter on June 11, 2007 explaining an overpayment on your claim due to incorrect pre-disability earnings. Your attorney, Ms. Maureen McFadden has informed me that you are unable to repay the full amount of the overpayment at this time.

We have determined that we can recoup the overpayment in 6 monthly installments beginning in your next benefit check that begins June 3, 2007. Therefore, we can reduce your monthly benefits by $439.90.

Exhibit 18-4

1242-03

# KELLY 0213

CC:     Megan Kelly

Sincerely,

*Jennifer McAvoy*

Jennifer McAvoy
Lead Disability Benefits Specialist
Unum Life Insurance Company of America

Ms. Kelly, if you or your attorney, has any questions, please feel free to contact me at 1-800-858-6843, extension 58292.

Claimant Name: Kelly, Megan L.
Claim Number: 17180010
July 9, 2007
Page 4 of 4

EXHIBIT 19

Exhibit 12-1



October 24, 2007

MAUREEN McFADDEN
819 BANCROFT WAY
BERKELEY, CA 94710

Original Recipient:
MEGAN L KELLY
2009 MCGEE NO 2
BERKELEY, CA 94703-1448

RE:     Kelly, Megan L
        DOB: February 16, 1978
        Claim Number:    1718010
        Policy Number:   588097
        Unum Life Insurance Company of America

Dear Ms. Kelly:

We are writing about your Long Term Disability claim.

The above policy provides for a reduction of your monthly benefit by any Social Security benefits paid for that same period.

Since you were awarded Social Security benefits effective April 01, 2006 for a period during which you received unreduced disability benefits, your claim now has an overpayment of $22,116.03 this includes remaining overpayment balance of $1,697.75. A copy of the calculation is attached.

If you do not have questions regarding this matter, please forward a check made out to Unum Life Insurance Company of America by November 22, 2007 to reimburse us for this overpayment. Be sure to include your Social Security number or claim number on your check for identification. Your canceled check will be proof of your payment.

Otherwise, please contact us by November 07, 2007 to address your concerns and to answer any questions you may have regarding this overpayment.

Please be advised that the policy under which you are covered states that any Social Security benefits payable to your dependants as a result of your Social Security claim may be an offset to your monthly disability benefit. At this time, we ask that you notify us if you have any dependents who are eligible for Social Security benefits based on your work history.

## KELLY 0192

Unum Life Insurance Company of America
Financial Recovery Unit
PO Box 9791
Portland, ME 04104-9828
Phone: 1-800-822-9103
Fax 207-575-6801
www.unumprovident.com
1242-03

KELLY 0193

1242-03

Claimant Name: Kelly, Megan L.
Claim Number: 1718010

To make it easier to reimburse us, we now offer a free service, in which the amount of the repayment can automatically be withdrawn from your checking or savings account. If you would like to take advantage of this service, please contact me at the toll-free number below.

Your net monthly benefit will now be $918.54 after tax deductions.

Ms. Kelly, if your benefits are taxable, and you have questions about tax issues, please contact our Tax Unit at 1-800-845-2290.

If you have any other questions, please contact me at 1-800-822-9103, extension 56638.

Sincerely,

*Mary Krupski*

Mary Krupski
Financial Services Representative
Unum Life Insurance Company of America

Enclosures:   ACH Notice (FRU)
CC:           Maureen McFadden

# EXHIBIT 20

*Exhibit 20-1*

**KELLY 0156**



Applera
Corporation

850 Lincoln Centre Drive
Foster City, CA
94404 USA

January 10, 2007

Maureen E. McFadden
Law Offices of Maureen E. McFadden
819 Bancroft Way
Berkeley, CA 94710

Re:    Megan Kelly

Dear Ms. McFadden:

Please find enclosed copies of additional documents pertaining to Megan Kelly's employment at Applied Biosystems.

If you have further questions, please do not hesitate to contact me at 650.638.5426.

Kind regards,

Veronica Jones
Senior Manager, Employee Relations

EXHIBIT 21

Exhibit 21-1

# LAW OFFICES OF MAUREEN E. MCFADDEN

819 Bancroft Way
Berkeley, CA 94710
www.mcfaddenlaw.net

February 23, 2007

Ph (510) 845-5203
Fax (510) 868-0976
maureen@mcfaddenlaw.net

**VIA FEDERAL EXPRESS**

Veronica Jones
Senior Manager, Employee Relations
Applied Biosystems
850 Lincoln Centre Drive
Foster City, CA 94404

Re:    <u>Megan Kelly v. Applied Biosystems</u>

Dear Ms. Jones:

This letter is written pursuant to Evidence Code § 1152, in an effort to settle Megan Kelly's employment-related claims against Applied Biosystems.

Ms. Kelly commenced employment as an Associate Production Chemist with Applied Biosystems in February 2002. Her performance was excellent. She received strong reviews, and agreeably worked the long hours often demanded. Throughout her time with Applied Biosystems, Ms. Kelly was a valued employee.

On July 6, 2004, Ms. Kelly tripped and sprained her ankle. After a short medical leave and a course of physical therapy, Ms. Kelly was released to return to work in September 2004. As part of her release to work, Ms. Kelly was supposed to be able to sit down whenever she needed to. However, Applied Biosystems was extraordinarily busy during this timeframe, and short-handed. Ms. Kelly, who generally worked alone, was pressured to get orders done quickly. As a result, she was seldom able to sit down.

On September 21, 2004, while moving about extensively and attending to multiple tasks at the same time, Ms. Kelly re-injured her right ankle. Emergency room physicians diagnosed Ms. Kelly with another ankle sprain, and she was again taken off of work. The re-injury was quite serious, in that Ms. Kelly's ankle did not heal well, and she continued to experience serious instability in her right ankle. Several subsequent falls have further aggravated the injury, and Ms. Kelly has also sustained wrist injuries in those falls.

Ms. Kelly has been under the care of numerous physicians while out on leave from Applied Biosystems. Throughout her leave, Ms. Kelly regularly left telephone messages with her immediate supervisor, Jonathan Laosiri, regarding her status and the progress of her recovery. Ms. Kelly also faxed doctor's notes to Applied Biosystems, to Mr. Laosiri's attention. Neither Mr. Laosiri nor anyone else from Applied Biosystems ever responded to Ms. Kelly's telephone messages, or communicated with her in any manner regarding her continued leave.

In January 2006, Ms. Kelly's physicians determined that she was well enough to return to work, albeit with restrictions as the to number of hours she could work, a restriction on lifting any more than 20 lbs, and a requirement that she sit down every hour for at least 10 minutes. Ms. Kelly provided

Exhibit Z-12

Applied Biosystems with a doctor's note authorizing her to work, and specifying these restrictions. Ms. Kelly's supervisor, Jonathan Laoshi, continued to fail to respond to her. Ms. Kelly then called Applied Biosystems's HR department directly, and again explained that she was authorized to return back to work, and the nature of her work restrictions. Applied Biosystems made no effort to get Ms. Kelly back to work. Instead, the company summarily informed Ms. Kelly that she could not return to work unless she either had no restrictions at all and/or could work at least 20 hours per week.

