Maureen E. McFadden, SBN 203781
LAW OFFICES OF MAUREEN E. MCFADDEN
819 Bancroft Way
Berkeley, CA 94710
Ph (510) 845-5203
Fax (510) 868-0976

Attorney for Plaintiff
MEGAN KELLY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MEGAN KELLY,<br><br>        Plaintiff,<br><br>    vs.<br><br>APPLERA CORPORATION and DOES 1-20, inclusive,<br><br>        Defendants. | Case No.: C-07-3002 MMC<br><br>**DECLARATION OF MAUREEN E. MCFADDEN IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:  July 28, 2008<br>Time: 9:00 a.m.<br>Courtroom 7, 19th Floor<br>The Honorable Maxine M. Chesney |

I, Maureen E. McFadden, declare:

1.     I have personal knowledge of the facts contained within this declaration and verify that the matters alleged herein are true and correct.  If called as a witness in this case, I could and would testify competently to the facts contained herein.

2.     I am an attorney licensed to practice law in the State of California, and in the Ninth Circuit Court of Appeal, and the Eastern, Northern and Central District Courts in California.  I am the owner of Law Offices of Maureen E. McFadden.

3.     I am counsel for plaintiff Megan Kelly in this matter.

4.      Attached hereto as Exhibit A are true and correct copies of excerpts from plaintiff Megan Kelly's February 11, 2008 deposition.

5.      Attached hereto as Exhibit B are true and correct copies of excerpts from plaintiff Megan Kelly's February 11, 2008 deposition.

6.      Attached hereto as Exhibit C are true and correct copies of excerpts from Dr. Raad Al-Sheikh's deposition.

7.      Attached hereto as Exhibit D are true and correct copies of excerpts from Stefan Lazar's deposition.

8.      Attached hereto as Exhibit E are true and correct copies of excerpts from Jonathon Laosiri's deposition.

9.      Attached hereto as Exhibit F are true and correct copies of excerpts from Stefan Lazar's deposition, including Exhibit 2 to that deposition.

10.      Attached hereto as Exhibit G are true and correct copies of excerpts from Stefan Lazar's deposition.

11.      Attached hereto as Exhibit H are true and correct copies of excerpts from Jonathon Laosori's deposition.

12.      Attached hereto as Exhibit I are true and correct copies of excerpts from Jonathon Laosori's deposition.

13.      Attached hereto as Exhibit J are true and correct copies of excerpts from Jonathon Laosori's deposition.

14.      Attached hereto as Exhibit K are true and correct copies of excerpts from Jonathon Laosori's deposition, including Exhibit 4 to that deposition.

15.    Attached hereto as Exhibit L are true and correct copies of excerpts from Jonathon Laosori's deposition, including Exhibit 6 to that deposition.

16.    Attached hereto as Exhibit M are true and correct copies of excerpts Stefan Lazar's deposition.

17.    Attached hereto as Exhibit N are true and correct copies of excerpts from Stefan Lazar's deposition.

18.    Attached hereto as Exhibit O are true and correct copies of excerpts from Stefan Lazar's deposition.

19.    Attached hereto as Exhibit P are true and correct copies of excerpts from Stefan Lazar's deposition.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed on this 20th day of June, 2008, at Berkeley, California.

By: _____
      Maureen E. McFadden

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

MEGAN KELLY,

        Plaintiff,

vs.                                    No. C-07-3002 MMC (EMC)

APPLERA CORPORATION,

        Defendant.

# CERTIFIED
# COPY

---

DEPOSITION OF MEGAN LYNN KELLY

San Francisco, California

Monday, February 11, 2008

Reported by:
DARCY J. BROKAW
RPR, CRR, CLR, CSR No. 12584

Job No. 82191

MEGAN LYNN KELLY                    02/11/08

1    BY MR. PAETKAU:

2        Q    Overall.  And I'm actually referring to

3    medical leaves of absence right now, not vacation or

4    anything else right now.

5        A    Okay.  I took leave when I injured my

6    ankle in July 2004.  I returned to work briefly, was

7    reinjured and continued leave after that.

8            And I took two weeks, about two weeks'

9    leave, for my third surgery in December of 2007.

10       Q    When did you return back to work after the

11   first leave in July of 2004?

12       A    In September of 2004, I believe.

13       Q    And how long were you back at work before

14   you went out on leave again?

15       A    About a week.

16       Q    When you returned to work in September of

17   '04, did you have the same duties?

18       A    Yes.

19       Q    Did you work the same hours?

20       A    I'm sorry, back to the previous question,

21   did I have the same duties.  Do you mean as before I

22   went out?

23       Q    Right.  Before you left in July and then

24   you came back in September for a week, during that

25   week, did you have the same duties?

35

# EXHIBIT B

1    BY MR. PAETKAU:

2        Q    Overall.  And I'm actually referring to

3    medical leaves of absence right now, not vacation or

4    anything else right now.

