# EXHIBIT J

time you called her, any recollection of talking to
anybody at Applera about Ms. Kelly?

    A.  Don't remember.

    Q.  Okay.  All right.  So the conversation
that you had with her, you initiated that call,      11:55
right?

    A.  She left me a voicemail, and I call back.

    Q.  Okay.  Was it just you and she
participating in this conversation?

    A.  Yes.      11:56

    Q.  How long was the conversation?

    A.  I don't remember.

    Q.  Okay.  Can you give me an estimate?  Less
than five minutes?

    A.  Between five and ten minutes.      11:56

    Q.  Five to ten minutes.

    So tell me everything that you recall
saying during the conversation.

    A.  I call her back, probably asking how she's
doing and I got her message, and try to get -- you      11:56
know, "What is the status of your injury?"

    And then she goes and tell me that -- she
told me that she has been released by the doctor,
but she still could not walk or drive on her own.

    So I told her, "Well, I'll contact the      11:57

91

safety people and will have them get back to you."

Q.  Do you specifically remember her saying those exact words, she could not walk --

A.  Yes.

Q.  -- or drive?

11:57

A.  Yes.

MR. PAETKAU:  You have to wait again.  I know we're kind of in conversation mode, but so the court reporter can make a clean record.

MS. McFADDEN:  Okay.

11:57

BY MS. McFADDEN:

Q.  So you're certain she said she could not walk at all?

A.  Yes.

Q.  Okay.  What else did Megan tell you?

11:57

A.  That her doctor released her.

Q.  What did she tell you about the doctor's release?

A.  Say that again.

Q.  Well, what is it she told you in terms of the doctor's release?

11:57

A.  That's it.  She told me she's been released by the doctor.

Q.  She didn't tell you what the restrictions were that the doctor gave her?

11:58

Aiken & Welch Court Reporters J. Laosiri 4/8/08

# EXHIBIT K

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4             ---oOo---

5  MEGAN KELLY,

6      Plaintiff,

7  vs.                No.  C-07-3002 MML

8  APPLERA CORPORATION,           (EMC)

9      Defendants.

10  _____/

11

12

13

14        DEPOSITION OF JONATHAN LAOSIRI

15

16

17

18

19        Taken before CAROL SCHILP

20           CSR No. 9648

21          April 8, 2008

22

23

24  One Kaiser Plaza, Suite 505

Oakland, California 94612

25  510/451-1580  Fax 510/451-3797

Certified Shorthand Reporters

you're just not remembering?

    A.  Could be.

    Q.  Anything else you remember Ms. Kelly telling you during this telephone call?

    A.  No.         11:59

    Q.  Did you ask her for any additional information?

    A.  No.

    Q.  Okay.  So you've told me now everything you remember Ms. Kelly saying during this phone   11:59 call?

    A.  I think so.

    Q.  Okay.  And anything else you remember telling Ms. Kelly during this phone call other than what you've already told me about?      11:59

    A.  No.

    Q.  No.  Okay.  So I've got the complete conversation, to your recollection?

    A.  I think, from what I remember.

    Q.  Okay.  So what's the first thing you did   11:59 after having this telephone call with Ms. Kelly?

    A.  I emailed -- I think it's Merte -- about the situation, what I learned from talking to Megan.  And I also -- I think that I also had told her my concerns of having, you know, someone in   12:00

that condition come in and work, because it becomes

a safety issue because we are dealing with

flammable materials.

Q.  Okay.  So when you say you told Merte, did

you -- you said you first -- when I asked you          12:01

what's the first thing you did, you said you

emailed Merte.

A.  Yes.

Q.  Then you gave some testimony about you          12:01

told Merte.

A.  In the email.

Q.  Okay.  So when you say "told," you mean

you told her in the email?

A.  Correct.

Q.  Did you send this email to Merte the same          12:01

day you had this conversation with Ms. Kelly?

A.  I don't remember.

Q.  Was it within a day or two of the

conversation with Ms. Kelly?

A.  Probably, because it's pretty important.          12:01

MS. McFADDEN:  Okay.  We'll mark this next

in order.  This will be Exhibit 4.

The court reporter will mark this and give

you a copy to look at.

(Plaintiff's Exhibit No. 4 marked for

95

identification.)

MS. McFADDEN:  Back on the record.

So for the record, we're marking as
Exhibit 4 an email.  It is Bates stamped D00078.
It's dated 1/24/2006.                                          12:04

BY MS. McFADDEN:

Q.  Have you had a chance to read this over?

A.  Yes.

Q.  Is this the email you were referring to
that you sent over to Merte Miles, the first thing      12:04
you did after the telephone call with Ms. Kelly?

