**EXHIBIT 2**

 **ESTIMATED FUNCTIONAL ABILITIES FORM**

The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843     Fax: 1-800-447-2498

0287500078017001

Please provide an estimate of your patient's functional ability. If for any reason you are having difficulty completing this form, please

contact **Michael Leding**     at **1-800-858-6843**

    claims owner

| Patient Name | Claim No. |
|---|---|
| Kelly, Megan L | 1718010 |

| Patient can Lift/carry | Never | Occasional 0-33% | Frequent 34-66% | Continuous 67-100% |
|---|---|---|---|---|
| 1-10 lbs. | | X | | |
| 11-20 lbs. | X | | | |
| 21-50 lbs. | X | | | |
| >50 lbs. | X | | | |

| Physical Activities | Never | Occasion 0-33% | Frequent 34-66% | Continuous 67-100% |
|---|---|---|---|---|
| Bend | | X | | |
| Kneel | X | | | |
| Crawl | X | | | |
| Climb Stairs | X | XXX XX | | |
| Reach above shoulder | | X | | |
| Push/Pull _1/2_ lbs. | | X | | |

**Use Hands**

| | Left | | Right | |
|---|---|---|---|---|
| | Y | N | Y | N |
| Simple Grasp | X | | X | |
| Fine Manipulation | X | | X | |
| Medium Dexterity | X | | | X |
| Power Grip | | X | | X |

Bimanual Dexterity     Y   N     Y   N

**Patient can use feet for repetitive movement for operating foot control**

| | Left | | Right | |
|---|---|---|---|---|
| | Y | N | Y | N |
| | X | | | X |

Is your estimated functional capacity based upon:
(A) Your patient's report
B) Measured capacity (e.g. exercise testing, pulmonary function testing, or a formal evaluation of physical capacity)
(C) Your clinical experience.

1099-02     (Please See Reverse Side)

Includes 2 Physicians Stmnts —
see next page



0287500078017702

Please comment on any additional medical and/or non-medical factors that impact your patient's functional ability, including any additional treatment or accommodation which might help improve your patient's ability to function.

*Pt's job requires handling dangerous chemicals and she is at risk for dropping these chemicals.*

**Current Functional Ability**

In an 8 hour workday, what is the maximum number of hours your patient could perform each of these levels of activity (please indicate appropriate number of hours):

**8** Hrs.   **Sedentary Activity**   10 lbs. maximum lifting or carrying articles. Walking/standing on occasion. Sitting 6/8 hours.

If you feel your patient needs to alternate activities more frequently than standard breaks (approximately every 2 hours), please provide frequency of breaks and your rationale.

____Hrs.   **Light Activity**   20 lbs. maximum lifting, carrying 10 lb. articles frequently, most jobs involving standing with a degree of pushing and pulling. Standing 6/8 hours.

____Hrs.   **Medium Activity**   50 lbs. maximum lifting with frequent lifting/carrying of up to 25 lbs. Frequent standing and walking.

____Hrs.   **Heavy Activity**   100 lbs. maximum lifting, frequent lifting/carrying of up to 50 lbs. Frequent standing and walking.

If you list hours in more than one category, we will assume your patient can perform the sum of those hours in a work day. If this is not your intent, please explain.

Given your knowledge of the medical factors impacting your patient's functional ability, at what point in time do you feel that there will be a significant change in functional ability. *postoperatively*

Having completed this form, if you would like to discuss your patient's functional abilities with the UnumProvident medical specialist working with your patient's disability claim, please contact **Michael Leding**
claims specialist

Date **10/12/06**   Physician Signature _____

Print Name *Andrew Haskell*

Phone Number *650 321-4121*

**Comments:**

1099-02

Claimant Name: Megan L Kelly    · Claim #:  1718010

Unum_0630

# EXHIBIT 3



1       UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3        SAN FRANCISCO DIVISION

4            ---oOo---

5   MEGAN KELLY,

6        Plaintiff,                    COPY

7   vs.                    No.  C-07-3002 MMC

8   APPLERA CORPORATION and
    DOES 1-20, inclusive,

9

10       Defendants.
    _____/

11

12

13      DEPOSITION OF GEORGE STEFAN LAZAR

14            VOLUME I

15         (Pages 1 to 249)

16

17

18      Taken before ERIN F. FERREYRA

19          CSR No. 12199

20        February 13, 2008

21

22

23

24

25





One Kaiser Plaza, Suite 505
Oakland, California 94612
510/451-1580   Fax 510/451-3797