Applied Biosystems's above-described conduct is in clear violation of California law. Ms. Kelly's ankle condition constitutes a "physical disability" within the meaning of the Fair Employment and Housing Act, in that it is a physiological condition that limits (i.e. makes more difficult) her achievement of the major life activity of work. Govt. Code § 12926(k). As such, Ms. Kelly is entitled to all the protections afforded under the law for individuals with disabilities. In particular, when an employee with a known physical disability requests accommodation, the employer is then obligated to engage in a timely good faith "interactive process." Govt. Code § 12940(n). Ms. Kelly's presentation of the January 2006 doctor's note to Applied Biosystems triggered its obligation to engage in the interactive process with her.

The "interactive process" refers to the back and forth dialogue and exchange of information between an employer and employee that is needed to determine what type of accommodation will aid an employee. As one court has explained of the interactive process: "Employers should meet with the employee who requests accommodation, request information about the condition and what limitations the employee has, ask what he or she specifically wants, and offer and discuss available alternatives when the request is burdensome." Taylor v. Phoenixville School Dist., 184 F.3d at 317. Because Applied Biosystems summarily dismissed Ms. Kelly's January 2006 request for accommodation, without making any effort whatsoever to analyze her work restrictions, or to explore options that would have enabled her to return to work, it will be held liable on a claim for failure to engage in the interactive process. See Claudio v. Regents of the University of California (2005) 134 Cal.App.4th 224.

Applied Biosystems will also be held liable on a separate claim for failure to accommodate, pursuant to Govt. Code § 12940(m). Employers have an affirmative duty to accommodate disabled workers. Ms. Kelly was not requesting anything extraordinary. The Fair Employment and Housing Act specifically identifies "offering part-time or modified work schedules" as a potential reasonable accommodation. Govt. Code § 12926(n); 2 Cal. Code Regs. § 7293.9(a). Allowing an employee to sit down and/or take breaks more often than is typical is also a well-accepted and common reasonable accommodation. If this matter is litigated, we are confident the evidence will show that Applied Biosystems could have accommodated Ms. Kelly's disability.

Ms. Kelly took pride in her job with Applied Biosystems, and was crushed at the company's unwillingness to assist in getting her back to work. Applied Biosystems's conduct is particularly despicable in light of the fact that Ms. Kelly's October 2004 re-injury was a workplace accident, which may have been caused in part by the company's inadequate accommodation of her original July 2004 sprained ankle. Ms. Kelly has experienced significant emotional distress arising out of Applied Biosystems's conduct. She has also sustained a substantial economic loss, including more than a year's work of salary and associated benefits.

Exhibit 21-3

February 23, 2007

—3—

Applied Biosystems's outrageous conduct towards Ms. Kelly may also warrant punitive damages. A sampling of recent disability discrimination verdicts demonstrates that juries take these claims seriously, and don't hesitate to award large emotional distress and punitive damages awards:

| Case | Economic Damages | Emotional Distress | Punitives | Total Jury Verdict |
|------|------------------|--------------------|-----------|--------------------|
| Martin v. Arrow Elect.(2006) $1M | | | $500K | $1.5M |
| Carr v. Wash. Mutual (2006) $118K | $682K | | | $800K |
| McGee v. Tuccemas (2005) $542K | $1.5M | | $1.2M | $3.2M |
| Welch v. Anaheim (2005) $215K | $5M | | | $5.2M |
| Roby v. McKesson (2004) $1.3M | $2.7M | $15M | | $19M |
| Wrysinski v. Agilent (2004) $850K | $117K | | $3.8M | $4.8M |
| Green v. State (2003) $59K | $2M | | | $2.6M |
| McMurray v. Burbank (2003) $997K | $537K | | | $1.5M |
| Tousignant v. San Bernardino $445K (2002) | $1M | | | $1.4M |

Ms. Kelly wants to move on with her life, and will agree to settle all past disability and related claims against Applied Biosystems for $75,000. She also wants her job back. Ms. Kelly hereby demands that Applied Biosystems promptly engage in the interactive process with her, and offer such reasonable accommodations as will allow her to return to work as quickly as possible. Towards that end, Ms. Kelly's current work restrictions are enclosed with this letter.

Please provide a response within one week of the date of this letter. If we do not hear from you by that time, we will commence litigation.

Very Truly Yours,

LAW OFFICES OF MAUREEN E. MCFADDEN

Maureen E. McFadden

Encl.  Current work restrictions
DFEH Complaint and right to sue letter

# EXHIBIT 22

Exhibit 22-1

**Page 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

MEGAN KELLY,

    Plaintiff,

vs.    No. C-07-3002 MMC (EMC)

APPLERA CORPORATION,

    Defendant.

DEPOSITION OF MEGAN LYNN KELLY
San Francisco, California
Monday, February 11, 2008

Reported by:
DARCY J. BROKAW
RPR, CRR, CLR, CSR No. 12584
Job No. 82191

**Page 2**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

MEGAN KELLY,

    Plaintiff,

vs.    No. C-07-3002 MMC (EMC)

APPLERA CORPORATION,

    Defendant.

DEPOSITION OF MEGAN LYNN KELLY,
taken on behalf of Defendant, at Littler Mendelson, 650
California Street, 20th Floor, San Francisco, California,
beginning at 9:57 a.m. and ending at 4:36 p.m., on Monday,
February 11, 2008, before me, DARCY J. BROKAW, RPR, CRR,
CLR, CSR No. 12584.

**Page 3**

APPEARANCES

For Plaintiff:
LAW OFFICES OF MAUREEN E. McFADDEN
BY: MAUREEN E. McFADDEN, ESQ.
819 Bancroft Way
Berkeley, California 94710
510-845-5203
maureen@mcfaddenlaw.net

For Defendant:
LITTLER MENDELSON
TYLER M. PAETKAU, ESQ.
650 California Street, 20th Floor
San Francisco, California 94108
415-433-1940
tpaetkau@littler.com