5        A    Okay.  I took leave when I injured my

6    ankle in July 2004.  I returned to work briefly, was

7    reinjured and continued leave after that.

8             And I took two weeks, about two weeks'

9    leave, for my third surgery in December of 2007.

10       Q    When did you return back to work after the

11   first leave in July of 2004?

12       A    In September of 2004, I believe.

13       Q    And how long were you back at work before

14   you went out on leave again?

15       A    About a week.

16       Q    When you returned to work in September of

17   '04, did you have the same duties?

18       A    Yes.

19       Q    Did you work the same hours?

20       A    I'm sorry, back to the previous question,

21   did I have the same duties.  Do you mean as before I

22   went out?

23       Q    Right.  Before you left in July and then

24   you came back in September for a week, during that

25   week, did you have the same duties?

                                                          35

MEGAN LYNN KELLY                    02/11/08

1      A    As before I left in July, yes.

2      Q    Okay.  And did you have the same hours,

3  the same shift?

4      A    Yes.

5      Q    And what happened during that week?  Was

6  there something that happened that you reinjured

7  your right ankle?

8      A    I was returned to work with restrictions

9  to be able to sit down whenever I needed to.  I was

10  the only one working on the product line that I was

11  working on, and I was told early on in that week

12  that we weren't meeting turnaround time and that we

13  needed to meet turnaround time; and I was reinjured

14  because I was trying to take oligos from Savant and

15  get them ready for the next step of processing

16  before I went to lunch so they would meet turnaround

17  time, even though I needed to sit down.

18      Q    So what were you doing when you reinjured

19  your ankle?

20      A    I had my hands full of oligos that I had

21  just taken out of the Savant.  I stepped away from

22  the Savant, and my ankle separated; and when I put

23  it back down on the floor, it hurt.

24      Q    And when you say you had a handful of

25  oligos, I'm just trying to picture it.  Is that test

36

# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MEGAN KELLY,

        Plaintiff,

  vs.                  No. C-07-3022 MMC

APPLERA CORPORATION,

        Defendant.

_____/

# CERTIFIED COPY

DEPOSITION OF RAAD AL-SHAIKH, M.D.

April 11, 2008

Reported by:

Natalie Y. Botelho

CSR No. 9897

RAAD AL-SHAIKH, M.D.    April 11, 2008

1  what was your assessment of her ability to walk without

2  assistance?

3          MS. McFADDEN:  I'm going to object.  I mean,

4  you're going to have to clarify when you're talking

5  about.

6          MS. AGARWAL:  Q.  During your treatment of

7  her.

8          MS. McFADDEN:  During any of the six sessions

9  or the five to ten visits --

10          MS. AGARWAL:  Right.

11          MS. McFADDEN:  -- over almost two years?

12          MS. AGARWAL:  Right.

13          THE WITNESS:  Can you repeat the question?

14          MS. AGARWAL:  Q.  Sure.  So during the span of

15  time that you treated Ms. Kelly, what was your

16  assessment of her ability to walk without any form of

17  assistance, without a cane or anything like that?

18  A.        I think -- well, for a large portion of the

19  time when she was under my care, she had difficulty

20  without some sort of assistive device.

21  Q.        Okay.  How did you examine or treat Ms. Kelly

22  when she came to your office the first time?

23  A.        I did a history, I did a physical examination,

24  we obtained X-rays.

25  Q.        Okay.  Did you -- at any point during your

10

# EXHIBIT D

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    SAN FRANCISCO DIVISION

4    ---oOo---

5    MEGAN KELLY,

6        Plaintiff,

7    vs.                         No.  C-07-3002 MMC

8    APPLERA CORPORATION and
     DOES 1-20, inclusive,

9

10       Defendants.
     _____/

11

12

13    DEPOSITION OF GEORGE STEFAN LAZAR

14    VOLUME I

15    (Pages 1 to 249)

16

17

18    Taken before ERIN F. FERREYRA

19    CSR No. 12199

20    February 13, 2008

21

22

23

24        One Kaiser Plaza, Suite 505
                               Oakland, California 94612
25                             510/451-1580  Fax 510/451-3797

     Aiken
     AND
     Welch                     Certified Shorthand Reporters

185

A.  No, not that I know of.                    05:51:38

Q.  Is it communicated to employees?          05:51:39

A.  If the -- it can be.                       05:51:42

Q.  Well, when you say it can be, is every    05:51:53
employee who goes out on leave notified that their  05:51:55
doctor's information about where they are in terms  05:52:02
of their health and their ability to get back to    05:52:06
work, that should go back to the disability         05:52:09
insurer and not the employer?                       05:52:11