A.  Yes.

Q.  Okay.  So -- and that's got the date
1/24/06, 10:16 a.m., right?

A.  I see that.                                              12:05

Q.  Okay.  And no reason to believe that isn't
accurate, right?

A.  Yes.

Q.  All right.  So your call with Ms. Kelly
was within a day or two of 1/24/2006 then, right?       12:05

A.  Probably, yes.

Q.  Okay.  All right.  So just looking at
this, I want to just look at who this email is sent
to first.

Who is John Butler?                                     12:05

Aiken & Welch Court Reporters

Jonathan B Laosiri/FOS/PEC

01/24/2006 10:16 AM

To    North America Occupational Health
Services/NE/FOS/PEC@PEC
cc    John H Butler/FOS/PEC@PEC, Merete K
Miles/FOS/PEC@PEC

bcc

Subject   Megan Kelly

Colista/Merete

I received a call from Megan Kelly today indicating that she is ready to return to work "Partially". She has been on a disability for over two years now. What is the right way to transition Megan back into the work place? I spoke to her this morning and per the Dr's request, she was released to work only 12 hrs/wk (3 days/wk). She spoke to someone in HR Direct and I am waiting to hear from them.

EXHIBIT 5   EXHIBIT 6   EXHIBIT 7

D00078


PLAINTIFF'S
EXHIBIT
LAOSIRI 1/10/09

# EXHIBIT L

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4                 ---oOo---

5  MEGAN KELLY,

6      Plaintiff,

7  vs.                  No.  C-07-3002 MML

8  APPLERA CORPORATION,            (EMC)

9      Defendants.

10  _____/

11

12

13

14         <u>DEPOSITION OF JONATHAN LAOSIRI</u>

15

16

17

18

19        Taken before CAROL SCHILP

20            CSR No. 9648

21           April 8, 2008

22

23

24    One Kaiser Plaza, Suite 505

25                Oakland, California 94612
                  510/451-1580   Fax 510/451-3797

                  Certified Shorthand Reporters

100

in the email unless it was accurate, correct?

A.  Correct.

Q.  So then it says -- well, let me ask you
this:  What is HR Direct?

A.  Basically, they provide assistance to          12:10
employee with family issues or adoptions, any, I
guess, crisis, like you were on drugs, you can't --
you know, those kind of things.

Q.  Okay.  And do you know, during the January
2006 time frame, who was in HR Direct at that time?      12:10
Do you know?

A.  No.  Because it's a service that, I think,
the company bought.

Q.  So you don't know the names of specific
individuals that would have been in HR Direct            12:10
during that time frame?

A.  No.

Q.  All right.  If you look at that last line
again, "She spoke to someone in HR Direct, and I am
waiting to hear from them," is -- so does that mean      12:10
you were waiting to hear back from HR Direct?  Is
that what that means?

A.  Yes.  Either from HR Direct or from Merte,
because they were probably contacting her.

Q.  Well, I don't want you to guess about          12:11

Aiken & Welch Court Reporters J. Laosiri 4/8/08

anything.

But when it says "I am waiting to hear from them," who were you waiting to hear from?

A. HR Direct.

Q. What is it that you were waiting to hear from HR Direct?    12:11

A. Some directions of where we're going to put -- how we're going to proceed.

Q. Okay. All right. So now that we've looked at this email, it doesn't -- does that jog    12:11 your memory at all about any additional details about your conversation with Ms. Kelly that you haven't told me about already?

A. No.

Q. Okay. All right. So you said the very    12:11 first thing you did was send this email to Calista and Merte, correct?

A. Correct.

Q. Okay. So I want to know, what's the very next thing you recall happening in terms of the    12:11 situation of Megan Kelly asking to get back to work at Applera? What's the next thing that happened?

A. I'm waiting for the direction from Merte Miles.

Q. So is the next thing that happened some    12:12

communication from Merte Miles?

A. Yes.

Q. You heard from Merte Miles before you heard from HR Direct?

A. I'm waiting to hear back from them. I'm waiting to hear back from Merte Miles to guide me of how to handle the situation, on how to -- how to assimilate her into the -- back into the workplace.    12:12

Q. Well, I understand you're waiting. But I want to know what happened next.    12:12

Who's the next person you heard from at Applera?

A. I don't remember.

Q. Okay. Who is Stefan Lazar? Stefan Lazar, do you know who that is?    12:13

A. The name rings a bell, but I don't know exactly. I think he's handle all the disability claims, I think.

Q. Is he part of HR at Applera, to your understanding?    12:13

A. I don't know.

Q. Or he was during that time frame?

A. I don't know.

Q. Do you recall having any conversations with Mr. Lazar about Ms. Kelly's request to return    12:13

EXHIBIT 1

106

Q.  Okay.

A.  -- on the phone.

Q.  All right.

MR. PAETKAU:  Maureen?