Certified Shorthand Reporters



17

1    Q.  Excuse me.  I didn't mean to interrupt                00:15:58

2    you.                                                       00:16:02

3    A.  I can tell you generically speaking,                   00:16:02

4    month, year.  I can't necessarily tell you exact           00:16:05

5    dates.                                                     00:16:07

6    Q.  And we're going to explore your memory                 00:16:08

7    later.  All I want to know right now is what you           00:16:10

8    told her in the meeting and what she said in the           00:16:12

9    meeting in terms of those dates.                           00:16:14

10        So just tell me to the best of your                   00:16:16

11   recollection what was discussed in that meeting in         00:16:18

12   terms of the dates of leaving, returning, coming           00:16:20

13   back and returning again.                                  00:16:22

14   A.  As I remember it, we discussed the fact                00:16:24

15   that she left on her first leave in July of 2004.          00:16:27

16   She returned, I believe it was September, was back         00:16:40

17   to work for approximately one week, ten days, and          00:16:46

18   then went out on leave again in September of '04.          00:16:51

19   And she actually returned to work, I believe, as I         00:17:03

20   remember, in May of 2007.                                  00:17:08

21   Q.  Okay.  So other than the -- so have you                00:17:20

22   told me everything that you remember discussing            00:17:26

23   with Ms. Lawson with respect to the timing of the          00:17:28

24   case?                                                      00:17:30

25   A.  Yes.                                                   00:17:30

 1      A.  I don't specifically remember who it was.          03:31:26

 2  Obviously, we discussed it, but I don't remember           03:31:33

 3  who it was.                                                 03:31:40

 4      Q.  Do you know if you had a doctor's note             03:31:42

 5  specifying the work restrictions that you                   03:31:45

 6  described before the break at the time of the               03:31:48

 7  conversation with Mr. Laosiri in January of 2006?          03:31:50

 8      A.  I did not have one.                                03:31:55

 9      Q.  Do you know if Mr. Laosiri had a doctor's          03:31:58

10  note specifying work restrictions that you                  03:32:01

11  specified prior to the break?                               03:32:04

12      A.  To the best of my knowledge, I don't know          03:32:08

13  if he did or not.                                           03:32:10

14      Q.  Do you know whether anybody at Applera had         03:32:11

15  written documentation -- a written doctor's note            03:32:16

16  specifying restrictions that you explained for us           03:32:19

17  just before the break?                                      03:32:22

18      A.  To my knowledge, no, none has been                 03:32:23

19  received.                                                   03:32:26

20      Q.  So at the time of the January 2006                 03:32:35

21  telephone conversation with Mr. Laosiri, how did            03:32:39

22  you know what Ms. Kelly's restrictions are, the             03:32:42

23  ones you explained to us before the break?                  03:32:47

24      A.  Because she had given them in a phone call         03:32:48

25  to HR direct.                                               03:32:56

1       A.  I do not know.                                    03:45:02

2       Q.  What is the report, the annual report             03:45:08

3   you're referencing?                                       03:45:10

4       A.  It's the EEOC reports.  They're required,         03:45:11

5   I believe, every year.                                    03:45:19

6       Q.  Do you have any information at all about          03:45:44

7   communications between Jonathan Laosiri and my            03:45:46

8   client Megan Kelly between the time frame of              03:45:50

9   September 2004 and January 2006?  Actually, let's         03:45:53

10  make that the end of 2005, rather, so through             03:46:00

11  December of 2005.                                         03:46:04

12      A.  No.                                               03:46:05

13      Q.  So you have no information at all about           03:46:06

14  any communications between Jonathan Laosiri and my        03:46:07

15  client between September of 2004 and the end of           03:46:11

16  2005?                                                     03:46:15

17      A.  No.                                               03:46:17

18      Q.  Does anyone to your knowledge at Applera          03:46:19

19  have knowledge about the communications between           03:46:22

20  Jonathan Laosiri and my client Megan Kelly between        03:46:25

21  the time frame of September of 2004 through the           03:46:29

22  end of 2005?                                              03:46:31

23      MR. PAETKAU:  Objection.  Lacks                       03:46:33

24  foundation.  Calls for speculation.  Assumes facts        03:46:36

25  not in evidence.                                          03:46:38

1        You can answer.                                03:46:40

2        THE WITNESS:  To my knowledge, no.             03:46:44

3    BY MS. McFADDEN:                                   03:46:44

4        Q.  Do you have an understanding of what the   03:46:52

5    term "reasonable accommodation" means?             03:46:54

6        A.  Yes.                                        03:46:56

7        Q.  What's your understanding?                 03:46:58

8        MR. PAETKAU:  Objection to the extent it       03:46:59

9    calls for a legal conclusion.                      03:47:02

10       You can answer as to your lay                  03:47:05

11   understanding.                                     03:47:07

12       THE WITNESS:  That an employer has a           03:47:10

13   responsibility to make a reasonable accommodation  03:47:13

14   for an employee who may, in fact, have a medical   03:47:17

15   condition but would not necessarily be considered  03:47:22

16   a disabled person.                                 03:47:25

17   BY MS. McFADDEN:                                   03:47:25

18       Q.  Have you given me your complete            03:47:36

19   understanding as to what you understand reasonable 03:47:38

20   accommodation means?                               03:47:40