ALSO PRESENT: Stefan Lazar

**Page 4**

INDEX

WITNESS: MEGAN KELLY

| EXAMINATION | PAGE |
|---|---|
| BY MR. PAETKAU | 6 |

EXHIBITS

| DEFENDANT'S | | PAGE |
|---|---|---|
| 1 | Copies of pages from Megan Lynn Kelly's calendars, Bates Nos. Kelly 0279 - 0294 | 51 |
| 2 | Application for employment with Applied Biosystems, dated January 8, 2002, Bates No. Kelly 0181 | 20 |
| 3 | Offer letter from Applied Biosystems, Bates Nos. Kelly 0176 - 0179 | 31 |
| 4 | Note from Dr. Raad Al-Shaikh, dated January 20, 2006, Bates No. Kelly 0295 | 83 |
| 5 | Leave of absence request from Applera Corporation, Bates No. Kelly 0187 | 189 |
| 6 | Document on Applera letterhead regarding short-term disability, Bates Nos. Kelly 0126 and 0127 | 191 |
| 7 | Letter from Unum Provident to Megan Lynn Kelly regarding short-term disability, Bates Nos. 0277 and 0278 | 194 |
| 8 | Letter from Unum Provident, dated August 4, 2004, Bates Nos. Kelly 0275 - 0276 | 201 |
| 9 | Letter from Unum Provident, Bates Nos. Kelly 0269 - 0270 | 202 |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877-955-3855

18 (Pages 69 to 72)

*Exhibit 22-2*

**Page 69**

```
 1     Q   Who did you call?
 2     A   I called Jonathan Laosiri.
 3     Q   Did you ever call anyone in the company's
 4   human resources department between September 22nd,
 5   '04 and January 23rd, 2006?
 6     A   I don't remember.
 7     Q   How many messages did you leave with
 8   Mr. Laosiri?
 9     A   I don't remember. I would call him at
10   points to report on whether or not I was able to
11   return to work.
12     Q   Did you ever send anything in writing,
13   such as an e-mail or fax, to Mr. Laosiri during the
14   time that you were out on leave?
15     MS. McFADDEN:  Again, this is, just to
16   clarify, the same time frame through January 23rd?
17     MR. PAETKAU:  September 22nd, 2004 through
18   January 23rd of '06.
19     MS. McFADDEN:  So during that time frame,
20   did you send any e-mails or faxes?
21     THE WITNESS:  I believe so, yes.
22     BY MR. PAETKAU:
23     Q   What did you send?
24     A   I sent a fax.
25     Q   What did the fax say?
```

**Page 70**

```
 1     A   The fax of my doctor's note.
 2     Q   Which doctor?
 3     A   I believe that was Dr. Al-Shaikh.
 4     Q   When did you fax the doctor's note?
 5     A   I don't remember.
 6     Q   Do you have a fax confirmation number or
 7   fax confirmation receipt?
 8     A   I have not found one yet in my files.  I
 9   cannot access them easily.
10     Q   Why can't you access the files easily?
11     A   They're in file boxes in my house that I
12   can't move around.
13     Q   You understand that the communications
14   with your doctor or doctors are important in this
15   case, right?
16     A   Yes.
17     Q   And you understand you have a duty to
18   produce documents that are responsive to my client's
19   First Request for Production of Documents?
20     A   Yes.
21     Q   And again, I don't want to give you a hard
22   time.  I realize there's some new documents here
23   that we haven't seen before.
24     MR. PAETKAU:  But given the allegations in
25   the case, I think that I would ask that you do --
```

**Page 71**

```
 1   another search of these new boxes that she hasn't
 2   been able to look at to see if there's any
 3   confirmation of fax receipts.  What I'm trying to
 4   avoid is piecemeal productions before trial, you
 5   know, before we file a dispositive motion.  It
 6   should have been produced before, but I'd ask that
 7   it be searched for responsive documents.
 8     MS. McFADDEN:  We searched and didn't come
 9   up with anything.  I'll search again, and if there's
10   anything, I'll produce it to you.
11     MR. PAETKAU:  Well, you just heard her say
12   she has boxes with possibly relevant documents in
13   it, these fax receipts.
14     THE WITNESS:  I have looked through as
15   much as I can.  I have things that are not always --
16   I keep a lot of paperwork.  These are not boxes that
17   necessarily have anything to do with work or should
18   have any work paperwork in them, but I'm still
19   trying to look through them.  The boxes that I've
20   not been able to reach are not the boxes I would
21   assume the fax paper would be in.  Those I've looked
22   through, I have not found anything.
23   I am still looking, because I am trying to
24   find it.  But the boxes that it's in are not -- it's
25   not that I have not tried to look for it.  I've
```

**Page 72**

```
 1   looked where it should have been; it has not been
 2   there.  I'm looking elsewhere.  I'm doing the best I
 3   can.
 4     BY MR. PAETKAU:
 5     Q   I understand.  I didn't mean to be
 6   accusatory with that.  But you understand my
 7   position.  I'm trying to defend my client, as
 8   Maureen is trying to represent you, and I need to
 9   have all the documents before we go to trial.  In
10   fact, I need to be able to ask her questions about
11   them.
12   So I'd just ask that you, you know, do a
13   thorough search and make sure that everything is
14   produced.  What I'm trying to avoid is getting new
15   documents the eve of trial.
16   Do you understand?
17     A   Yes.
18     MR. PAETKAU:  So I'm going to reserve my
19   right to examine her on any documents that have not
20   been produced before today.
21     BY MR. PAETKAU:
22     Q   How many boxes are left that you haven't
23   searched at your before.
24     A   I don't know.
25     Q   More than 50?
```

SARROFF COURT REPORTERS AND LEGAL TECHNOLOGIES

Exhibit 12-3

19 (Pages 73 to 76)

**Page 73**

```
 1      A   No, I don't think so.
 2      Q   More than five?
 3      A   There are book boxes that I haven't opened
 4  that should not have any paperwork.  There are more
 5  than five of those, and I haven't looked at them
 6  recently.
 7      Q   When you said you called and left messages
 8  with Mr. Laosiri, between September 22nd, 2004, and
 9  January 23rd, 2006, how many messages -- what's your
10  best estimate of the number of messages you left for
11  Mr. Laosiri?
12      A   The best I can say is that I called him
13  after doctors' appointments.  I don't know how many
14  doctors' appointments, therefore I don't know how
15  many messages.
16      Q   Did you ever get him live during this time
17  period when you were out on leave?
18      A   Not that I can remember.
19      Q   And beyond the fax of the doctor's note
20  from Al-Shaikh, did you ever send anything in
21  writing to Mr. Laosiri during this time period of
22  your leave?
23      A   Sure.
24      Q   I'm sorry, could you repeat that?
25      MR. PAETKAU:  Could you read that back.
```

**Page 74**

```
 1  please.
 2      (The record was read back by the reporter as follows:
 3          "Q   And beyond the fax of the
 4          doctor's note from Al-Shaikh,
 5          did you ever send anything in
 6          writing to Mr. Laosiri during
 7          this time period of your
 8          leave?")
 9      MS. McFADDEN:  Again, this is through
10  January.
11  BY MR. PAETKAU:
12      Q   Right, September 22nd, '04 through
13  January 23rd, '06.
14      A   Not that I remember at this time.
15      Q   When you say "at this time," is there
16  something you're going to go look at to try to
17  refresh your memory about this?
18      A   There is nothing I know to look at to
19  refresh my memory, but right now I do not remember.
20      Q   Did you have Mr. Laosiri's e-mail address?
21      A   No.
22      Q   Had you ever sent e-mails to him before
23  you left and went out on medical leave in September
24  of '04?
25      A   I sent him e-mails through the work
```