A.  Yes.                                        05:52:13

Q.  Everybody is notified that goes out on    05:52:13
leave?                                          05:52:18

A.  Yes.                                        05:52:18

Q.  And how are employees notified of that?   05:52:19

A.  They are told in the letter that          05:52:22
communication regarding their medical condition is  05:52:40
to be communicated with UnumProvident.              05:52:44

Q.  And between the period of September 2004  05:53:03
when Ms. Kelly was reinjured and went out on leave  05:53:06
again and the end of 2005, did you receive any      05:53:09
updates from Unum as to her status?                 05:53:12

A.  Yes.                                        05:53:15

Q.  What did you learn as a result of those   05:53:17
updates?                                        05:53:19

A.  We learned that -- we learned how far     05:53:19

the -- what's the period of her certification as          05:53:22

being off work and eligible for the salary               05:53:29

continuation program.                                    05:53:32

    Q.  In January of 2006, did you find out that   05:53:42

Ms. Kelly had a new set of work restrictions and         05:53:44

that she was seeking accommodations that allowed         05:53:50

her to return to work?                                   05:53:52

    MR. PAETKAU:  Objection to the question as    05:53:57

phrased.  Lacks foundation.  Assumes facts not in        05:53:58

evidence.  Argumentative.                                05:54:01

BY MS. McFADDEN:                                          05:54:01

    Q.  Do you understand the question?          05:54:04

    A.  Could you read back the question, please.  05:54:04

    (Record read.)                                   05:54:06

BY MS. McFADDEN:                                          05:54:06

    Q.  I think there's a couple of things off in   05:54:26

that question.  Let me reask it.                         05:54:28

    In January of 2006, did you receive any        05:54:30

information that Ms. Kelly's status had changed in       05:54:34

that she had work restrictions and was seeking           05:54:40

accommodation that would allow her to return to          05:54:42

work?                                                    05:54:44

    MR. PAETKAU:  Objection.  Asked and           05:54:44

answered.                                                05:54:48

    THE WITNESS:  Yes.                            05:54:48

# EXHIBIT E

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4                      ---oOo---

5    MEGAN KELLY,

6         Plaintiff,

7    vs.                        No.   C-07-3002 MML

8    APPLERA CORPORATION,                 (EMC)

9         Defendants.

10   _____/

11

12

13

14          DEPOSITION OF JONATHAN LAOSIRI

15

16

17

18

19          Taken before CAROL SCHILP

20               CSR No. 9648

21              April 8, 2008

22

23

24             One Kaiser Plaza, Suite 505
                                   Oakland, California 94612
25                                 510/451-1580   Fax 510/451-3797

                                   Certified Shorthand Reporters

98

Q.   Okay.  All right.  Well, let's look at
this again.

And do you believe this to be accurate?
Is that the email you sent?

A.   Yeah.                                                        12:08

Q.   Okay.  So the email says that you spoke to
her this morning.  Per the doctor's request, she
was released to work only 12 hours a week.

So now that you've read this email, does
that refresh your recollection that, in your call      12:08
with Ms. Kelly, she told you she could return 12
hours a week?

A.   I don't remember, but must be.

Q.   Okay.  And as you're looking at this
email, does that refresh your recollection about       12:08
anything else Ms. Kelly told you during that
telephone call?

A.   No.

Q.   Okay.  And looking at the email, it says
"I received a call from Megan Kelly today."            12:08

So looking at the email date of 1/24/06,
does that refresh your recollection that the call
with Ms. Kelly was on January 24th?

A.   Yeah.

Q.   Okay.  And that's the only call you've had     12:08

99

with Ms. Kelly?

A.  Yes.

Q.  Okay.  All right.  So let's look at the last line of this email.  It says "She spoke with someone in HR Direct, and I'm waiting to hear from  12:09 them."

Okay.  And the "she" is referring to Ms. Kelly, right, in that last sentence?

A.  Yes.

Q.  Okay.  So during the telephone  12:09 conversation with Ms. Kelly, did she tell you about having spoken to somebody in HR Direct?

A.  She must have; otherwise, I wouldn't have write it down.

Q.  And as we sit here today, any  12:09 recollection, now that you're looking at this email, about what she told you in terms of talking to somebody in HR Direct?

A.  I don't remember.

Q.  Okay.  12:09

MR. PAETKAU:  I think she's asking if this refreshes your memory.

THE WITNESS:  No.

BY MS. McFADDEN:

Q.  Okay.  Well, you wouldn't have put it down  12:09

103

to work in or about January 2006?

A. I don't remember.

Q. So as we sit here today, you don't recall having any conversation with Mr. Lazar with regard to Ms. Kelly's request to return to work?                    12:13

A. I don't remember.

Q. Okay.  Do you remember having any conversations with anybody from HR with respect to Ms. Kelly's request to return to work in or about January 2006?                                               12:14

A. I don't remember.

Q. So as we sit here today, you have no recollection at all of whether or not you had any conversations with anybody from HR about Ms. Kelly's request to return to work?               12:14

A. I don't remember.  It was two years ago.

MS. McFADDEN:  I'm going to mark next in order -- this will be Exhibit 5.