MS. McFADDEN:  Yeah.                                    12:19

MR. PAETKAU:  Is now a convenient time for
a lunch break, or do you want to keep going?

MS. McFADDEN:  Yeah, it's probably as good
a time as any.  Let's go off the record.

(Recess was taken from 12:19 to 1:02.)        12:19

BY MS. McFADDEN:

Q.  All right.  I think we're going to mark --
well, let me just ask you first, so what's the
next -- you sent an email to Merte Miles, and we
marked that as an exhibit to the record.          13:02

When did you hear back from Ms. Miles?

A.  I don't remember.

Q.  Okay.  When you heard back, was it via a
telephone call, in person, an email?

A.  I don't remember.                           13:02

Q.  Okay.  Do you know how long, between the
time you got the email -- you sent the email to
her, it took for her to respond?

A.  I don't remember.

MS. McFADDEN:  Okay.  All right.  Well,      13:02

107

let's mark next in order -- I think we are on
Exhibit 6.

      I'll have the court reporter mark this and
hand you a copy.

      (Plaintiff's Exhibit No. 6 marked for
      identification.)

BY MS. McFADDEN:

   Q.  Why don't you read that whole thing over
and then just look up when you're done, please.

      So for the record, we're marking as          13:03
Exhibit 6 a two-page document bearing Bates stamp
number D00076 to D00077, and it's a string of
emails dated 1/24/06.

      Mr. Laosiri, have you had a chance to look
at what we marked as Exhibit 6?                        13:05

   A.  Yes.

   Q.  And have you see all the email strings
that are part of Exhibit 6 before?

   A.  I can't say that I can remember.  But I
don't remember.                                        13:05

   Q.  Okay.  All right.  Well, let's first focus
on the second page of the exhibit.  Now, the very
bottom exhibit, we actually marked that as a
separate exhibit.  That's what we marked as Exhibit
4.  So we're not going to go over that again.          13:06

108

Let's look at the second email at the top of the second page.

Do you recall receiving this email on or about January 24th, 2006, from Ms. Miles?

A.  I don't remember it.                    13:06

Q.  Okay.  Well, you may not remember that date and time, but do you remember getting an email from Ms. Miles in response to your email to her that morning?

A.  I don't remember.                    13:06

Q.  So even as you look at it and read it over, you still don't remember it?

A.  No.

Q.  Okay.  Well, it's -- it indicates that it's from Merte Miles, and it's to you.                    13:06

And that's your work email, right?

A.  Yes.

Q.  Any reason to believe you didn't receive this?

A.  No.                    13:06

Q.  Okay.  Well, let's take a look at this. And let's look at the times first.

The email -- the time on your email below, which we already discussed as a separate exhibit, is 10:16 a.m., right, on the 24th?                    13:06

109

A.  Yes.

Q.  And then the email from Merte, responding, is also 1/24/06, 10:56.

A.  Yes, I see that.

Q.  So within the hour.                          13:07

Do you remember her responding to your email within the hour?

A.  Again, I don't remember seeing this email, but -- I see this email in front of me, but I don't remember reading it.                          13:07

Q.  Okay.  All right.  Well, let's look at the second email, the one on the top of the page -- actually, let me ask you a question first.  Let's look at who this is addressed to.

Who is Sandra Miyahara, M-i-y-a-h-a-r-a?   13:07

A.  She's also working side by side with Merte Miles.  And I -- I don't know exactly what her job function is, but she's in the same -- she's a backup, basically.

Q.  Health and safety person?                    13:07

A.  Yeah.

Q.  Okay.  So does she work under Merte Miles, to your understanding?

A.  I don't know.

Q.  Okay.  So let's look at Ms. Miles'           13:07

110

response.   She says "Hi Calista.   I would like to
discuss this one with Dr. Wharton.   We should
consider doing a fit-for-duty screening before she
returns.   Last time she ended up doing too much and
was reinjured while at work, although her injury                    13:08
originally was nonwork-related.   She needs to be
able to walk.   Although she can take breaks, the
work environment is time dependent (certain things
have to be done at certain times, f.ex, when an
instrument is done with a run, it must be                           13:08
unloaded)."

          Did I read that accurately?

     A.   Yes.

     Q.   All right.   Now, this was being sent to
you and cc'd to these others.                                       13:08

          Do you remember, now that you've had a
chance to look this over, doing anything in
response to receiving this email from Merte Miles?

     A.   I don't remember.

     Q.   Okay.   Do you remember her saying she                    13:09
wanted to discuss Megan Kelly's situation with
Dr. Wharton?