21       MR. PAETKAU:  Objection.  Calls for a          03:47:41

22   legal conclusion again.  Asked and answered.       03:47:44

23       THE WITNESS:  Ask the question again,          03:47:48

24   please.                                            03:47:49

25   BY MS. McFADDEN:                                   03:47:49

1      Q.  Sure.  Let me reask it.  I asked you for        03:47:51

2  your understanding, and you gave me an                03:47:54

3  explanation.  I want to make sure I've got your       03:47:55

4  complete understanding.  I wanted to see that you     03:47:58

5  didn't leave anything out.                            03:48:00

6          Have you told me everything that is your      03:48:02

7  understanding as to what reasonable accommodation     03:48:04

8  means?                                                03:48:05

9          MR. PAETKAU:  Let me just object.  The        03:48:06

10 question calls for a legal conclusion.  It's also     03:48:08

11 overbroad.  Vague and ambiguous.                      03:48:10

12         You can answer.                               03:48:15

13         THE WITNESS:  The other major portion of      03:48:18

14 that is that in making that a reasonable              03:48:21

15 accommodation, an employer is not required to do      03:48:24

16 anything which would cause undue hardship on the      03:48:29

17 employer.                                             03:48:32

18 BY MS. McFADDEN:                                      03:48:32

19     Q.  So do I now have your complete explanation   03:48:41

20 of what you understand that term to mean?             03:48:44

21         MR. PAETKAU:  Same objections.  The           03:48:45

22 questions call for a legal conclusion.  Vague and     03:48:47

23 ambiguous.  Overbroad.                                03:48:51

24         THE WITNESS:  What you have is the basics     03:48:53

25 of what I know, the basic premise of a reasonable     03:48:56

| | |
|---|---|
| 1 | accommodation. | 03:49:03 |
| 2 | BY MS. McFADDEN: | 03:49:03 |
| 3 |    Q.  And what is the basis of your | 03:49:05 |
| 4 | understanding?  You gave me an explanation as to | 03:49:11 |
| 5 | what you understand reasonable accommodation to | 03:49:13 |
| 6 | mean.  Where do you get that understanding from? | 03:49:15 |
| 7 |      MR. PAETKAU:  I just want to object to the | 03:49:17 |
| 8 | question as again calling for a legal conclusion | 03:49:19 |
| 9 | and attempting to invade the attorney-client | 03:49:22 |
| 10 | privilege, attorney work product. | 03:49:24 |
| 11 |      And if any part of your answer would | 03:49:25 |
| 12 | reveal confidential communications with an | 03:49:28 |
| 13 | attorney or attorneys, I would instruct you not to | 03:49:30 |
| 14 | include that in your answer. | 03:49:34 |
| 15 |      THE WITNESS:  It would be based upon | 03:49:39 |
| 16 | discussions I have had with my supervisor, my | 03:49:41 |
| 17 | peers, who have had a variety of experiences and a | 03:49:49 |
| 18 | variety of training that I have attended. | 03:49:53 |
| 19 | BY MS. McFADDEN: | 03:49:53 |
| 20 |    Q.  Do you have an understanding of what the | 03:50:00 |
| 21 | term "interactive process" means? | 03:50:01 |
| 22 |      MR. PAETKAU:  Objection.  Calls for a | 03:50:04 |
| 23 | legal conclusion.  Vague and ambiguous. | 03:50:07 |
| 24 |      THE WITNESS:  Yes. | 03:50:09 |
| 25 | BY MS. McFADDEN: | 03:50:09 |

1    Q.  What does it mean?                           03:50:11

2        MR. PAETKAU:  Same objections.  Legal        03:50:13

3   conclusion.  Vague and ambiguous.                 03:50:15

4        THE WITNESS:  The interactive process is a   03:50:19

5   requirement for the employer to engage with an    03:50:23

6   employee with a medical condition to see if they  03:50:29

7   can make a reasonable accommodation.              03:50:33

8   BY MS. McFADDEN:                                  03:50:33

9        Q.  And how did you come to have that        03:50:41

10  understanding as to what interactive process      03:50:43

11  means, leaving out any attorney-client privileged 03:50:45

12  information, of course?                            03:50:48

13       A.  As based upon conversations with my      03:50:49

14  supervisor, my peers, who have also had           03:50:51

15  circumstances regarding this type of action and   03:50:57

16  documents which I have read and seminars which I   03:51:00

17  have attended.                                     03:51:05

18       Q.  Do you have an understanding as to what  03:51:10

19  triggers the interactive process?                 03:51:11

20       MR. PAETKAU:  Objection.  Calls for a        03:51:13

21  legal conclusion.  Vague and ambiguous.           03:51:15

22  Overbroad.                                         03:51:17

23       You can answer.                               03:51:21

24       THE WITNESS:  It can be triggered in a       03:51:25

25  variety of ways, either upon the request of the   03:51:26

```
 1   employee or the start of -- or initiated by the        03:51:33
 2   employer, either one.                                  03:51:39
 3   BY MS. McFADDEN:                                       03:51:39
 4       Q.  Anything else?                                 03:51:46
 5           MR. PAETKAU:  Anything else?                   03:51:47
 6   BY MS. McFADDEN:                                       03:51:47
 7       Q.  Have you given me your complete                03:51:49
 8   explanation as to what triggers the interactive        03:51:51
 9   process?                                               03:51:55
10           MR. PAETKAU:  Objection.  Calls for a          03:51:55
11   legal conclusion.  Vague and ambiguous.  Overbroad     03:51:57
12   in this context.                                       03:51:59
13           You can answer.                                03:52:01
14           THE WITNESS:  To the best of my knowledge,     03:52:02
15   the answer is yes, I have.                             03:52:03
16   BY MS. McFADDEN:                                       03:52:03
17       Q.  Do you have an understanding as to what        03:52:07
18   the phrase or term "essential functions of the         03:52:10
19   job" means?                                            03:52:13
20           MR. PAETKAU:  Objection.  Calls for a          03:52:15
21   legal conclusion.  Vague and ambiguous.                03:52:17
22   Overbroad.                                             03:52:19
23           THE WITNESS:  Yes.                             03:52:21
24   BY MS. McFADDEN:                                       03:52:21
25       Q.  What does it mean?                             03:52:25
```