**Page 75**

```
 1  system, where you type in his name and it would send
 2  it to him.
 3      Q   Did you ever think to look up on the
 4  company directory or at another place his e-mail
 5  address so you could keep him informed about your
 6  progress so you were on medical leave?
 7      A   No.
 8      Q   Why not?
 9      A   I left him messages at his phone.
10  Supervisors are supposed to check their phone
11  messages.  I left him my phone number to call me
12  back.  And he also had my HR records to call me
13  back.
14      Q   Would you say that you left more or less
15  than ten voicemail messages for Mr. Laosiri?
16      MS. McFADDEN:  Again, this is just through
17  January 23rd?
18      MR. PAETKAU:  Right, from September --
19      THE WITNESS:  I could guess, but I could
20  not reasonably guess.  I do not remember.
21  BY MR. PAETKAU:
22      Q   I'm just trying to help you come up with
23  an estimate.  Was it more or less than 20 messages
24  for Mr. Laosiri?
25      A   I would like to help you with an estimate,
```

**Page 76**

```
 1  I would, but I called him after doctors'
 2  appointments.  I do not remember how many times I
 3  called him.  I cannot estimate, because my estimates
 4  would only be guesses at this point.
 5      Q   Okay.  There's probably a number that we
 6  can all agree that you didn't call him more than
 7  that number.  Let's just say it's a hundred times.
 8      I think you're trying your phone call to
 9  doctor visits?
10      A   Yes.
11      Q   Can you give me your best estimate as to
12  the number of doctor visits you had between
13  September 22nd of '04 and January 23rd of '06?
14      A   No, I really can't.  I had a lot of
15  doctors' visits.  I don't remember how many.  I have
16  not gone through and counted up.  I didn't keep
17  track of the time.  So I really don't remember.
18      Q   Which healthcare providers -- and I mean
19  that broadly, physicians, therapists, chiropractors,
20  I'm sure I'm leaving out some -- did you see during
21  this time period, September 22nd of '04 through
22  January 23rd of '06?
23      A   The question is asking which doctors --
24      Q   Correct.
25      A   Names of doctors?
```

Page 85

```
 1   Q   And what did Mr. Lazar say in that phone
 2   call?
 3   A   That it was not worth the trouble to have
 4   me back at work unless I could work 20 hours a week,
 5   or if I could work 40 hours a week, they could talk
 6   to me about restrictions.
 7   Q   Did Mr. Lazar in this phone call express
 8   any concern about your health, whether you could
 9   resume your duties, your work duties?
10   A   Not that I recall.
11   Q   How long did the conversation last?
12   A   It was not very long.  It was -- it was
13   not very long.  I don't remember exactly how short.
14   Q   More than ten minutes?
15   A   I don't believe so.
16   Q   Did you have any other communications with
17   anyone at the company after that phone call with
18   Mr. Lazar regarding the possible return to work?
19       MS. McFADDEN:  Do you want to specify a
20   time frame, or are we going forward through --
21       MR. PAETKAU:  Yes.  I'm still talking
22   about in 2006.
23   BY MR. PAETKAU:
24   Q   So after this phone call on either
25   January 30th or 31st, 2006 with Mr. Lazar, did you
```

Page 86

```
 1   have any communications with anyone at the company
 2   about returning to work, up through the end of 2006?
 3   A   No.  I had been told it wasn't worth
 4   returning -- it wasn't worth it to the company to
 5   have me return unless I could work 20 hours.  During
 6   2006, I was never given a release or work 20 hours
 7   without restrictions, so I never called anybody and
 8   I never received a call from anybody.
 9   Q   In the phone call with Mr. Lazar on the
10   30th or the 31st of January, 2006, do you recall
11   anything else being discussed in that phone
12   conversation?
13   A   No.
14   Q   Anything about your long-term disability
15   benefits through Unum or work, anything else about
16   work restrictions?
17   A   I think Unum might have been mentioned,
18   but I don't remember the conversation about it.
19   Q   Now, looking at what we've marked as
20   Exhibit 4, if you had returned to work three days a
21   week, working four hours a day, how much in wages
22   would that be for you?
23       MS. McFADDEN:  Calls for a legal
24   conclusion.
25       How much in wages per week would she have
```

Page 87

```
 1   earned working 12 hours a week?
 2       MR. PAETKAU:  Working 12 hours a week,
 3   correct.
 4       MS. McFADDEN:  What would the salary have
 5   been?
 6       MR. PAETKAU:  Right.
 7   BY MR. PAETKAU:
 8   Q   For this part-time schedule here on
 9   Exhibit 4, if you had actually worked three days a
10   week, four hours a day, so 12 hours in a week, how
11   much would that be in pay to you, gross or net,
12   whatever you want to --
13       MS. McFADDEN:  Calls for a legal
14   conclusion, calls for an expert opinion.
15       If you're able to come up with some
16   numbers, go ahead.
17       THE WITNESS:  If it was put back at my
18   salary from the time I was out the first time, I
19   mean, I don't know.  We could all sit here and do
20   the math from the salary at the time I went out.
21   And if you assumed that I wouldn't have gotten any
22   raises, wouldn't have improved at all during the
23   time I worked, then you could do the numbers.
24       MS. McFADDEN:  He's just asking what would
25   your weekly salary have been if you were working 12
```

Page 88

```
 1   hours a week.  That's it, right now.
 2       THE WITNESS:  If you take the hourly wage
 3   I got at the time I left work in 2004 and multiplied
 4   it by 12 and assumed that that was it, then you'd
 5   get the number.
 6   BY MR. PAETKAU:
 7   Q   Ballpark, what's the hourly wage?  Is it
 8   20 --
 9   A   $18 or so.
10   Q   Okay.  So 18 times 12 would be roughly
11   what the weekly wage would be?
12   A   (Witness nods head up and down.)
13   Q   That's a yes?
14   A   Yes.
15   Q   Okay.
16   A   I'm sorry, I actually -- back to one of
17   the earlier questions you had about did I
18   communicate with anyone about returning to work
19   after talking with Stefan Lazar, I answered that as
20   no.  I didn't talk to anybody about returning to
21   work.  You know, I am coming back on this date
22   again, within the year of 2006.
23       I did still make calls and say I'm still
24   off, you know, I've been on -- you know, on
25   restriction or off work.  I still made the calls to
```