So the court reporter will mark this, and she'll give you a copy to look at.                       12:15

(Plaintiff's Exhibit No. 5 marked for
identification.)

MS. McFADDEN:  So for the record, we're marking as Exhibit 5 a one-page document.  It's got a handwritten notation at the bottom, Bates stamped    12:15

Kelly 0294.  It looks like it's a doctor's note.

It's dated 1/20/06, and it's on the letterhead of

Fremont Orthopedic, O-r-t-h-o-p-e-d-i-c, Medical

Group.

BY MS. McFADDEN:

Q.  All right.  Why don't you take a look at
this briefly, Mr. Laosiri.

Let me just ask you another question
before we talk about this.

Did you review Mr. Lazar's deposition            12:17
transcript?

A.  No.

Q.  All right.  Have you seen this document we
marked as Exhibit 5 before?

A.  No.                                          12:17

Q.  Okay.  Well, as we're looking at it here,
it appears to be a doctor's note for Ms. Kelly
dated 1/20/06.  Let's look where it says
"Restrictions remarks."  I'm just going to read
that out loud, if you'd follow along with me.     12:17

It says "Return to work three days a week,
working four hours day.  Should be able to sit down
every hour for ten minutes.  No lifting over 20
pounds."  Okay.

MR. PAETKAU:  Is there a question?  If           12:17

EXHIBIT 1  EXHIBIT 2

there is --

MS. McFADDEN: Yeah.

MR. PAETKAU: -- I just want to object to
the characterization of this as a -- appears to be
a doctor's note. It's lacking in foundation;      12:17
speculation.

But you go ahead with your question. I
didn't know you were going to read the document.
BY MS. McFADDEN:

Q. Okay. Now, you said that you don't       12:17
remember seeing this document before.

But specifically those restrictions, are
those what you understood Ms. Kelly's work
restrictions to be in January 2006?

MR. PAETKAU: Objection. Asked and          12:18
answered.

THE WITNESS: I think so.
BY MS. McFADDEN:

Q. Okay. And when did you first find out
that those were what Ms. Kelly's work restrictions   12:18
were?

A. Can you rephrase that?

Q. When did you first learn that those were
Ms. Kelly's work restrictions?

A. When I spoke to her --                    12:18

106

Q.  Okay.

A.  -- on the phone.

Q.  All right.

MR. PAETKAU:  Maureen?

MS. McFADDEN:  Yeah.                                    12:19

MR. PAETKAU:  Is now a convenient time for
a lunch break, or do you want to keep going?

MS. McFADDEN:  Yeah, it's probably as good
a time as any.  Let's go off the record.

(Recess was taken from 12:19 to 1:02.)        12:19

BY MS. McFADDEN:

Q.  All right.  I think we're going to mark --
well, let me just ask you first, so what's the
next -- you sent an email to Merte Miles, and we
marked that as an exhibit to the record.              13:02

When did you hear back from Ms. Miles?

A.  I don't remember.

Q.  Okay.  When you heard back, was it via a
telephone call, in person, an email?

A.  I don't remember.                                 13:02

Q.  Okay.  Do you know how long, between the
time you got the email -- you sent the email to
her, it took for her to respond?

A.  I don't remember.

MS. McFADDEN:  Okay.  All right.  Well,       13:02

## FREMONT ORTHOPAEDIC MEDICAL GROUP

**38690 Stivers Street, Suite A**
**Fremont, CA 94536**
**(510) 793-6655 phone**
**(510) 793-4318 fax**

EL D. MORGAN, M.D.
T. DEARBORN, M.D.
D M. BELL, M.D.

RAAD A. AL-SHAIKH, M.D.
KEITH A. JEFFREY, PA-C
GREG J. GRANATO, PA-C

ME _Megan Kelly_ DATE: _1-20-06_

S UNABLE TO RETURN TO WORK/PARTICIPATE IN P.E. FROM _____ TO _____

AY RETURN TO WORK/P.E. ON _____

AY RETURN TO WORK/P.E. WITH RESTRICTION NOTED BELOW ON _2-1-06_

RECEIVED TREATMENT IN OUR OFFICE ON _____ AT _____

HAS A FOLLOW-UP APPOINTMENT ON _____

STRICTIONS/REMARKS: _Return to work 3 days/week working_
_hrs/day. Should be able to sit down every hour_
_for 10 minutes. No lifting over 20 lbs._

R OFFICE WILL NOT FAX WORK/SCHOOL NOTES. IT IS THE PATIENT'S RESPONSIBILITY TO SUBMIT
EM TO THE EMPLOYER/SCHOOL.

_Kelly 0294_ M.D.