     A.   I don't remember.

     Q.   Okay.   Do you remember her referencing the
possibility of a fitness-for-duty exam?                             13:09

111

A.   I don't remember.

Q.   Okay.  And you have no idea of whether --
whether or what you did to respond to this email?

A.   Correct.

Q.   Okay.  And other than this email from          13:09
Merte Miles to you, do you remember any other
communications you had with Ms. Miles responding to
your email to her?

A.   I don't remember.

Q.   Okay.  So you don't remember anything at        13:09
all that Ms. Miles said to you specifically about
Megan Kelly's request to return to work?

A.   No.

Q.   Okay.  Well, let's look at the next page,
page 1 of this exhibit.                              13:10

And on the top email from Donald
Wharton -- you're actually not on that email.  And
you don't have any recollection of seeing that top
email from Dr. Wharton before?

A.   No.                                             13:10

Q.   Okay.  Well, let's look at it.
Dr. Wharton says -- and again, this is also
1/24/06, the same day, right -- the same day as the
first two e-mails?

A.   Correct.                                        13:10

Q.  Dr. Wharton says "I agree that we need to have a fitness-for-duty assessment.  I need some information about her condition, and she will need to sign a release of medical records form so her PMD will respond to me."

13:10

Do you have any recollection of Dr. Wharton advising that Megan should have a fitness-for-duty exam?

A.  I don't know.

Q.  You don't have any recollection of that at all?

13:11

A.  No.

Q.  Did she -- did Applera ask Ms. Kelly to have a fitness-for-duty exam?

A.  I don't know.

13:11

Q.  Do you know any reasons why they wouldn't ask her to have a fitness-for-duty exam in response to Dr. Wharton's comment here?

A.  I don't know.

Q.  Is there anybody but you who would have more information as to the fitness-for-duty exam and why Ms. Kelly did or did not have one done?

13:11

MR. PAETKAU:  Objection.  Argumentative as phrased; lacks foundation; calls for speculation.

THE WITNESS:  I don't know.

13:11

BY MS. McFADDEN:

Q.  So you don't know anybody but yourself
that would know more information about whether or
not the company offered Ms. Kelly a
fitness-for-duty exam?                               13:11

MR. PAETKAU:  Objection.  That misstates
prior testimony; it's argumentative; lacks
foundation; calls for speculation.

THE WITNESS:  I don't know.

BY MS. McFADDEN:                                     13:11

Q.  So why -- you have no idea?

A.  Correct.

Q.  Okay.  Do you have any recollection of
having any discussions with anybody at Applera
about a fitness-for-duty exam and Megan Kelly?      13:12

A.  No.

Q.  Okay.  Do you remember having any
conversations with Dr. Wharton about Ms. Kelly?

A.  No.

Q.  Well, when you got Calista -- when you got   13:12
Merte Miles' response to your email, that we're
looking at, the second page here, did that give you
the guidance you needed in terms of what to do with
the Megan Kelly situation?

MR. PAETKAU:  Objection.  Lacks               13:12

114

foundation.

THE WITNESS:  Yes.

BY MS. McFADDEN:

Q.  So what guidance did you think you were getting from Merte Miles in that email, the second page of Exhibit 6?                    13:13

A.  That we should be doing the fitness test, the fit-for-duty screen, before she return.

Q.  So did that answer all the questions you had about what needed to be done?                    13:

A.  Yes.

Q.  So did you respond to this email?

A.  I don't remember.

Q.  Did you do anything to follow up on the email suggesting a fitness-for-duty exam?                    13:14

MR. PAETKAU:  Objection.  Asked and answered three times now.

THE WITNESS:  I don't remember.

MS. McFADDEN:  Let's mark next in order -- this will be Exhibit 7.                    13:14

The court reporter will mark that and give you a copy.

(Plaintiff's Exhibit No. 7 marked for
identification.)

MS. McFADDEN:  For the record, we're                    13:14



"Donald Whorton, MD"
<dwhorton@workcare.com>

01/24/2006 12:51 PM

To  "Colista A Isadore"
    <Colista.Isadore@appliedbiosystems.com>, "Merete Miles
    \(E-mail\)" <milesmk@appliedbiosystems.com>
cc
bcc
Subject  RE: Megan Kelly

I agree that we need to have a fitness for duty assessment.  I need some information about her condition and she will need to sign a release of medical records form so her PMD will respond to me.

Don

**Dr. Donald Whorton**
Vice President and Epidemiologist
WorkCare
1320 Harbor Bay Parkway, Suite 115
Alameda, CA 94502
Phone: (510) 748-6900 ext 202
Fax: (510) 748-6915
**Confidentiality Notice:** Confidential Health Information May Be Enclosed
Health care information is personal and sensitive information related to a person's health care. It is being e-mailed to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Re-disclosure without additional patient consent or as permitted by law is prohibited. Unauthorized re-disclosure or failure to maintain confidentiality could subject you to penalties described in federal and state law." IMPORTANT WARNING: This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this message by error, please notify us immediately and destroy the related message.