1      MR. PAETKAU:  Same objections.                    03:52:27

2      Can we have -- just so I don't have to            03:52:29

3  repeat them every time, questions with legal terms   03:52:32

4  such as reasonable accommodations, essential         03:52:36

5  functions of the job, could I have a running         03:52:42

6  objection?                                            03:52:44

7      MS. McFADDEN:  Yeah.  This is the last            03:52:47

8  one.                                                  03:52:48

9      THE WITNESS:  Could you ask the question          03:52:48

10  again, please.                                       03:52:51

11  BY MS. McFADDEN:                                     03:52:51

12    Q.  I believe you did have an understanding as     03:52:52

13  to what the term "essential functions of the job"    03:52:53

14  means.  So I want to get your understanding of       03:52:57

15  what that means.                                     03:52:59

16      MR. PAETKAU:  Same objections.  Legal            03:53:01

17  conclusion.  Overbroad.  Vague and ambiguous.        03:53:02

18      THE WITNESS:  Essential functions of the         03:53:04

19  job are exactly what it says.  What are the basic    03:53:05

20  functions of this job, not the things that may be    03:53:10

21  done 5 percent or 10 percent.  What are the major    03:53:14

22  functions of this job.                               03:53:17

23  BY MS. McFADDEN:                                     03:53:26

24    Q.  Is that your complete explanation of what      03:53:26

25  the term "essential functions of the job" is?        03:53:28

108

1      A.  Yes.                                              03:53:33

2      Q.  And where did you get that understanding          03:53:37

3  from?                                                     03:53:38

4      A.  It comes from conversations with my               03:53:38

5  supervisor, with my peers who have had cases in           03:53:40

6  looking at these situations and with documents            03:53:43

7  that I have read and seminars that I have                 03:53:46

8  attended.                                                 03:53:48

9      Q.  All right.  I want to go over briefly any         03:53:51

10 education and training you've received.  Let's            03:53:55

11 focus on specifically while you were at Applera           03:53:57

12 first, and I want to specifically focus on the            03:54:01

13 topic of disability discrimination and reasonable         03:54:03

14 accommodation.                                            03:54:07

15      So focusing on that topic only, I want to            03:54:07

16 hear about all the trainings you received at              03:54:10

17 Applera.  So let's start backwards in time, if we         03:54:11

18 can.                                                      03:54:14

19      When is the last training you've received            03:54:15

20 that you can recall where -- scratch that.  Let me        03:54:20

21 reask that question.                                      03:54:24

22      Going backwards in time from today, when             03:54:25

23 is the last time you received any training at             03:54:28

24 Applera regarding disability discrimination and           03:54:30

25 reasonable accommodation?                                 03:54:33

1    now.  Let's go back to the last question and the          06:11:18

2    answer, or there may not have been an answer.  I          06:11:20

3    don't remember.                                            06:11:24

4         THE WITNESS:  Could you read it back,                06:11:25

5    please.                                                    06:11:27

6         (Record read.)                                       06:11:28

7    BY MS. McFADDEN:                                           06:11:28

8    Q.  So let me just make sure I've got your                 06:11:47

9    answer clear.  So you're not sure whether or not          06:11:49

10   the ticket requested that you or Jamil do                  06:11:52

11   anything?                                                  06:11:55

12   A.  Without the ticket in front of me to see              06:11:55

13   it, I don't remember.                                      06:11:58

14   Q.  You're a higher level than Jamil, correct?            06:11:59

15   A.  Correct.                                               06:12:01

16   Q.  And when you received the ticket, you knew            06:12:02

17   what to do, correct?                                       06:12:05

18   A.  In most cases, I would know what to do.               06:12:06

19   Q.  When you received this ticket, did you                06:12:13

20   know what to do?                                           06:12:15

21   A.  I believe so, but again, without it in                06:12:16

22   front of me in the correct wording exactly what           06:12:19

23   was asked, I'm not sure.                                   06:12:23

24   Q.  Let's talk about what you did do.                     06:12:25

25   Actually, before we even do that, let's mark an           06:12:26

1  exhibit.  This will be No. 1.                          06:12:31

2        The court reporter is going to mark this,        06:12:34

3  and she'll give you a copy to review.  And if          06:12:35

4  you'll just look that over briefly and I'll ask        06:12:38

5  you a question about that.                             06:12:41

6        (Plaintiff's Exhibit No. 1 was marked for        06:12:42