Exhibit 22-5

**Page 93**

```
 1   chemicals and vials around the laboratory and your
 2   ankle gave way, that that could cause injury to
 3   yourself or others?
 4        A   He did not put that into words, no.
 5        Q   Did he say anything else beyond what
 6   you've said about staying out to rehab, to
 7   rehabilitate your ankle?
 8        A   He did not say stay out or rehabilitate my
 9   ankle. He said to stay out until it was better.
10        Q   Those were -- those were the words or very close to
11   the words that he said.
12        Q   Okay. On the 31st in Exhibit 1,
13   Kelly 283, can you read what the entry is there?
14        A   On the 31st?
15        Q   The 31st.
16        A   "Out with Alan" because depressed. "Not
17   returning to work."
18            I'm sorry. "Depressed that not returning
19   to work."
20        Q   When did you make that entry?
21        A   On the 31st.
22        Q   In 2006?
23        A   Correct.
24        Q   Who is Alan?
25        A   Alan is a friend of mine.
```

**Page 94**

```
 1        Q   And what's Alan's last name?
 2        A   Oliver, O-l-i-v-e-r.
 3        Q   Is he a current or former employee of
 4   Applera?
 5        A   No.
 6        Q   Where does he live?
 7        A   He's in Santa Cruz now.
 8        Q   At the time, where did he live?
 9        A   Berkeley, I believe. He moved to Santa
10   Cruz at some point. I'm not sure when. But he was
11   up in Berkeley that day.
12        Q   What does Mr. Oliver do for a living, if
13   you know?
14        A   He's a crystallographer.
15        Q   A crystallographer?
16        A   Yes.
17        Q   Does he have his own company in Santa
18   Cruz?
19        A   He works for a university.
20        Q   UC Santa Cruz?
21        A   Yes, I believe so.
22        Q   Is he a professor?
23        A   I'm not sure. He's teaching a course.
24   I'm not sure if that is professor or if they have
25   some other standard for a teacher.
```

**Page 95**

```
 1        Q   Does this refresh your recollection as to
 2   when you had this conversation with Mr. Lazar about
 3   returning to work?
 4        A   The "Return to work?" would have been
 5   written in when I got the doctor's note on the 20th.
 6   The response, "No, they do not want me back until 20
 7   hours a week," would have been written in when I got
 8   that response. I do not know if that was -- on what
 9   day that was. But since I had the question written
10   in the book, I just wrote the answer to it the same
11   place.
12        Q   Okay. On the entry on the 31st, it says
13   that "depressed that not returning to work."
14            So had you already communicated with
15   someone at the company about the possibility of
16   returning to work with restrictions --
17            MS. McFADDEN: Asked and answered.
18            BY MR. PAETKAU:
19        Q   -- on the 31st?
20            MS. McFADDEN: Sorry. Asked and answered.
21            THE WITNESS: I answered earlier that I
22   had heard from HR, either the 30th or the 31st. I
23   do not know which.
24            BY MR. PAETKAU:
25        Q   Okay. It says -- you use the word
```

**Page 96**

```
 1        Q   When is the last time you spoke with
 2   Mr. Oliver?
 3        A   Within the last few weeks.
 4        Q   Did the subject of that conversation have
 5   anything to do with this case or your deposition?
 6        A   It mainly had to do with my cat.
 7        Q   When you say "mainly," how about
 8   secondarily, did you mention the lawsuit or your
 9   deposition?
10        A   I don't believe so.
11        Q   Have you asked him to be a witness for
12   you?
13        A   No.
14        Q   It says here that "out with Alan because
15   depressed that not returning to work."
16            Does that -- strike that.
17            The next entry on the 1st, that's
18   February 1st of '06?
19        Q   Do you want me to read it?
20            I was first just asking that
21   February 1st of '06.
22        A   Yes.
23        Q   Could you read it please?
24        A   "Return to work? No, they do not want me
25   back until 20 hours a week."
```

*Exhibit 22-c*

**Page 97**

```
 1   "depressed" here.
 2       Q   Have you ever been diagnosed with clinical
 3   depression?
 4       A   Diagnosed with clinical depression?  I
 5   don't believe so, but I'm not sure.
 6       Q   Have you ever sought treatment for mental
 7   health issues?
 8       A   Regarding depression?  No.
 9       Q   Actually, you're limiting my question.  My
10   question was broader.  Any mental health issues?
11       A   No.
12       Q   Have you ever seen a psychologist or a
13   psychiatrist?
14       A   As a child.
15       Q   That was after your parents were divorced,
16   when you were three?
17       A   Correct.
18       Q   Psychologist or psychiatrist?
19       A   I don't remember.
20       Q   He or a she?
21       A   I think they were both "he"s.  Each parent
22   had one.
23       Q   Where was that?  Where were they located?
24       A   I don't know.  I was driven.  I was driven
25   around.
```

**Page 98**

```
 1       MS. McFADDEN:  I'm going to object to any
 2   further questioning as irrelevant and raise a
 3   privacy objection.  This stuff when she was a young
 4   child is not going to be relevant.
 5       MR. PAETKAU:  We have a disagreement on
 6   that.  It's in her doctors' notes.
 7   BY MR. PAETKAU:
 8       Q   Where were you living at the time when you
 9   were three years old?
10       A   Arizona, I believe.
11       Q   And you told one of your doctors that --
12   one of your doctors suggested that -- that it was --
13   there may be other -- strike that.
14           During 2006, did one of your doctors
15   suggest that these minor traumas that turn into
16   major issues for you, shoulder, ankle, wrist, that
17   they might be caused by some underlying condition?
18       A   They didn't suggest that to me.  There was
19   a suggestion at some point that I see somebody else
20   for pain management therapy rather than going to the
21   joint doctor, the orthopedist, for -- I'm sorry, I
22   don't know what they're called.  The one that did
23   braces.  Orthotics are different.  We're talking
24   about the actual joint doctors.
25       MS. McFADDEN:  That's all right.
```

**Page 99**

```
 1       THE WITNESS:  Well, the joint doctors,
 2   they suggested I go to somebody for pain management.
 3   BY MR. PAETKAU:
 4       Q   Who's the "they"?
 5       A   I don't remember the doctor.
 6       Q   Do you recall Dr. Haskell informing you
 7   before your surgery that you might have a negative
 8   reaction to the ankle surgery in light of your
 9   reactions to the minor trauma that you had suffered?
10       A   I don't recall him saying that, no.
11       Q   Were you ever diagnosed as a
12   hypochondriac?
13       A   No.
14       Q   Have you ever been asked by any doctor if
15   you're exaggerating your symptoms from the minor
16   traumas that you've suffered to your limbs?
17       A   No.
18       Q   Has anyone suggested that there might be
19   some social or underlying psychological condition
20   for why you perceive minor trauma to your limbs in
21   the way that you have?
22       A   Not that I recall.
23       Q   It looks like on Exhibit 1, Kelly 284, the
24   next contact with the company, at least according to
25   your diary -- I'm sorry, your calendar, is -- is
```