PLAINTIFF'S
EXHIBIT
5
LA0319 1163

EXHIBIT 6   EXHIBIT 7   EXHIBIT 8

# EXHIBIT F

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4                 ---oOo---

5    MEGAN KELLY,

6         Plaintiff,

7    vs.                          No.  C-07-3002 MMC

8    APPLERA CORPORATION and
     DOES 1-20, inclusive,
9

10        Defendants.
     _____/

11

12

13        DEPOSITION OF GEORGE STEFAN LAZAR

14              VOLUME I

15           (Pages 1 to 249)

16

17

18      Taken before ERIN F. FERREYRA

19           CSR No. 12199

20         February 13, 2008

21

22

23

24                          One Kaiser Plaza, Suite 505
                            Oakland, California 94612
25      510/451-1580   Fax 510/451-3797

                            Certified Shorthand Reporters

187

And before we go any further, I need a          05:54:48

break.                                                        05:54:50

MS. McFADDEN:   Sure.                              05:54:51

(Recess taken 4:30 to 4:37.)                      05:54:51

BY MS. McFADDEN:                                           05:54:51

Q.  So how did you first find out that          06:03:26

Ms. Kelly had new work restrictions and was      06:03:31

seeking accommodation that would allow her to    06:03:36

return to work?                                              06:03:38

MR. PAETKAU:   Objection.  Assumes facts      06:03:42

not in evidence.  Lacks foundation.               06:03:44

THE WITNESS:  I believe it was her call to   06:03:45

HR direct stating what the restrictions were.    06:03:51

BY MS. McFADDEN:                                           06:03:51

Q.  Do you know when that call was?             06:04:00

A.  The specific date, no.  But it would be    06:04:04

the latter part of January, not the end.  But    06:04:06

sometime from 18th, 19th, 20th forward and later. 06:04:10

Q.  And what exactly were you told?             06:04:16

A.  What I was told is what was in the ticket   06:04:21

saying that -- what was in the ticket.            06:04:26

Q.  When you say "ticket," what's a ticket?     06:04:34

A.  HR direct opens what they call an          06:04:36

electronic ticket for every call that they get,  06:04:39

who it comes from, information, so it can go back 06:04:43

188

and be looked at later if there's any questions    06:04:50

about it.    06:04:52

Q.  When you say "electronic," are paper    06:04:53

copies printed out and also maintained somewhere    06:04:55

of the tickets?    06:04:58

A.  Automatically, no.  But they are still    06:04:59

saved electronically.    06:05:01

Q.  So does somebody present you a copy of the    06:05:07

ticket or how did you literally find out --    06:05:09

A.  It gets sent to me electronically.    06:05:12

Q.  So you received an electronic copy of the    06:05:15

ticket?    06:05:18

A.  Uh-huh.    06:05:18

Q.  Have you saved that?    06:05:19

A.  Yes, we have it.    06:05:20

Q.  Where is it right now?    06:05:21

A.  I believe there's a copy in her file, and    06:05:24

there is still a copy electronically.    06:05:27

Q.  And when you say "file," is this the leave    06:05:30

of absence file we discussed earlier?    06:05:32

A.  Yes.    06:05:34

Q.  Is it anywhere else?    06:05:35

A.  I am not sure.    06:05:46

Q.  And is there any requirement of resolving    06:05:49

tickets in a particular amount of time?    06:05:52

221

Q.  For the record, we're marking as Exhibit 2    06:51:59

a document that does not have a Bates stamp number    06:52:04

on it, but it has a number of tabs.  The top tab    06:52:07

says "description," and the first line says    06:52:11

"reopen" with a check box that says "yes," and it    06:52:13

says "reference inquiry ID."    06:52:18

So if you'll take a moment and look this    06:

over, please.    06:

A.  I know which one this is.    06:

Q.  So is this a ticket you were referencing    06:

earlier, what we've marked as Exhibit 2?    06:52:

A.  Yes.    06:

Q.  And --    06:53:00

MR. PAETKAU:  Just so I'm clear, there's    06:53:05

not a Bates number on this?    06:53:07

BY MS. McFADDEN:    06:53:07

Q.  No, I guess not.    06:53:10

MR. PAETKAU:  But is it a copy of what was    06:53:11

produced to us?    06:53:13

MS. McFADDEN:  I believe so.    06:53:16

BY MS. McFADDEN:    06:53:16

Q.  When is the first time that you saw this    06:53:26

ticket?    06:53:27

A.  Without the dates on here, it's impossible    06:53:28

for me to tell.  The pages are missing.  They're    06:53:33

224

MS. McFADDEN:  If you would just read the    06:56:55
very last thing.    06:56:57

(Record read.)    06:56:58

BY MS. McFADDEN:    06:56:58

Q.  So can you tell me, who generated this    06:57:36
ticket?  Under description where it has that    06:57:39
paragraph, who wrote that description?    06:57:42