-----Original Message-----
**From:** Colista A Isadore [mailto:Colista.Isadore@appliedbiosystems.com]
**Sent:** Tuesday, January 24, 2006 11:38 AM
**To:** Donald Whorton, MD
**Subject:** Fw: Megan Kelly

Don, FYI - from Merete.  Colista

---- Forwarded by Colista A Isadore/NE/FOS/PEC on 01/24/2006 11:37 AM -----

Merete K
Miles/FOS/PEC

01/24/2006 10:56 AM

To  Jonathan B Laosiri/FOS/PEC@PEC
cc  John H Butler/FOS/PEC@PEC, North America Occupational Health Services/NE/FOS/PEC@PEC,
    Sandra G Miyahara/FOS/PEC@PEC
Subject  Re: Megan Kelly Link

D00076


PLAINTIFF'S EXHIBIT



Merete K Miles/FOS/PEC
01/24/2006 10:56 AM

To   Jonathan B Laosiri/FOS/PEC@PEC

cc   John H Butler/FOS/PEC@PEC, North America Occupational
     Health Services/NE/FOS/PEC@PEC, Sandra G
     Miyahara/FOS/PEC@PEC

bcc

Subject   Re: Megan Kelly

Hi Colista,

I would like to discuss this one with Dr. Whorton. We should consider doing a fit for duty screening before she returns. Last time she ended up doing too much and was reinjured while at work although her injury originally was non work related.   She needs to be able to walk Although she can take breaks the work environment is time dependent (certain things have to be done at certain times, f.ex when an instrument is done with a run it must be unloaded)

Regards,

Merete K. Miles
Environmental Health & Safety
Applied Biosystems
Phone (925) 230-5507
Fax (925) 230-3098

Jonathan B Laosiri/FOS/PEC

Jonathan B
Laosiri/FOS/PEC
01/24/2006 10:16 AM

To   North America Occupational Health Services/NE/FOS/PEC@PEC

cc   John H Butler/FOS/PEC@PEC, Merete K Miles/FOS/PEC@PEC

Subject   Megan Kelly

Colista/Merete

I received a call from Megan Kelly today indicating that she is ready to return to work "Partially". She has been on a disability for over two years now. What is the right way to transition Megan back into the work place? I spoke to her this morning and per the Dr's request, she was released to work only 12 hrs/wk (3 days/wk). She spoke to someone in HR Direct and I am waiting to hear from them.

D00077

# EXHIBIT M

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4                 ---oOo---

5   MEGAN KELLY,                        COPY

6        Plaintiff,

7   vs.                          No.   C-07-3002 MMC

8   APPLERA CORPORATION and
    DOES 1-20, inclusive,
9
         Defendants.
10  _____/

11

12

13       DEPOSITION OF GEORGE STEFAN LAZAR

14                 VOLUME I

15            (Pages 1 to 249)

16

17

18      Taken before ERIN F. FERREYRA

19              CSR No. 12199

20            February 13, 2008

21

22

23

24                One Kaiser Plaza, Suite 505
                                      Oakland, California 94612
25                                    510/451-1580   Fax 510/451-3797

                                      Certified Shorthand Reporters

196

Q. My apologies. Please continue on.     06:15:03

A. Yes.     06:15:05

Q. So please continue on. I want to know     06:15:06
everything that you did in response to getting the     06:15:08
ticket in January 2006.     06:15:12

A. The conversation -- I had the conversation     06:15:24
with Jonathan Laosiri. I don't remember at that     06:15:28
point as to whether he was aware of the     06:15:36
restrictions or what they would be. However, if     06:15:38
he did not know, I would have informed him. And     06:15:43
that he would need to review whether he could make     06:15:49
that kind of accommodation or not.     06:15:52

    To the best of my recollection, he asked     06:15:59
for my guidance because of the minimal number of     06:16:13
hours she could work, and I told him that the     06:16:21
general guideline would be a minimum of 20 hours     06:16:32
just as a starting point in that most employees at     06:16:45
20 hours or more, we should be able to accommodate     06:16:52
with exceptions.     06:17:00

    And with employees who worked less than 20     06:17:04
hours, it was more difficult to do, but that he     06:17:07
would have to make the judgment based upon what     06:17:17
work he had and what work she could do. He had to     06:17:20
make the best business judgment. We also had the     06:17:26
discussion of our concern about her safety and the     06:17:30