7        Identification.)                                 06:12:59

8  BY MS. McFADDEN:                                       06:12:59

9     Q.  For the record, we're marking as Exhibit 1     06:13:05

10 a document that has -- it's marked Kelly 0295 on       06:13:10

11 the bottom.  It's Fremont Orthopedic Medical           06:13:15

12 Group, a note dated 1-20-06.                           06:13:21

13       Have you seen this before, what we've           06:13:24

14 marked as Exhibit 1?                                   06:13:26

15    A.  Yes.                                            06:13:30

16    Q.  When did you first see it?                      06:13:33

17    A.  To my recollection, two days ago.              06:13:34

18    Q.  Well, let's take a look at the                 06:13:38

19 restrictions on this note, and it says, "Return to    06:13:39

20 work three days a week, working four hours a day.      06:13:42

21 Should be able to sit down every hour for ten          06:13:46

22 minutes.  No lifting over 20 pounds."                  06:13:48

23       Are those the restrictions as you               06:13:50

24 understood Ms. Kelly to have in January of 2006?      06:13:52

25    A.  As I remember from what I saw on the           06:13:57

1   ticket, yes.                                              06:13:59

2       Q.  Let's talk now about what you did in              06:14:09

3   response to getting the ticket.  And by the way,          06:14:11

4   do you know how long after the ticket was                 06:14:14

5   generated did you receive it?                             06:14:16

6       A.  Without the ticket in front of me, I can't       06:14:20

7   tell you.                                                 06:14:23

8       Q.  What did you do in response to getting the        06:14:24

9   ticket?  I want to know everything you did.  I'd          06:14:26

10  like to go in order, but if you don't know in             06:14:30

11  order, just tell me the best you can what you             06:14:33

12  recall.                                                   06:14:34

13      MR. PAETKAU:  Objection.  Overbroad.                  06:14:36

14  Calls for a narrative.                                    06:14:37

15      You can answer.                                       06:14:38

16      THE WITNESS:  I remember having a                     06:14:41

17  conversation with Mr. Laosiri, with Jonathan              06:14:42

18  Laosiri.                                                  06:14:48

19  BY MS. McFADDEN:                                          06:14:48

20      Q.  And is that the conversation you told me          06:14:52

21  about this morning?                                       06:14:53

22      A.  Yes.                                              06:14:54

23      MR. PAETKAU:  If you ask a broad question             06:14:55

24  like that, Maureen, you have to let him answer.           06:14:59

25  BY MS. McFADDEN:                                          06:14:59

1       A.  Specifically ask her, I don't know.                    06:31:58

2       Q.  And do you know what happened to the                  06:32:00

3  referral to health services about the fitness for       06:32:03

4  duty exam?                                               06:32:05

5       A.  Yes.  It is my understanding that             06:32:06

6  Dr. Wharton, who was part of health services, who       06:32:16

7  was a contract vendor, part of the vending, part        06:32:22

8  of the vendor group, did review whatever files,         06:32:28

9  information they had.  But nothing -- it did not         06:32:34

10 go any further than that.                                06:32:41

11      Q.  Why didn't it go any further than that?         06:32:44

12      A.  At that time, because he was actually           06:32:48

13 working with Workers' Comp.  And so there was a          06:32:52

14 discussion about whether he should take on -- he         06:33:01

15 should do anything which was outside of Workers'         06:33:06

16 Comp.                                                    06:33:08

17      Q.  When you say he was working with Workers'       06:33:08

18 Comp, are you referring to Dr. Wharton?                 06:33:11

19      A.  Yes.                                            06:33:13

20      Q.  So is the reason it didn't go any further       06:33:14

21 because there wasn't a Workers' Comp claim filed?        06:33:17

22      A.  It was not -- the individual was not on         06:33:19

23 Workers' Comp.                                           06:33:23

24      Q.  So is that the reason --                        06:33:24

25      A.  Because remember she had now been out for       06:33:25

1  answered.                                              06:37:51

2          THE WITNESS:  I don't know.                    06:37:51

3  BY MS. McFADDEN:                                       06:37:51

4      Q.  So other than that safety was one of the       06:37:59

5  three factors that he told you was one of the          06:38:01

6  reasons he couldn't accommodate her, do you know       06:38:06

7  anything more at all other than safety was             06:38:08

8  mentioned?                                             06:38:10

9          MR. PAETKAU:  Objection.  Asked and            06:38:11

10 answered.  Misstates testimony.                        06:38:12

11         THE WITNESS:  I know that safety was the       06:38:14

12 prime reason.                                          06:38:16

13 BY MS. McFADDEN:                                       06:38:16