**Page 100**

```
 1   this April 28th?
 2       A   March 28th.
 3       Q   No, that would be March 28th.
 4           And can you read what you wrote there?
 5       A   "Veronica Jones, ABI employee relations,
 6   (650)638-5426, 3/27/07, 4:32 p.m.  Want to talk" --
 7   parentheses -- sorry, quotation marks.  "Want to
 8   talk to her regarding end of work," end quotations.
 9       Q   And what does that mean?
10       A   It means that at some point between the
11   27th and the 28th, I talked to Veronica Jones or got
12   a note that she wanted -- or a message that she
13   wanted to talk to me.
14       Q   At some point in time in March, did
15   Ms. Jones call you at home?
16       A   I believe so.
17       Q   Was anybody living with you at the time?
18       A   No, nobody was living with me.
19       Q   You were living alone in Berkeley?
20       A   Yes.
21       Q   Do you recall picking up the phone and
22   somebody asking if you were there, somebody from the
23   company asking you if you were there?
24       A   I don't remember.  It's March 2008 --
25   2007.
```

Exhibit 22-T

**Page 133**

```
 1   Q   Is he a neighbor?
 2   A   No.
 3   Q   Where does Eric, Mr. Mayor, live?
 4   A   Union City.
 5   Q   It's M-a-i-e-r?
 6   A   M-a-y-e-r.
 7   Q   Do you know who his employer is?
 8   A   I think it's the Oakland Unified School
 9   District, but I'm not sure.
10   Q   Is he a teacher?
11   A   Yes.
12   Q   In Oakland?
13   A   I believe so, yes.
14   Q   Okay.  How long of a period of time were
15   you convalescing after your November '06 right ankle
16   surgery?
17   A   I don't recall.
18   Q   More or less than one year?
19   MS. McFADDEN:  November '06?
20   BY MR. PAETKAU:
21   Q   November '06, November 3rd, '06.
22   Q   How would you define "convalescing"?
23   Q   How long did it take you to recover?
24   A   I still haven't recovered both use of the
25   ankle without pain.  I was -- it was less than a
```

**Page 134**

```
 1   month before I was able to get up with crutches and
 2   move, but it wasn't -- it wasn't an easy thing.
 3   Q   Sure.  I've had ankle -- I mean Achilles
 4   surgery, so I know what you mean.  I mean, maybe not
 5   the same type of injury, but ...
 6   When you were sent home after the
 7   November 3rd, '06 right ankle surgery, did you use a
 8   wheelchair or an electric cart when you were first
 9   recovering to get around?
10   A   I do have an electric cart.  I did use
11   that as much as possible.  And then I also had two
12   crutches.
13   Q   Did you ever use a wheelchair?
14   A   No.
15   Q   Did you ever go to see Dr. Haskell in a
16   wheelchair?
17   A   I don't recall.  There are wheelchairs
18   available at the facility he works at; and I might
19   have gone up in one at one point, but I don't
20   remember.
21   Q   Whether you got it at Dr. Haskell's office
22   or anywhere else, did you ever use a wheelchair?
23   MS. McFADDEN:  Asked and answered.
24   THE WITNESS:  I don't recall.  I think I
25   might have, but I'm not sure.  I've been in electric
```

**Page 135**

```
 1   carts, on crutches.  It's been a long time.  I
 2   really am not sure.
 3   BY MR. PAETKAU:
 4   Q   Okay.  I understand.  I mean, I'm not
 5   trying to trick you, but most people I think would
 6   recall if they were in a wheelchair or not.
 7   You don't recall one way or the other?
 8   MS. McFADDEN:  Asked and answered.
 9   THE WITNESS:  I don't recall.
10   BY MR. PAETKAU:
11   Q   You do recall the electric cart and the
12   braces and the crutches.
13   The brace, is that the same thing as
14   crutches?
15   A   No.  Braces are orthotics, specifically
16   designed to hold the ankle immobile.
17   Q   Okay.  Is the brace or braces, is that
18   different than the boot?
19   A   I have had a boot, I've also had other
20   braces, smaller ones.
21   Q   Okay.  And then there's something called
22   the cam walker.  Did you use that, as well?
23   A   That is the boot, as far as I'm aware.
24   Q   I was picturing when I heard the word "cam
25   walker" that it was like one of those things where
```

**Page 136**

```
 1   you can, you know, get around with having a walker.
 2   Did you ever use anything like that?
 3   A   Not that I recall.
 4   Q   Okay.  And how about -- did you ever use a
 5   cane?
 6   A   I did try at various points to use a cane.
 7   I usually ended up back on crutches.
 8   Q   And when you say "back on crutches," are
 9   they here somewhere?
10   A   Crutches.
11   Q   Okay.  So just the kind of standard
12   crutches that people use when they break a bone,
13   break an ankle or a leg?
14   A   I, for a time, used a cuff crutch.  It has
15   a cuff that goes around your arm, and you still hold
16   onto it.  It provides the same function as the
17   standard crutch.
18   Q   And it doesn't hurt under here on the
19   second month, right?
20   A   Mm-hmm.
21   Q   I know --
22   A   Yes.
23   Q   -- what you mean.
24   Q   Do you drive currently?
25   A   No.
```

# EXHIBIT 23

*Exhibit 23-1*

**Pedhirney, Michael G.**

-------------------------------------------------------------

| | |
|---|---|
| **From:** | Pedhirney, Michael G. |
| **Sent:** | Wednesday, January 23, 2008 1:32 PM |
| **To:** | maureen@mcfaddenlaw.net |
| **Cc:** | Paetkau, Tyler M. |
| **Subject:** | Kelly v. Applera |

Ms. McFadden,

I am writing as a follow-up to my voicemail message from yesterday. Applera wishes to proceed with taking Ms. Kelly's deposition. Please let us know by the end of the day tomorrow if you and your client are available on any of the following dates: January 28, any day the week of February 4, or any day the week of February 11.

In addition, Applera intends to notice your deposition for sometime in mid-to-late February. Please be assured that Applera will not be exploring discovery that is attorney-client privileged, including attorney-client-privileged communications between you and your client. Rather, Applera is interested in obtaining information regarding your role as Ms. Kelly's representative in the interactive process, and your client's claim that our client failed to engage in the interactive process in good faith. *See Claudio v. Regents of the University of California*, 134 Cal. App. 4th 224, 247 (2005); *Montebello Rose Comp., Inc. v. Agricultural Labor Relations Board*, 119 Cal. App. 3d 1, 32-33 (1981). At your earliest convenience, please let us know when you are available for deposition in mid-to-late February. If you have any questions, please feel free to contact Tyler or me.

Best regards,

Michael Pedhirney

**Pedhirney, Michael G.**

| | |
|---|---|
| **From:** | maureen@mcfaddenlaw.net |
| **Sent:** | Wednesday, January 23, 2008 4:10 PM |
| **To:** | Pedhirney, Michael G. |
| **Subject:** | Re: Kelly v. Applera |

I got your message yesterday, but I've been out of the office - will get you dates as quick as I can here. The next month is a bit tricky, as I have a trial coming up, but I ought to be able to find a day. You are going to have to make a motion to get my depo - as you know, I have no information.