A.  Because the person didn't initial, which    06:57:54
they sometimes do, they sometimes do not, because    06:57:59
they didn't initial it, I can't tell.  The audit    06:58:02
trail would have shown who did it.    06:58:06

Q.  But it's someone in the call taker center?    06:58:15

A.  In HR direct, yes.    06:58:18

Q.  Because they are the ones who field these    06:58:21
kind of calls and who would create these tickets,    06:58:22
correct?    06:58:25

A.  Yes.    06:58:25

Q.  So then let's look under "resolution."    06:58:26
First of all, do you recognize this to be    06:58:38
accurate?  Is this the ticket we've been referring    06:58:40
to?    06:58:42

A.  Yes, it is.    06:58:43

Q.  And let's look under "resolution" where it    06:58:44
says "Jamil, can you give her a call?  She has    06:58:47
left messages for her manager to call, to no    06:58:51

## Description

**Reopen?:** ☐ Yes    **Reference Inquiry ID:**

**Case Type:** Leave of Absence (LOA)

**Case Subtype:** Leave of Absence

**Case Item:** Return from Leave

**Summary:** Policy Overview

**Description:** Dr. is allowing her to come back on a modified schedule. 3x a week 4/hrs a day totalling 12hrs a week. Other modifications are not to lift over 20 pounds must sit for at least 10 minutes per hour and possible other restrictions as well.

Is released to come back as of February 1. Has not been able to reach her manager. Best way to reach her is  510-845-7636.

**Resolution:** Jamil, can you give her a call - she has left messages for her manager to no avail. Thanks - LC

Stefan- per our discussion, please referr to this Inquiry. Thanks. J.S

Notified employee that we could not meet the necessary accomodations.  Stefan 1/30/06

**Attachment(s):** 📄

## Assignment

**Assigned To:** Stefan Lazar

**Phone:** (650) 554-3331

## Progress

**Priority:** ☐ Medium

**Resolve By Date:** 01/31/2006

**Resolve By Time:** 01:53 PM

**Time Open:** 7 Days  5 Hours  43 Minutes

**Total Time Spent:**

**Closed On:** 01/31/2006

## Audit Trail

PLAINTIFF'S EXHIBIT

# EXHIBIT G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

MEGAN KELLY,

     Plaintiff,

vs.

No.  C-07-3002 MMC

APPLERA CORPORATION and
DOES 1-20, inclusive,

     Defendants.
_____/

COPY

DEPOSITION OF GEORGE STEFAN LAZAR

VOLUME I

(Pages 1 to 249)

Taken before ERIN F. FERREYRA

CSR No. 12199

February 13, 2008



One Kaiser Plaza, Suite 505
Oakland, California 94612
510/451-1580   Fax 510/451-3797

Certified Shorthand Reporters

196

Q.  My apologies.  Please continue on.    06:15:03

A.  Yes.    06:15:05

Q.  So please continue on.  I want to know    06:15:06
everything that you did in response to getting the    06:15:08
ticket in January 2006.    06:15:12

A.  The conversation -- I had the conversation    06:15:24
with Jonathan Laosiri.  I don't remember at that    06:15:28
point as to whether he was aware of the    06:15:36
restrictions or what they would be.  However, if    06:15:38
he did not know, I would have informed him.  And    06:15:43
that he would need to review whether he could make    06:15:49
that kind of accommodation or not.    06:15:52

To the best of my recollection, he asked    06:15:59
for my guidance because of the minimal number of    06:16:13
hours she could work, and I told him that the    06:16:21
general guideline would be a minimum of 20 hours    06:16:32
just as a starting point in that most employees at    06:16:45
20 hours or more, we should be able to accommodate    06:16:52
with exceptions.    06:17:00

And with employees who worked less than 20    06:17:04
hours, it was more difficult to do, but that he    06:17:07
would have to make the judgment based upon what    06:17:17
work he had and what work she could do.  He had to    06:17:20
make the best business judgment.  We also had the    06:17:26
discussion of our concern about her safety and the    06:17:30