197

1   safety of other employees in the area.                      06:17:37

2          Because of the restrictions, there was a           06:17:50

3   question about her stability.  And as we know now        06:17:54

4   from later documents, she still needed surgery,          06:18:03

5   which she had not had.  And there was a concern          06:18:06

6   both for her safety and of safety of the                 06:18:10

7   individuals around, time issue aside.                    06:18:15

8       Q.  So have you now told me everything that          06:18:26

9   you recall doing in response to getting the              06:18:28

10  ticket?                                                  06:18:30

11      A.  Yes.                                             06:18:30

12      Q.  How many conversations total did you have        06:18:32

13  with Jonathan Laosiri in January 2006 with respect       06:18:33

14  to the issue of getting Ms. Kelly back to work?          06:18:38

15      A.  At least two, but it could have been more.       06:18:44

16      Q.  This morning you gave some testimony about       06:18:50

17  a conversation with Mr. Laosiri.  Was that the           06:18:52

18  first conversation you had with him?                     06:18:55

19      A.  Yes, I believe that's what I said this           06:18:57

20  morning.                                                 06:19:01

21      Q.  And when did you have another conversation       06:19:03

22  with him?                                                06:19:05

23      A.  The later conversation would have been           06:19:05

24  when he -- when a decision was made that he could        06:19:07

25  not make the accommodation.  He could not make --        06:19:12

# EXHIBIT N

1            UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4              ---oOo---

5  MEGAN KELLY,

6      Plaintiff,

7  vs.                No.  C-07-3002 MMC

8  APPLERA CORPORATION and
     DOES 1-20, inclusive,

9

10      Defendants.
      _____/

11

12

13       DEPOSITION OF GEORGE STEFAN LAZAR

14              VOLUME I

15          (Pages 1 to 249)

16

17

18      Taken before ERIN F. FERREYRA

19          CSR No. 12199

20        February 13, 2008

21

22

23

24    One Kaiser Plaza, Suite 505
                    Oakland, California 94612

25                    510/451-1580  Fax 510/451-3797

                    Certified Shorthand Reporters



209

1    ticket?                                                06:34:45

2        A.   Correct.                                      06:34:45

3        Q.   So just moving forward, we've talked about    06:34:51

4    the first conversation you had with Jonathan           06:34:53

5    Laosiri after getting the ticket.  What did you do     06:34:55

6    next?                                                  06:34:58

7        A.   The only thing that I can specifically        06:35:00

8    remember from that point forward is the                06:35:02

9    conversation that I had with Jonathan in which he      06:35:07

10   believed we could not make that specific              06:35:13

11   accommodation of having her return to work.           06:35:17

12       Q.   And do you know how much time passed         06:35:35

13   between your first and second conversations with      06:35:36

14   Mr. Laosiri?                                          06:35:38

15       A.   No, but I can say that it would have been    06:35:39

16   within a short -- it would have been within a few     06:35:41

17   days, within a short period of time, because I        06:35:45

18   know -- because I know of a subsequent action         06:35:48

19   which couldn't have happened if I hadn't had the      06:35:52

20   conversation with him.                                06:35:54

21       Q.   So this telephone conversation, was it       06:35:59

22   just you and he on the call?                          06:36:01

23       A.   Yes, to the best of my recollection, yes.    06:36:02

24       Q.   And who initiated the call?                  06:36:05

25       A.   I have no -- I don't remember.               06:36:08

210

Q.  How long was the phone call?                     06:36:11

A.  I have no idea.  I do not remember.              06:36:12

Q.  More or less than ten minutes, can you           06:36:15
say?                                                 06:36:17

A.  I can't answer that.  I do not know.             06:36:18

Q.  Well, tell me as specifically as you can         06:36:21
exactly what Mr. Laosiri told you in the second      06:36:23
call.                                                06:36:26

A.  I can only tell you in generalities what I       06:36:29
remember, and that was that based upon three         06:36:34
factors, the safety factor, the physical             06:36:40
restrictions and the time factor, the limited        06:36:47
hours, that he could not accommodate -- he could     06:36:51
not accommodate that.                                06:36:59

Q.  And did you ask him for the reason he            06:37:10
reached that conclusion?                             06:37:11

A.  At this point in time, I don't remember.         06:37:16
I would make an assumption that I did, but to        06:37:19
specifically state to you, I can't, because I        06:37:23
don't remember.                                      06:37:29

Q.  Do you have any recollection at all as to        06:37:30
the basis for those three factors that he            06:37:31
determined based upon those he couldn't              06:37:40
accommodate her?                                     06:37:42

MR. PAETKAU:  Objection.  Asked and                  06:37:47

# EXHIBIT O

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

MEGAN KELLY,

    Plaintiff,

vs.                   No.  C-07-3002 MMC

APPLERA CORPORATION and
DOES 1-20, inclusive,

    Defendants.