14     Q.  Did he tell you safety was the primary         06:38:17

15 reason?                                                06:38:19

16     A.  Yes.                                           06:38:19

17     Q.  What did he tell you with respect to           06:38:21

18 safety being the primary reason?                       06:38:22

19     A.  I don't remember.  I only remember that        06:38:23

20 among the issues, the various factors which we         06:38:27

21 have discussed, safety, the physical restrictions,     06:38:36

22 the time factor, that that was of critical             06:38:39

23 importance.                                            06:38:42

24     Q.  And have you told me everything that           06:38:44

25 you're aware of that he said with respect to           06:38:48

214

1   excuse me.  I can't do it because of the business.   06:41:36

2   It's not that I don't want the person because   06:41:40

3   they're too old or that I've had trouble with this   06:41:45

4   person before and they're just not -- for reasons   06:41:49

5   which are in most cases would probably be illegal.   06:41:52

6        I just have to be sure that he's making it   06:41:56

7   for the right reasons.  We are an at-will   06:41:59

8   employer.  So as long as he's making business   06:42:02

9   decisions that are not prohibited by law, then   06:42:05

10   that's fine.  And I need to be sure of that to the   06:42:10

11   best of my ability.   06:42:13

12        Q.  As we sit here today, do you have any   06:42:16

13   recollection specifically what you did to assure   06:42:19

14   yourself that he was making decisions with proper   06:42:22

15   business reasons?   06:42:26

16        A.  Specifically, no.   06:42:27

17        Q.  And as you sit here today, do you know   06:42:31

18   whether you ever reached a conclusion that he was   06:42:34

19   making his decisions for proper business reasons?   06:42:36

20        A.  Yes.   06:42:39

21        Q.  And the question was a "yes" or "no."  So   06:42:42

22   did you reach that decision?   06:42:45

23        A.  Yes.   06:42:46

24        Q.  So what was the -- was there a conclusion   06:42:50

25   to this call in terms of what the next step would   06:42:53

215

1    be?                                                        06:42:56

2        A.  The next step would be to provide her with 06:42:56

3    an accommodation, and that was to allow her to      06:43:00

4    continue to remain on leave with receiving her      06:43:05

5    benefits from Unum and receiving her full benefit   06:43:08

6    package at no cost to her.  That is an              06:43:12

7    accommodation.                                       06:43:15

8        Q.  And is that something that you and          06:43:28

9    Jonathan Laosiri discussed in the telephone call,   06:43:29

10   that that was going to be the next step?            06:43:32

11       A.  I don't remember.                           06:43:36

12       Q.  As you sit here today, you don't know       06:43:40

13   whether that was discussed at all?                  06:43:41

14          MR. PAETKAU:  With Mr. Laosiri in that       06:43:43

15   second telephone call?                              06:43:45

16   BY MS. McFADDEN:                                    06:43:45

17       Q.  Right, correct.                             06:43:46

18       A.  No, I do not remember.                      06:43:47

19       Q.  And do you remember ever having any         06:43:49

20   discussion with Mr. Laosiri about that?             06:43:51

21          MR. PAETKAU:  That being the reasonable      06:43:54

22   accommodation, the paid leave or the leave of       06:43:57

23   absence?                                             06:44:00

24   BY MS. McFADDEN:                                    06:44:00

25       Q.  Right.                                      06:44:01

```
 1    BY MS. McFADDEN:                                    06:45:23

 2        Q.  Do you have any information at all about    06:45:32

 3    what Mr. Laosiri did to reach his conclusion that   06:45:36

 4    he couldn't accommodate Ms. Kelly?                  06:45:44

 5        A.  No, I do not.                               06:45:46

 6        Q.  Did you ever make any effort to find out    06:45:47

 7    what he did to reach his conclusion that he         06:45:50

 8    couldn't accommodate her?                           06:45:54

 9        A.  Not to my recollection.                     06:45:56

10        Q.  To your knowledge, did anybody at Applera   06:46:04

11    make any effort to find out what Jonathan Laosiri   06:46:08

12    did in reaching his conclusion that he couldn't     06:46:11

13    accommodate Ms. Kelly?                              06:46:14

14        A.  I'm not privy to any such information.      06:46:15

15        Q.  So have you told me about all the factors   06:46:50

16    that you're aware of that went into the             06:46:52

17    determination that Ms. Kelly could not be           06:46:56

18    accommodated as to the January 2006 work            06:47:01

19    restriction?                                        06:47:04

20        A.  I've stated all of the information that I   06:47:06

21    can remember that you asked about.                  06:47:09

22        MS. McFADDEN:  And that's a different           06:47:15

23    question, so I need to have my question answered.   06:47:15

24    Let's reread it one more time.                      06:47:18

25        (Record read.)                                  06:47:20
```