----- Original Message -----
> From: "Pedhirney, Michael G." <MPedhirney@littler.com>
> To: maureen@mcfaddenlaw.net
> Subject: Kelly v. Applera
> Date: Wed, 23 Jan 2008 13:32:09 -0800
>
> Ms. McFadden,
>
> I am writing as a follow-up to my voicemail message from yesterday.
> Applera wishes to proceed with taking Ms. Kelly's deposition. Please
> let us know by the end of the day tomorrow if you and your client are
> available on any of the following dates: January 28, any day the week
> of February 4, or any day the week of February 11.
>
> In addition, Applera intends to notice your deposition for sometime in
> mid-to-late February. Please be assured that Applera will not be
> exploring discovery that is attorney-client privileged, including
> attorney-client-privileged communications between you and your client.
> Rather, Applera is interested in obtaining information regarding your
> role as Ms. Kelly's representative in the interactive process, and
> your client's claim that our client failed to engage in the
> interactive process in good faith. See Claudio v. Regents of the
> University of California, 134 Cal. App. 4th 224, 247 (2005);
> Montebello Rose Comp., Inc. v. Agricultural Labor Relations Board, 119
> Cal. App. 3d 1, 32-33 (1981). At your earliest convenience, please
> let us know when you are available for deposition in mid-to-late
> February. If you have any questions, please feel free to contact Tyler or me.
>
>
> Best regards,
>
>
>
> Michael Pedhirney
>
> ----
>
> To ensure compliance with requirements imposed by the IRS, we inform
> you that any U.S. federal tax advice contained in this document
> (including any attachments) is not intended or written to be used, and
> cannot be used, for the purpose of (i) avoiding penalties under the
> Internal Revenue Code or (ii) promoting, marketing or recommending to
> another party any transaction or matter addressed herein.
> This email may contain confidential and privileged material for the

1

> sole use of the intended recipient(s). Any review, use, distribution
> or disclosure by others is strictly prohibited. If you are not the
> intended recipient (or authorized to receive for the recipient),
> please contact the sender by reply email and delete all copies of this
> message.
>
> To reply to our email administrator directly, send an email to
> postmaster@littler.com
>
> Littler Mendelson, P.C.
> http://www.littler.com

>

Maureen E. McFadden
Law Offices of Maureen E. McFadden
819 Bancroft Way
Berkeley, CA 94710
Ph (510)845-5203

Exhibit 23-3

Exhibit 23-4

## Pedhirney, Michael G.

| | |
|---|---|
| **From:** | Paekau, Tyler M. |
| **Sent:** | Tuesday, January 29, 2008 5:02 PM |
| **To:** | 'maureen@mcfaddenlaw.net' |
| **Cc:** | Pedhirney, Michael G. |
| **Subject:** | RE: Kelly v. Applera |

Maureen,

As ordered today by Magistrate Judge Chen, please provide, at your earliest convenience, available dates in the next two weeks for your client's deposition and proposed dates for Stefan Lazar's deposition.

Also, I am writing to "meet and confer" further regarding our client's request for your deposition as a necessary percipient witness. We respectfully disagree with your assertion below that you "have no information" relevant to your client's claims and our client's defenses. See, e.g., Paragraphs 15-17 of your client's Complaint; your letter to our client dated 12/22/06; your letter to our client, Veronica Jones, dated 2/23/07; our client Charles Heinzer's letter to you dated 3/28/07; our client's Answer and its 9th, 14th, 15th, 21st and 22nd Affirmative Defenses (among other Affirmative defenses, including avoidable consequences doctrine, failure to cooperate in interactive process, and disruption of interactive process); *see also Claudio v. Regents of Univ. of Cal.*, 134 Cal. App. 4th 224, 247 (2005). You have not cited any authority or evidence to support your assertion that you "have no information" relevant to the disputed issues. If you have such authority or evidence, please provide it as soon as possible.

Thank you for your anticipated cooperation. If you have any questions or if you would like to discuss, please contact me or Michael Pedhirney.

Regards, Tyler

Tyler Paekau | Littler Mendelson, P.C.
The National Employment & Labor Law Firm®

650 California St. | 20th Floor
San Francisco, California 94108
Direct Dial: (415) 677-3197
Fax: (415) 743-6577
tpaekau@littler.com | www.littler.com

-----Original Message-----
From: maureen@mcfaddenlaw.net [mailto:maureen@mcfaddenlaw.net]
Sent: Wednesday, January 23, 2008 4:10 PM
To: Pedhirney, Michael G.
Subject: Re: Kelly v. Applera

I got your message yesterday, but I've been out of the office - will get you dates as quick as I can here. The next month is a bit tricky, as I have a trial coming up, but I ought to be able to find a day. You are going to have to make a motion to get my depo - as you know, I have no information.

> ----- Original Message -----
> From: "Pedhirney, Michael G." <MPedhirney@littler.com>
> To: maureen@mcfaddenlaw.net
> Subject: Kelly v. Applera
> Date: Wed, 23 Jan 2008 13:32:09 -0800

Exhibit 12-5

> Ms. McFadden,
>
> I am writing as a follow-up to my voicemail message from yesterday.
> Appitera wishes to proceed with taking Ms. Kelly's deposition. Please
> let us know by the end of the day tomorrow if you and your client are
> available on any of the following dates: January 28, any day the week of
> February 4, or any day the week of February 11.
>
> In addition, Appitera intends to notice your deposition for sometime in
> mid-to-late February. Please be assured that Appitera will not be
> exploring discovery that is attorney-client privileged, including
> attorney-client-privileged communications between you and your client.
> Rather, Appitera is interested in obtaining information regarding your
> role as Ms. Kelly's representative in the interactive process, and your
> client's claim that our client failed to engage in the interactive
> process in good faith. See Claudio v. Regents of the University of
> California, 134 Cal. App. 4th 224, 247 (2005); Montebello Rose Comp.,
> Inc. v. Agricultural Labor Relations Board, 119 Cal. App. 3d 1, 32-33
> (1981). At your earliest convenience, please let us know when you are
> available for deposition in mid-to-late February. If you have any
> questions, please feel free to contact Tyler or me.
>
> Best regards,
>
> Michael Pedhirney
>
> ----
>
> To ensure compliance with requirements imposed by the IRS, we inform you that
> any U.S. federal tax advice contained in this document (including
> any attachments)
> is not intended or written to be used, and cannot be used, for the
> purpose of (i)
> avoiding penalties under the Internal Revenue Code or (ii)
> promoting, marketing
> or recommending to another party any transaction or matter addressed herein.
> This email may contain confidential and privileged material for the
> sole use of the
> intended recipient(s). Any review, use, distribution or disclosure
> by others is strictly
> prohibited. If you are not the intended recipient (or authorized
> to receive for the
> recipient), please contact the sender by reply email and delete all
> copies of this
> message.
> To reply to our email administrator directly, send an email to
> postmaster@littler.com
> Littler Mendelson, P.C.