197

safety of other employees in the area.                06:17:37

        Because of the restrictions, there was a     06:17:50

question about her stability.  And as we know now    06:17:54

from later documents, she still needed surgery,      06:18:03

which she had not had.  And there was a concern      06:18:06

both for her safety and of safety of the             06:18:10

individuals around, time issue aside.                06:18:15

        Q.  So have you now told me everything that  06:18:26

you recall doing in response to getting the          06:18:28

ticket?                                              06:18:30

        A.  Yes.                                     06:18:30

        Q.  How many conversations total did you have 06:18:32

with Jonathan Laosiri in January 2006 with respect   06:18:33

to the issue of getting Ms. Kelly back to work?      06:18:38

        A.  At least two, but it could have been more. 06:18:44

        Q.  This morning you gave some testimony about 06:18:50

a conversation with Mr. Laosiri.  Was that the       06:18:52

first conversation you had with him?                 06:18:55

        A.  Yes, I believe that's what I said this   06:18:57

morning.                                            06:19:01

        Q.  And when did you have another conversation 06:19:03

with him?                                           06:19:05

        A.  The later conversation would have been   06:19:05

when he -- when a decision was made that he could    06:19:07

not make the accommodation.  He could not make --    06:19:12

203

                MR. PAETKAU:  Objection.  Misstates prior      06:25:22

testimony.  The testimony speaks for itself.  It's      06:25:23

in the record.                                          06:25:27

BY MS. McFADDEN:                                        06:25:27

    Q.  Why did you tell Mr. Laosiri he had to          06:25:28

make a business judgment?                               06:25:30

                MR. PAETKAU:  Objection.  That question  06:25:31

assumes facts not in evidence and misstates prior       06:25:32

testimony.  Argumentative.                              06:25:35

                THE WITNESS:  Mr. Laosiri is the business.  06:25:42

It is his responsibility to make a judgment in his      06:25:47

organization whether he can accommodate an              06:25:52

employee.  It is not my responsibility nor do I         06:25:56

have the authority.  I can only advise and              06:26:01

recommend.                                              06:26:07

BY MS. McFADDEN:                                        06:26:07

    Q.  And do you think it's important that your       06:26:24

input be considered in terms of the ultimate            06:26:32

judgment about what's going to be done in terms of      06:26:36

accommodating an employee's disability?                 06:26:38

    A.  Absolutely, yes.                                06:26:41

    Q.  Just to make sure that I've got your            06:26:53

testimony straight, who had the final call, in          06:26:55

your opinion, as to whether or not Ms. Kelly's          06:27:02

January 2006 work restrictions would be                 06:27:05

204

1   accommodated?                                          06:27:07

2       A.  Mr. Laosiri.                                   06:27:10

3       Q.  And is that in writing somewhere that when     06:27:19

4   an employee is requesting accommodation for a          06:27:25

5   disability; it's the supervisor rather than HR         06:27:28

6   that makes the final call?                             06:27:32

7           MR. PAETKAU:  Objection.  That question        06:27:34

8   assumes a fact in evidence that Ms. Kelly had a        06:27:35

9   disability.                                            06:27:39

10          You can answer.                                06:27:41

11          THE WITNESS:  I don't know that it's           06:27:46

12  specifically in writing, but it is the model that      06:27:47

13  we use.                                                06:27:50

14  BY MS. McFADDEN:                                       06:27:50

15      Q.  You also testified that in your                06:27:54

16  conversation with Mr. Laosiri, the safety of           06:28:01

17  plaintiff and other employees was discussed.  Was      06:28:04

18  this in the first conversation you had with him?       06:28:06

19      A.  I believe it was.                              06:28:08

20      Q.  What specifically do you remember              06:28:11

21  discussing in terms of the safety of plaintiff and     06:28:13

22  others?                                                06:28:15

23      A.  There was -- we expressed -- he expressed      06:28:16

24  specific -- he expressed concerns about her safety     06:28:31

25  and falling, given the materials that had to be        06:28:36

# EXHIBIT H

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4                     ---oOo---

5    MEGAN KELLY,

6          Plaintiff,

7    vs.                          No.   C-07-3002 MML

8    APPLERA CORPORATION,                    (EMC)

9          Defendants.

10    _____/

11

12

13

14          DEPOSITION OF JONATHAN LAOSIRI

15

16

17

18

19           Taken before CAROL SCHILP

20                CSR No. 9648

21               April 8, 2008

22

23

24          One Kaiser Plaza, Suite 505
                                Oakland, California 94612
25                              510/451-1580   Fax 510/451-3797

                                Certified Shorthand Reporters

25

A.  I don't remember.

Q.  Did you receive any training about sexual harassment at any other companies you've worked for since university?

A.  Yes.                                                    10:25

Q.  What's the last sexual harassment training you've had?

A.  At Affymetrix.

Q.  Do you have an understanding of what the term reasonable accommodation means?          10:25

A.  Yes.

Q.  What's your understanding of what that term means?

A.  Well --

MR. PAETKAU:  Objection to the extent it      10:25
calls for a legal conclusion.

You can answer if you understand.

THE WITNESS:  A reasonable accommodation
is, if I have a job that I could provide to someone
that -- you know, that could be comfortable at a     10:26
job, then I could -- then I will, you know, find a
job for them.  If they can't stand for too long, I
would make accommodation that they could sit down
maybe five minute or ten minute, whatever is
required.                                              10:26

26

BY MS. McFADDEN:

Q.  And you've just given me your understanding of what the term reasonable accommodation means.

Where did you get that understanding from,     10:26
that that's what it means?