_____/

COPY

DEPOSITION OF GEORGE STEFAN LAZAR

VOLUME I

(Pages 1 to 249)

Taken before ERIN F. FERREYRA

CSR No. 12199

February 13, 2008



One Kaiser Plaza, Suite 505
Oakland, California 94612
510/451-1580   Fax 510/451-3797

Certified Shorthand Reporters

217

BY MS. McFADDEN:                                    06:45:23

Q.  Do you have any information at all about      06:45:32

what Mr. Laosiri did to reach his conclusion that  06:45:36

he couldn't accommodate Ms. Kelly?                 06:45:44

A.  No, I do not.                                 06:45:46

Q.  Did you ever make any effort to find out      06:45:47

what he did to reach his conclusion that he        06:45:50

couldn't accommodate her?                          06:45:54

A.  Not to my recollection.                       06:45:56

Q.  To your knowledge, did anybody at Applera     06:46:04

make any effort to find out what Jonathan Laosiri  06:46:08

did in reaching his conclusion that he couldn't    06:46:11

accommodate Ms. Kelly?                             06:46:14

A.  I'm not privy to any such information.         06:46:15

Q.  So have you told me about all the factors      06:46:50

that you're aware of that went into the            06:46:52

determination that Ms. Kelly could not be          06:46:56

accommodated as to the January 2006 work           06:47:01

restriction?                                       06:47:04

A.  I've stated all of the information that I      06:47:06

can remember that you asked about.                 06:47:09

MS. McFADDEN:  And that's a different          06:47:15

question, so I need to have my question answered.  06:47:15

Let's reread it one more time.                     06:47:18

(Record read.)                            06:47:20

# EXHIBIT P

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4                   ---oOo---

5   MEGAN KELLY,

6         Plaintiff,

7   vs.                          No.  C-07-3002 MMC

8   APPLERA CORPORATION and
    DOES 1-20, inclusive,
9
          Defendants.
10  _____/

11

12

13         DEPOSITION OF GEORGE STEFAN LAZAR

14                  VOLUME I

15             (Pages 1 to 249)

16

17

18        Taken before ERIN F. FERREYRA

19               CSR No. 12199

20             February 13, 2008

21

22

23

24              One Kaiser Plaza, Suite 505
                                    Oakland, California 94612
25                                  510/451-1580   Fax 510/451-3797

                                    Certified Shorthand Reporters

228

1  we're holding, the answer is yes.                    07:02:58
2       Q.  Do you have a recollection as to what it    07:03:00
3  is that you and Jamil discussed?                      07:03:02
4       A.  No recollection at all.                      07:03:04
5       Q.  Do you know whether you did have a           07:03:07
6  discussion with him other than that this paper        07:03:08
7  says so?                                              07:03:10
8       A.  If it says we did, we did.                   07:03:11
9       Q.  So the line we were just talking about,      07:03:15
10  "Stefan, per our discussion, please refer to this    07:03:17
11  inquiry, thanks, JS," did Jamil enter that line      07:03:19
12  into the system on this ticket?                       07:03:24
13      A.  Yes.                                          07:03:26
14      Q.  And the one that we read above that that     07:03:26
15  says LC, LC is a person who created that line and    07:03:28
16  entered into the system?                              07:03:33
17      A.  Correct.                                      07:03:34
18      Q.  So let's look at the next line, and it       07:03:36
19  says, "Notified employee that we could not meet      07:03:43
20  the necessary accommodations," and it's got your     07:03:46
21  name, Stefan, 1-30-06?                                07:03:48
22      A.  Correct.                                      07:03:51
23      Q.  And that means you entered that line?        07:03:52
24      A.  Yes.                                          07:03:54
25      Q.  And who notified the employee that we        07:03:54