228

1    we're holding, the answer is yes.                    07:02:58

2        Q.  Do you have a recollection as to what it    07:03:00

3    is that you and Jamil discussed?                     07:03:02

4        A.  No recollection at all.                      07:03:04

5        Q.  Do you know whether you did have a          07:03:07

6    discussion with him other than that this paper      07:03:08

7    says so?                                             07:03:10

8        A.  If it says we did, we did.                   07:03:11

9        Q.  So the line we were just talking about,     07:03:15

10   "Stefan, per our discussion, please refer to this   07:03:17

11   inquiry, thanks, JS," did Jamil enter that line     07:03:19

12   into the system on this ticket?                      07:03:24

13       A.  Yes.                                         07:03:26

14       Q.  And the one that we read above that that    07:03:26

15   says LC, LC is a person who created that line and   07:03:28

16   entered into the system?                             07:03:33

17       A.  Correct.                                     07:03:34

18       Q.  So let's look at the next line, and it      07:03:36

19   says, "Notified employee that we could not meet     07:03:43

20   the necessary accommodations," and it's got your    07:03:46

21   name, Stefan, 1-30-06?                               07:03:48

22       A.  Correct.                                     07:03:51

23       Q.  And that means you entered that line?       07:03:52

24       A.  Yes.                                         07:03:54

25       Q.  And who notified the employee that we       07:03:54

1    could not meet the necessary accommodations?        07:03:58

2        A.  To the best of my recollection, I did.        07:04:01

3        Q.  When did you notify Ms. Kelly that Applera    07:04:04

4    could not meet her accommodations?        07:04:08

5        A.  It would have been 1-30.  That is the        07:04:14

6    reason it was dated that date.  1-30-06.        07:04:18

7        Q.  Do you have a practice of as soon as you    07:04:28

8    take an action, documenting it?  Is that why you    07:04:29

9    know it was the same day?        07:04:34

10       A.  Even if I do it a different day, if I        07:04:35

11   enter it in a different day, I will try to put the   07:04:37

12   date on whatever it happened, whatever the action   07:04:40

13   was taken, it's that date that I'll type on here.    07:04:46

14       Q.  I see.  So even if you didn't get around    07:04:50

15   to entering it into the system until the next day,   07:04:53

16   you would have put the previously if that's the      07:04:56

17   day you called her?        07:04:58

18       A.  Yes, that is correct.        07:04:59

19       Q.  So do you have a specific recollection of   07:05:00

20   telephoning Ms. Kelly and telling her the company    07:05:02

21   could not meet the necessary accommodations?        07:05:06

22       A.  I have a specific recollection of having    07:05:09

23   the telephone call conversation with her, yes.       07:05:14

24       Q.  And what did you tell her in that call?     07:05:19

25       A.  That based upon her restrictions and our    07:05:22

1    concern for both her safety and the employees,                07:05:27

2    other employees at the work site safety, we would             07:05:32

3    not be able to meet her restrictions, however, she            07:05:36

4    could remain out on leave, and that is the                    07:05:39

5    accommodation we would be able to make.                       07:05:42

6        Q. You have a specific recollection of                    07:05:57

7    telling -- of mentioning safety to her in this                07:05:58

8    call?                                                         07:06:01

9            MR. PAETKAU:  Objection.  Asked and                   07:06:02

10   answered.                                                     07:06:13

11           THE WITNESS:  I have a specific                       07:06:13

12   recollection of having the call and the                       07:06:14

13   specific -- and remembering the specific points,             07:06:26

14   no.                                                           07:06:30

15   BY MS. McFADDEN:                                              07:06:30

16       Q. So as you sit here today, you don't know              07:06:32

17   for sure whether or not you ever even used the               07:06:33

18   word safety; is that fair to say?                            07:06:36

19       A. That's fair to say.                                    07:06:39

20       Q. All right.  And do you have a specific                07:06:41

21   recollection of telling her in the call that she            07:06:44

22   could stay out on leave, and that's the                      07:06:49

23   accommodation the company was granting her?  Do             07:06:51

24   you specifically remember telling her that?                  07:06:53

25       A. I specifically remember having the call.             07:06:56

231

1    I don't specifically remember any of the items          07:07:01

2    which I would have -- information which I would          07:07:07

3    have conveyed to her other than the fact that we          07:07:10

4    could not meet the requested accommodation.              07:07:13

5         Q.  Okay.                                            07:07:19

6         MR. PAETKAU:  Were you finished with your            07:07:20

7    answer?                                                   07:07:22

8         THE WITNESS:  Yes.                                   07:07:23

9    BY MS. McFADDEN:                                          07:07:23

10        Q.  How long was this telephone call with           07:07:24

11   Ms. Kelly?                                                07:07:25

12        A.  I believe it would have been relatively         07:07:26

13   short.  It may have been five minutes.  It could         07:07:28

14   have been ten minutes.  It would not have been a         07:07:34

15   lengthy conversation.                                     07:07:36

16        Q.  Did you tell her it wasn't worth it for         07:07:39

17   the company to bring her back?                            07:07:41

18        A.  Would you please ask the -- what was the        07:07:44

19   statement, please.                                        07:07:46

20        Q.  Did you tell Ms. Kelly that it wasn't           07:07:47

21   worth it for Applera to bring her back for 12            07:07:51

22   hours?                                                    07:07:55

23        A.  I never made that statement.                    07:07:55

24        Q.  Did you say anything similar to that?           07:07:57

25        A.  To my recollection, no.                         07:07:59

1  Q.  Have you told me everything at all that          07:08:02

2  you recall about what was said in the conversation   07:08:03