*Exhibit 28-6*

Maureen E. McFadden
Law Offices of Maureen E. McFadden
819 Bancroft Way
Berkeley, CA 94710
Ph (510) 845-5203

>
> http://www.littler.com

# EXHIBIT 24

*Exhibit 24-1*

1 | JOHN M. SKONBERG, Bar No. 069409
2 | TYLER M. PAETKAU, Bar No. 146305
   | MICHAEL G. PEDHIRNEY, Bar No. 233164
3 | LITTLER MENDELSON
   | A Professional Corporation
4 | 650 California Street, 20th Floor
   | San Francisco, CA 94108.2693
5 | Telephone: 415.433.1940
   | Facsimile: 415.399.8490
6 | E-mail: jskonberg@littler.com

7 | Attorneys for Defendant
8 | APPLERA CORPORATION

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11 | SAN FRANCISCO DIVISION

12 | MEGAN KELLY,                          Case No. C-07-3002 MMC

13 |                    Plaintiff,         DEFENDANT APPLERA
                                           CORPORATION'S NOTICE OF
14 |          v.                           DEPOSITION OF PARTY-AFFILIATED
                                           WITNESS MAUREEN MCFADDEN
15 | APPLERA CORPORATION,
                                           Judge:    The Honorable Maxine M. Chesney
16 |                    Defendant.

17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108 2693
415.433.1940

NOTICE OF DEPOSITION OF MAUREEN
MCFADDEN                                   Case No. C-07-3002 MMC

*Exhibit 24-2*

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

1   TO PLAINTIFF MEGAN KELLY AND HER ATTORNEY OF RECORD:

2          PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure 30,

3   Defendant Applera Corporation ("Defendant") will take the deposition of Maureen McFadden on

4   April 11, 2008 starting at 10:00 a.m., at the offices of Littler Mendelson, a Professional Corporation,

5   located at 650 California Street, 20th Floor, San Francisco, California 94108-2693.  The deposition

6   will continue if necessary on future dates mutually agreed upon by the witness and the parties.

7          PLEASE TAKE FURTHER NOTICE that Defendant reserves the right to record the

8   deposition testimony by videotape, and to use instant visual display of testimony, i.e., LiveNote or

9   Summation, in addition to recording the testimony stenographically, from which a written transcript

10  will be prepared.

11

12  Dated: March   4   , 2008

13

14          JOHN M. SKONBERG
            TYLER M. PAETKAU
15          MICHAEL G. PEDHIRNEY
            LITTLER MENDELSON
16          A Professional Corporation
            Attorneys for Defendant
17          APPLERA CORPORATION

18

19  Firmwide:84484660.1 008292.1051

20

21

22

23

24

25

26

27

28

NOTICE OF DEPOSITION OF MAUREEN
MCFADDEN                                                        2.                              Case No. C-07-3002 MMC

**PROOF OF SERVICE BY MAIL**

1

2    I am employed in San Francisco County, California. I am over the age of eighteen

3    years and not a party to the within-entitled action. My business address is 650 California Street,

4    20th Floor, San Francisco, California 94108.2693. I am readily familiar with this firm's practice for

5    collection and processing of correspondence for mailing with the United States Postal Service. On

6    March 4, 2008, I placed with this firm at the above address for deposit with the United States Postal

7    Service a true and correct copy of the within document(s):

8    **DEFENDANT APPLERA CORPORATION'S**
9    **NOTICE OF DEPOSITION OF PARTY-AFFILIATED**
    **WITNESS MAUREEN MCFADDEN**

10

11    in a sealed envelope, postage fully paid, addressed as follows:

12    Maureen E. McFadden, Esq.
13    Law Offices of Maureen E. McFadden
    819 Bancroft Way
14    Berkeley, CA 94710

15    Following ordinary business practices, the envelope was sealed and placed for

16    collection and mailing on this date, and would, in the ordinary course of business, be deposited with

17    the United States Postal Service on this date.

18    I declare that I am employed in the office of a member of the bar of this court at

19    whose direction the service was made.

20    Executed on March 4, 2008, at San Francisco, California.

21

22

23    Linda K. Camanio

24    Firmwide:84486011.1 008292.1051

25

26

27

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

# EXHIBIT 25

Exhibit 35-1

| Attorney or party without attorney (name and address): | Telephone | For Court Use Only |
|---|---|---|
| MICHAEL PEDHIREX, CSB 233164<br>LITTLER MENDELSON, PC.<br>650 California Street, 20th Floor<br>San Francisco, CA 94108.2693<br>Telephone: 415.433.1940<br>DEFENDANT APPLERA CORP. | 415-433-1940 | |

Insert name of Court, judicial district and branch district, if any:

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

Plaintiff:
MEGAN KELLY

Defendant:
APPLERA CORPORATION

| DECLARATION | Date: | Time: | Dept./Div.: | Case Number: |
|---|---|---|---|---|
| | 11/2/07 | 10:00 a.m. | Lightning | C-07-3002 MMC |

Dr. Raad AL-Shaikh
1860 Mowry Ave, 3rd Fl
Fremont, CA 94538

Records Pertaining to: Megan Kelly

1. CERTIFICATION OF RECORDS COPIED (Custodian's Initials: _____)

   a. I am a duly authorized Custodian of Records, or other qualified witness, for the above-named business. As such, I have the authority to certify these records.

   b. The photocopied records submitted herewith are true copies of all records described in the deposition subpoena/authorization.

   c. To the best of my knowledge, all such records were prepared or compiled by the personnel of the above-named business, in the ordinary course of business, at or near the time of the acts, conditions, or events recorded.

   d. No documents have been withheld in order to avoid their being photocopied. If we have only part of the records described in the deposition subpoena/authorization such records are available as provided.

2. CERTIFICATION OF NO RECORDS COPIED (Custodian's Initials: _____)

   a. I am a duly authorized Custodian of Records, or other qualified witness, for the above-named business. As such, I have the authority to certify these records.

   b. A thorough search has been made for the documents records described in the Deposition Subpoena/Authorization and, based on the information provided to us for identification, no such records were found.

   c. No records of records are transmitted because we do not have said records.

If no records, please explain: Not a patient of Dr. Al-Shaikhs.
_____

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on (date) DEC 05 2007 at (place) Fremont, California.

Print Name: Raad AL-Shaikh                    Signature: _____

DECLARATION OF CUSTODIAN OF RECORDS
CCP 1985-1997, 2018-2021, Evid. Code 1560-1566/et.