A.  Just from my experience.

Q.  Do you have an understanding of what the term interactive process means?

A.  No.
                                                10:26

Q.  Have you ever heard the term interactive process before?

A.  No.

Q.  Do you have an understanding of what the phrase essential functions of a job means?     10:27

MR. PAETKAU:  Objection.  Vague and ambiguous; lacks foundation; and to the extent it calls for a legal conclusion.

You can answer if you understand it.

THE WITNESS:  Can you rephrase that?     10:27

BY MS. McFADDEN:

Q.  Have you ever heard the term essential functions of a job?

A.  Yes.

Q.  Okay.  Do you have an understanding of     10:27

# EXHIBIT I

1           UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4               ---oOo---

5  MEGAN KELLY,

6      Plaintiff,

7  vs.                No.  C-07-3002 MML

8  APPLERA CORPORATION,         (EMC)

9      Defendants.

10  _____/

11

12

13

14        DEPOSITION OF JONATHAN LAOSIRI

15

16

17

18

19       Taken before CAROL SCHILP

20          CSR No. 9648

21         April 8, 2008

22

23

24

25



One Kaiser Plaza, Suite 505
Oakland, California 94612
510/451-1580  Fax 510/451-3797

Certified Shorthand Reporters

27

what that means?

    A.  Yes.

    Q.  What's your understanding?

    A.  It's what is required to do a job.

    Q.  And where did you get your understanding  10:27
that that's what essential functions means?

    A.  From experience.

    Q.  Do you have an understanding of the
process -- strike that.

       I want to focus on the time period of  10:27
January 2006.  So while you were production
manager, that time frame.

       During that time frame, do you have an
understanding of what process Applera Corporation
used to determine reasonable accommodations for  10:28
employees with disabilities?

       MR. PAETKAU:  I want to object to that as
lacking foundation; also to the extent it calls for
legal conclusions.

       You can answer it if you understand.  10:28

       THE WITNESS:  Could you question that --
say the question again?

BY MS. McFADDEN:

    Q.  Sure.  Let me try to ask that again.

       During the last six months while you were  10:28

28

with Applera, just focusing on that time frame, do you know how it is the company determined reasonable accommodations for employees with disabilities?

  MR. PAETKAU: Again, objection. Lacks    10:28 foundation; incomplete hypothetical; and to the extent it calls for a legal conclusion; and vague and ambiguous.

  You can answer.

BY MS. McFADDEN:    10:29

  Q. I'm asking for your understanding.

  A. Yes.

  Q. Okay. Well, what's the process the company uses?

  MR. PAETKAU: Or used at that time?    10:29

  MS. McFADDEN: Yes.

BY MS. McFADDEN:

  Q. Focusing on that time frame, the last six months, what process did Applera use to determine reasonable accommodations for employees with    10:29 disabilities?

  A. I usually handled through company safety officers and the company doctor.

  MS. McFADDEN: Could you -- I'm sorry. It's a little bit noisy. Could you just repeat his    10:29

29

1    complete answer?

2             (Record was read.)

3    BY MS. McFADDEN:

4        Q.  Okay.  And so let me reask it, because I'm

5    not sure you understood the question.                    10:29

6             I'm not asking about you specifically.

7    We'll get into you and what you did.  But right now

8    I'm asking about the company as a whole.  And if

9    you don't know, you don't know.

10            But do you know, at Applera Corporation,        10:30

11   is there a process --

12       A.  I don't know.

13       Q.  Let me just finish the question before you

14   answer --

15       A.  Okay.                                            10:30

16       Q.  -- just so that we've got a complete

17   record.

18            In terms of Applera Corporation as a

19   whole, do you know whether the company has a

20   process that it used to determine accommodations

21   for employees with disabilities?                         10:30

22       MR. PAETKAU:  Objection.  Incomplete

23   hypothetical; lacks foundation; vague and

24   ambiguous; asked and answered; and to the extent it

25   calls for legal conclusions.                             10:30

30

        You can answer.

        THE WITNESS:  I don't know.

BY MS. McFADDEN:

    Q.  Okay.  Okay.  And then you previously gave

an answer that you usually handle through company          10:30

safety officers or company doctors.

        What is a company safety officer?

        MR. PAETKAU:  Objection.  The question

misstates prior testimony.

        You can answer.                                    10:30

        THE WITNESS:  I don't -- I mean, I don't

know her job function, what she does every day.

But anything regarding the safety of the people, of

the employee, I normally refer to her.

BY MS. McFADDEN:                                           10:31

    Q.  Okay.  So was there just one company

safety officer at Applera during your last six

months?

    A.  I don't know.

    Q.  Okay.  Who was the company safety officer     10:31

who was there during the last six months?

    A.  Merte Miles.

    Q.  Could you spell that for us?

    A.  M-i-l-e-s, M-e-r-t-e, I think.

    Q.  What was Merte Miles' function with           10:31