229

1    could not meet the necessary accommodations?    07:03:58

2        A.  To the best of my recollection, I did.    07:04:01

3        Q.  When did you notify Ms. Kelly that Applera    07:04:04

4    could not meet her accommodations?    07:04:08

5        A.  It would have been 1-30.  That is the    07:04:14

6    reason it was dated that date.  1-30-06.    07:04:18

7        Q.  Do you have a practice of as soon as you    07:04:28

8    take an action, documenting it?  Is that why you    07:04:29

9    know it was the same day?    07:04:34

10       A.  Even if I do it a different day, if I    07:04:35

11   enter it in a different day, I will try to put the    07:04:37

12   date on whatever it happened, whatever the action    07:04:40

13   was taken, it's that date that I'll type on here.    07:04:46

14       Q.  I see.  So even if you didn't get around    07:04:50

15   to entering it into the system until the next day,    07:04:53

16   you would have put the previously if that's the    07:04:56

17   day you called her?    07:04:58

18       A.  Yes, that is correct.    07:04:59

19       Q.  So do you have a specific recollection of    07:05:00

20   telephoning Ms. Kelly and telling her the company    07:05:02

21   could not meet the necessary accommodations?    07:05:06

22       A.  I have a specific recollection of having    07:05:09

23   the telephone call conversation with her, yes.    07:05:14

24       Q.  And what did you tell her in that call?    07:05:19

25       A.  That based upon her restrictions and our    07:05:22

230

1    concern for both her safety and the employees,        07:05:27

2    other employees at the work site safety, we would      07:05:32

3    not be able to meet her restrictions, however, she     07:05:36

4    could remain out on leave, and that is the             07:05:39

5    accommodation we would be able to make.                07:05:42

6        Q.  You have a specific recollection of            07:05:57

7    telling -- of mentioning safety to her in this         07:05:58

8    call?                                                  07:06:01

9        MR. PAETKAU:  Objection.  Asked and               07:06:02

10   answered.                                              07:06:13

11       THE WITNESS:  I have a specific                   07:06:13

12   recollection of having the call and the                07:06:14

13   specific -- and remembering the specific points,       07:06:26

14   no.                                                    07:06:30

15   BY MS. McFADDEN:                                       07:06:30

16       Q.  So as you sit here today, you don't know       07:06:32

17   for sure whether or not you ever even used the         07:06:33

18   word safety; is that fair to say?                      07:06:36

19       A.  That's fair to say.                            07:06:39

20       Q.  All right.  And do you have a specific         07:06:41

21   recollection of telling her in the call that she       07:06:44

22   could stay out on leave, and that's the                07:06:49

23   accommodation the company was granting her?  Do        07:06:51

24   you specifically remember telling her that?            07:06:53

25       A.  I specifically remember having the call.       07:06:56

231

1   I don't specifically remember any of the items          07:07:01
2   which I would have -- information which I would          07:07:07
3   have conveyed to her other than the fact that we         07:07:10
4   could not meet the requested accommodation.              07:07:13
5       Q.  Okay.                                            07:07:19
6           MR. PAETKAU:  Were you finished with your        07:07:20
7   answer?                                                  07:07:22
8           THE WITNESS:  Yes.                               07:07:23
9   BY MS. McFADDEN:                                         07:07:23
10      Q.  How long was this telephone call with           07:07:24
11  Ms. Kelly?                                               07:07:25
12      A.  I believe it would have been relatively         07:07:26
13  short.  It may have been five minutes.  It could        07:07:28
14  have been ten minutes.  It would not have been a        07:07:34
15  lengthy conversation.                                    07:07:36
16      Q.  Did you tell her it wasn't worth it for         07:07:39
17  the company to bring her back?                           07:07:41
18      A.  Would you please ask the -- what was the        07:07:44
19  statement, please.                                       07:07:46
20      Q.  Did you tell Ms. Kelly that it wasn't           07:07:47
21  worth it for Applera to bring her back for 12           07:07:51
22  hours?                                                   07:07:55
23      A.  I never made that statement.                    07:07:55
24      Q.  Did you say anything similar to that?           07:07:57
25      A.  To my recollection, no.                         07:07:59

232

1    Q.  Have you told me everything at all that        07:08:02

2  you recall about what was said in the conversation  07:08:03

3  with Ms. Kelly by you?                              07:08:05

4    A.  To the best of my recollection, yes.          07:08:19

5    Q.  And what did Ms. Kelly say in the             07:08:21

6  telephone call?                                     07:08:23

7    A.  I have no specific memory of what she did     07:08:27

8  say.                                               07:08:31

9    Q.  Between the time of your second telephone     07:08:36

10  call with Jonathan Laosiri where he told you he     07:08:38

11  could not accommodate those restrictions and the   07:08:41

12  time that you made the phone call to Ms. Kelly,    07:08:43

13  how much time was there between those two events?  07:08:47

14    A.  It would have been relatively short.         07:08:57

15  Maybe a day or two, if even that.  I don't         07:09:00

16  specifically remember, but given the fact that I   07:09:07

17  said I did this on the 30th and it would have been 07:09:15

18  a week or a little more when we first knew, it had 07:09:23

19  to be within a day or two of the conversation.  It 07:09:31

20  could have been actually been the same day.        07:09:36

21    Q.  In between the time that you had the          07:09:39

22  second telephone conversation with Jonathan        07:09:44

23  Laosiri and the time that you telephoned           07:09:46

24  Ms. Kelly, did you do anything at all with respect 07:09:48

25  to reconsidering whether there was anything the    07:09:51