3  with Ms. Kelly by you?                               07:08:05

4  A.  To the best of my recollection, yes.            07:08:19

5  Q.  And what did Ms. Kelly say in the               07:08:21

6  telephone call?                                      07:08:23

7  A.  I have no specific memory of what she did       07:08:27

8  say.                                                 07:08:31

9  Q.  Between the time of your second telephone       07:08:36

10  call with Jonathan Laosiri where he told you he     07:08:38

11  could not accommodate those restrictions and the    07:08:41

12  time that you made the phone call to Ms. Kelly,     07:08:43

13  how much time was there between those two events?   07:08:47

14  A.  It would have been relatively short.            07:08:57

15  Maybe a day or two, if even that.  I don't          07:09:00

16  specifically remember, but given the fact that I    07:09:07

17  said I did this on the 30th and it would have been  07:09:15

18  a week or a little more when we first knew, it had  07:09:23

19  to be within a day or two of the conversation.  It  07:09:31

20  could have been actually been the same day.         07:09:36

21  Q.  In between the time that you had the            07:09:39

22  second telephone conversation with Jonathan         07:09:44

23  Laosiri and the time that you telephoned            07:09:46

24  Ms. Kelly, did you do anything at all with respect  07:09:48

25  to reconsidering whether there was anything the     07:09:51

233

1    company could do to accommodate Ms. Kelly's work    07:09:53

2    restrictions?    07:09:56

3        A.  We were accommodating her.  We were    07:09:57

4    providing her with a continued leave of absence    07:09:59

5    which at that point there was no requirement of    07:10:02

6    the law for us to do that.    07:10:05

7        Q.  Move to strike as nonresponsive and let me    07:10:07

8    ask the question again a little differently.    07:10:09

9            Between the time of the second call with    07:10:12

10   Mr. Laosiri and the time of the telephone call to    07:10:18

11   Ms. Kelly, did you do anything at all other than    07:10:23

12   anything you've already told me about to consider    07:10:31

13   potential accommodations for Ms. Kelly's work    07:10:35

14   restrictions?    07:10:37

15       A.  Yes.    07:10:38

16       Q.  What did you do during that time frame?    07:10:39

17       A.  I considered what accommodations were    07:10:42

18   possible.    07:10:45

19       Q.  What did you do with respect to    07:10:47

20   considering what accommodations were possible?    07:10:48

21   This is just in the time frame between your second    07:10:50

22   call with Mr. Laosiri and the telephone call you    07:10:53

23   made to Ms. Kelly.  So what did you do?    07:10:56

24       A.  I considered what her work restrictions    07:11:00

25   were, the safety issue and the factor of where she    07:11:02

234

1    worked, the work site and what would be possibly    07:11:12

2    available at that work site and any other options    07:11:16

3    which were the continued leave of absence.    07:11:24

4        Q.  What did you do with respect to    07:11:27

5    considering other jobs?    07:11:29

6        A.  Based upon what her restrictions were, I    07:11:31

7    did not see any other opportunities there because    07:11:36

8    of the limited work force.    07:11:40

9        Q.  When you say "because of the limited work    07:11:43

10    force," what does that mean?    07:11:45

11        A.  There are not that many employees out    07:11:48

12    there, out in Pleasanton comparatively speaking to    07:11:50

13    some of the other sites.    07:11:53

14        Q.  Did she have to stay in Pleasanton?  Did    07:11:54

15    you consider whether he might work at other work    07:11:57

16    sites for Applera?    07:12:00

17        A.  No.    07:12:01

18        Q.  Why not?    07:12:01

19        A.  Because it would be an undue hardship on    07:12:01

20    her to get there.    07:12:03

21        Q.  And tell me how you reached the conclusion    07:12:04

22    that it would be an undue hardship for her to get    07:12:07

23    to another location?    07:12:10

24        A.  Because given her physical restrictions,    07:12:11

25    it was difficult, it was my understanding it would    07:12:13

1    be difficult for her to get to work.  And she          07:12:15

2    indicated that it is still difficult for her to        07:12:18

3    get to work even today, since she's returned --        07:12:20

4        Q.  Did you ever ask her --                         07:12:25

5        A.  I haven't finished answering your              07:12:27

6    question.  The other would be, which was actually     07:12:32

7    the more important factor, was distance.  Any         07:12:34

8    other work site would be substantially further or     07:12:37

9    she would have to cross a bridge.  That's             07:12:44

10   unreasonable, and it would not have been              07:12:48

11   considered.  We would not consider that.              07:12:50

12       Q.  And but you never asked Ms. Kelly whether     07:12:53

13   going to a further work site further away would       07:13:02

14   have been a burden to her?                            07:13:05

15       A.  No.                                           07:13:06

16       Q.  Let's look at -- if we look at the --         07:13:16

17   let's look at the very bottom of Exhibit 2, under     07:13:19

18   "progress."  And then it says -- do you see that      07:13:21

19   where it says "time open, 7 days, 5 hours, 43         07:13:26

20   minutes"?                                             07:13:31

21       A.  Yes.                                           07:13:32

22       Q.  And then it says "closed on 1-31-2006."       07:13:35

23   Does that mean that it had been open for the week     07:13:42

24   prior to 1-31-2006?                                   07:13:44

25       A.  It may mean that, but it may not.  Without    07:13:46

249

1    STATE OF CALIFORNIA      )

2                             )

3    COUNTY OF ALAMEDA        )

4

5         I, ERIN F. FERREYRA, do hereby certify:

6         That GEORGE STEFAN LAZAR, in the foregoing

7    deposition named, was present and by me sworn as a

8    witness in the above-entitled action at the time

9    and place therein specified;

10        That said deposition was taken before me at

11   said time and place, and was taken down in

12   shorthand by me, a Certified Shorthand Reporter of

13   the State of California, and was thereafter

14   transcribed into typewriting, and that the

15   foregoing transcript constitutes a full, true and

16   correct report of said deposition and of the

17   proceedings that took place;

18        IN WITNESS WHEREOF, I have hereunder

19   subscribed my hand this 3rd day of March 2008.

20

21            *Erin Ferreyra*
         _____
22        ERIN F. FERREYRA, CSR NO. 12199
          State of California

23

24

25