**EXHIBIT 4**

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4                 ---oOo---

5   MEGAN KELLY,

6       Plaintiff,             COPY

7   vs.                No.  C-07-3002 MML

8   APPLERA CORPORATION,         (EMC)

9       Defendants.

10  _____/

11

12

13

14        DEPOSITION OF JONATHAN LAOSIRI

15

16

17

18

19       Taken before CAROL SCHILP

20          CSR No. 9648

21         April 8, 2008

22

23

24

25



One Kaiser Plaza, Suite 505
Oakland, California 94612
510/451-1580  Fax 510/451-3797

Certified Shorthand Reporters

25

1      A.  I don't remember.

2      Q.  Did you receive any training about sexual

3  harassment at any other companies you've worked for

4  since university?

5      A.  Yes.                                        10:25

6      Q.  What's the last sexual harassment training

7  you've had?

8      A.  At Affymetrix.

9      Q.  Do you have an understanding of what the

10 term reasonable accommodation means?                10:25

11     A.  Yes.

12     Q.  What's your understanding of what that

13 term means?

14     A.  Well --

15     MR. PAETKAU:  Objection to the extent it        10:25

16 calls for a legal conclusion.

17         You can answer if you understand.

18     THE WITNESS:  A reasonable accommodation

19 is, if I have a job that I could provide to someone

20 that -- you know, that could be comfortable at a     10:26

21 job, then I could -- then I will, you know, find a

22 job for them.  If they can't stand for too long, I

23 would make accommodation that they could sit down

24 maybe five minute or ten minute, whatever is

25 required.                                            10:26

26

1    BY MS. McFADDEN:

2        Q.  And you've just given me your

3    understanding of what the term reasonable

4    accommodation means.

5        Where did you get that understanding from,    10:26

6    that that's what it means?

7        A.  Just from my experience.

8        Q.  Do you have an understanding of what the

9    term interactive process means?

10       A.  No.                                       10:26

11       Q.  Have you ever heard the term interactive

12   process before?

13       A.  No.

14       Q.  Do you have an understanding of what the

15   phrase essential functions of a job means?        10:27

16       MR. PAETKAU:  Objection.  Vague and

17   ambiguous; lacks foundation; and to the extent it

18   calls for a legal conclusion.

19       You can answer if you understand it.

20       THE WITNESS:  Can you rephrase that?          10:27

21   BY MS. McFADDEN:

22       Q.  Have you ever heard the term essential

23   functions of a job?

24       A.  Yes.

25       Q.  Okay.  Do you have an understanding of    10:27

27

1    what that means?

2        A.  Yes.

3        Q.  What's your understanding?

4        A.  It's what is required to do a job.

5        Q.  And where did you get your understanding    10:27

6    that that's what essential functions means?

7        A.  From experience.

8        Q.  Do you have an understanding of the

9    process -- strike that.

10            I want to focus on the time period of     10:27

11   January 2006.  So while you were production

12   manager, that time frame.

13           During that time frame, do you have an

14   understanding of what process Applera Corporation

15   used to determine reasonable accommodations for    10:28

16   employees with disabilities?

17           MR. PAETKAU:  I want to object to that as

18   lacking foundation; also to the extent it calls for

19   legal conclusions.

20           You can answer it if you understand.        10:28

21           THE WITNESS:  Could you question that --

22   say the question again?

23   BY MS. McFADDEN:

24       Q.  Sure.  Let me try to ask that again.

25           During the last six months while you were   10:28



Aiken & Welch Court Reporters J. Laosiri 4/8/08

52

1    Q.  Okay.  While Ms. Kelly was out on the

2    leave of absence for the first injury to her ankle,

3    did you have any communications at all with her?

4    A.  Don't remember.

5    Q.  Okay.  Did you have any communications        10:58

6    with Ms. Kelly specifically about her return to

7    work after the initial leave of absence for the

8    original injury?

9    A.  No.

10   Q.  Okay.  When Ms. Kelly returned to work at      10:59

11   Applera after the first leave of absence for the

12   original injury, did she give you a doctor's note?

13   A.  No.

14   Q.  To your knowledge, when Ms. Kelly returned

15   to work at Applera after the first leave of absence  10:59

16   for the original injury to her ankle, did she have

17   any work restrictions?

18   A.  I don't remember.

19   Q.  Now, let me see if I can jog your memory

20   at all.                                             11:00

21       Have you ever -- any recollection of ever

22   hearing that when she returned to work after the

23   original injury, she needed to take breaks more

24   frequently than employees normally would?

25   A.  No.                                            11:00



53

1      Q.  Okay.  Ever hear anything or recall

2  hearing anything along the lines that she needed to

3  sit down more often than employees normally would?

4      A.  No.

5      Q.  Okay.  And so when you say "no," I want to        11:00

6  make sure, are you certain you never heard anything

7  like that, or you're just not recalling?

8          MR. PAETKAU:  Objection.  Asked and

9  answered.

10         THE WITNESS:  I can't recall.                     11:01

11  BY MS. McFADDEN:

12     Q.  Okay.  So if Ms. Kelly had come to you and

13  told you that she had work restrictions in terms

14  of -- well, any work restrictions, but with regard

15  to taking breaks or needing to sit down, would you    11:01

16  have documented that?

17         MR. PAETKAU:  Objection.  Incomplete

18  hypothetical; lacks foundation.

19         THE WITNESS:  Yes.

20  BY MS. McFADDEN:                                        11:01

21     Q.  Okay.  How would you have documented that?

22     A.  On email to myself.

23     Q.  So an email from yourself to yourself?

24     A.  Yes.

25     Q.  What would be the purpose of the email          11:01

54

1    from yourself --

2        A.   Well, not -- also to the lead.

3        Q.   To who?

4        A.   The lead.

5        Q.   Who was the lead?                              11:01

6        A.   The people that also help me oversee the

7    production operation.

8        Q.   Okay.  So during the 2004, 2005 time

9    frame, who were the leads?

10       A.   I don't remember.  I can't recall.  So       11:02

11   many.

12       Q.   Well, how many leads were there at one

13   time?

14       A.   Six.

15       Q.   So just to make sure that I'm                 11:02

16   understanding your testimony, you believe that if

17   Ms. Kelly had specifically told you about work

18   restrictions, you would have sent an email to

19   yourself and to the leads?

20       A.   Yes.                                          11:02

21       Q.   And as we sit here today, do you know

22   whether or not you did that?

23           MR. PAETKAU:  Objection.  Lacks

24   foundation.

25           THE WITNESS:  I don't remember.               11:02

55

BY MS. McFADDEN:

Q. And in terms of -- you said that if you had received restrictions from Ms. Kelly, you would have sent an email to yourself as well as these leads.                                                           11:03

Why would you have done that?

A. Just to let the lead knows that if there's any accommodation we need to make, they know, so they don't expect her to do more than what she can.

Q. Any reason you wouldn't have communicated   11:03 to HR?

A. Don't remember.

Q. Did somebody tell you that if an employee comes in with restrictions, that's what you should do, is send an email to yourself and leads?         11:04

A. No.

Q. When Ms. Kelly returned to work after being out on the first leave of absence, did you have any concern about her being reinjured?

A. Yes.                                          11:04

Q. What was your concern?

A. My concern was for her to come back and -- and reinjure herself again, and come with safety also for people that work around her.

Q. Okay. So this is just to make sure I've    11:04

70

```
 1          THE WITNESS:  No.
 2   BY MS. McFADDEN:
 3      Q.  So you think they're your personal
 4   property?
 5      A.  Yes.                                      11:31
 6      Q.  So after the reinjury, did Ms. Kelly go
 7   out on another leave of absence?
 8      A.  Yes, I think so.
 9      Q.  Well, when you think so, do you have any
10   doubt about that?                               11:31
11      A.  No.
12      Q.  Okay.  Do you know when she went out on
13   the second leave of absence for -- due to her
14   ankle?
15      A.  I don't remember.                        11:31
16      Q.  Did you have any communications at all
17   with Ms. Kelly prior to her going out on the second
18   leave of absence, other than what you've already
19   told me about?
20      A.  No.                                      11:32
21      Q.  Did you have any idea how long she was
22   going to be out for --
23      A.  No.
24      Q.  -- when she went out -- just let me
25   finish.  Let me finish the whole question.      11:32
```

71



1       When she went out on the second leave of

2   absence, at the time she went out, did you have any

3   idea how long she was going to be out?

4       A.  No.

5       Q.  Okay.  At the time of the reinjury, did          11:32

6   you have any discussions with anybody at Applera

7   about what had happened?

8       A.  Can you -- can you say that again?

9       Q.  Sure.  Let me break it down more

10  specifically.                                           11:33

11      In terms of the reinjury to Ms. Kelly's

12  ankle, did you have any discussions at the time it

13  happened with anybody at Applera about what had

14  happened?

15          MR. PAETKAU:  Objection.  Asked and             11:33

16  answered.

17          THE WITNESS:  I don't remember.

18  BY MS. McFADDEN:

19      Q.  Okay.  Does Applera have a special

20  division that's assigned to safety issues?             11:33

21      A.  Just a safety officer, who was Merte

22  Miles.

23      Q.  Okay.  And what division does Merte Miles

24  work for?

25      A.  I don't know.                                  11:33



78

1        Q.  Okay.  I want to talk about communications

2  between you and Ms. Kelly from when she went out on

3  the second leave of absence after the reinjury

4  through the end of 2005.  So let's focus on that

5  time frame.                               11:41

6        Do you have that in mind?

7        A.  No.

8        Q.  All right.  So this would be when she went

9  out on a leave of absence.  And I know you don't

10  recall the exact date, but we've been looking at     11:41

11  these papers, and I know you said that didn't

12  refresh your recollection.  But whatever date she

13  did go out for the reinjury through the end of

14  2005.  And I want to talk about any communications

15  you may have had with Ms. Kelly during that time     11:42

16  frame.

17        Do you recall any communications at all

18  with Ms. Kelly from when she went out on the leave

19  of absence for the reinjury and the end of 2005?

20        A.  Yes.                                11:42

21        Q.  Okay.  How many communications did you

22  have with Ms. Kelly during that time frame?

23        A.  One.

24        Q.  And was the one communication you had in

25  person, on the telephone?                    11:42



79

1    A.  Telephone.

2    Q.  And was this a conversation where you and

3   she actually spoke?

4    A.  Yes.

5    Q.  Okay.  About when was that conversation?    11:42

6    A.  I don't remember.

7    Q.  Okay.  But it was sometime between when

8   she went out on leave of absence and the end of

9   2005?

10    A.  I don't remember.    11:42

11    Q.  Okay.  So it could have been after the end

12   of 2005?

13    A.  Yes.

14    Q.  Okay.  All right.  Well, when she first --

15   when she went out on a leave of absence, was she    11:43

16   leaving you voicemails periodically?

17        MR. PAETKAU:  Objection.

18   BY MS. McFADDEN:

19    Q.  During that time frame of -- let's just

20   focus on the time frame of September 2004 through    11:43

21   the end of 2005.

22        Did Ms. Kelly leave you any voicemails on

23   your work voicemail during that time frame?

24    A.  I don't remember.

25    Q.  So as we sit here today, you don't    11:43

Aiken & Welch Court Reporters J. Laosiri 4/8/08

80

1   remember having received a single voicemail from

2   Ms. Kelly during that time frame?

3        A.  I may have.  I don't remember.

4        Q.  Do you remember returning any voicemails

5   that she left for you during the time frame of          11:44

6   September 2004 through the end of 2005?

7             MR. PAETKAU:  Objection.  That question

8   assumes facts not in evidence, and is therefore

9   argumentative; and lacks foundation.

10            THE WITNESS:  I don't remember.          11:44

11  BY MS. McFADDEN:

12       Q.  Okay.  Is there any reason that, if

13  Ms. Kelly left you a voicemail during the time

14  frame of September 2004 to the end of 2005, you

15  wouldn't have returned the call?          11:44

16       A.  No.

17       Q.  As we sit here today, have you heard that

18  Ms. Kelly had a complaint that she was leaving you

19  voicemails and you never returned her calls during

20  the time frame of September 2004 through the end of          11:44

21  2005?

22       A.  No.

23       Q.  Okay.  And just to make sure we have your

24  testimony today, as we sit here today, you just

25  don't remember one way or another whether or not          11:44

81

1    she left you voicemails during that time frame?

2        A.  Yes, I don't remember.

3        Q.  Okay.  So she may have?  She may not have?

4        A.  Yes.

5        Q.  When you received voicemails, did you          11:45

6    document who was calling you and what they were

7    calling you about?

8            MR. PAETKAU:  Objection.  Hopelessly

9    overbroad; vague and ambiguous.

10           MS. McFADDEN:  Well, let me work on that.     11:45

11   BY MS. McFADDEN:

12       Q.  Did you have a practice of, when you're

13   checking your voicemails, jotting down who was

14   calling, the time and date, what they were calling

15   about and so forth?                                   11:45

16       A.  I did --

17           MR. PAETKAU:  Objection.  Overbroad.

18           You can answer.

19           THE WITNESS:  I did, but not always.

20   BY MS. McFADDEN:                                      11:45

21       Q.  So sometimes you would jot that down, but

22   not always?

23       A.  Correct.

24       Q.  Well, how did you decide when you were

25   going to write it down and when you weren't?          11:45

84

1  in your daily notebook, would you have done

2  anything else?

3        MR. PAETKAU:  Objection.  Incomplete

4  hypothetical; lacks foundation; calls for

5  speculation.                                        11:48

6        THE WITNESS:  Well, it depends on what the

7  voicemail say.

8  BY MS. McFADDEN:

9     Q.  Okay.  Well, as to voicemails that just

10  updated you on her status in terms of "I visited my   11:48

11  doctor and I'm still out on leave of absence,"

12  something along those lines, "I'm still unable to

13  return to work," "I'm still out," something along

14  those lines, if you had received a message like

15  that, other than jotting it down in your notebook,   11:48

16  would you have communicated it to anybody in the

17  company?

18        MR. PAETKAU:  Objection.  That question

19  assumes facts not in evidence; it's argumentative;

20  lacks foundation; calls for speculation; and is an   11:48

21  incomplete hypothetical; and compound.

22        THE WITNESS:  No.

23  BY MS. McFADDEN:

24     Q.  Okay.  And what's the reason that you

25  would not have communicated that to anybody in the   11:48

85

1    company, that Ms. Kelly had left you such a

2    message?

3         MR. PAETKAU:  Objection.  Again,

4    argumentative; lacks foundation; calls for

5    speculation; incomplete hypothetical.                    11:49

6         THE WITNESS:  Could just be like "FYI,

7    this is my status."

8    BY MS. McFADDEN:

9         Q.  Okay.  But did you think that you had an

10   obligation to let people in HR know what was going      11:49

11   on with Ms. Kelly?

12        MR. PAETKAU:  Objection.  Assumes facts

13   not in evidence; lacks foundation; argumentative.

14        THE WITNESS:  I don't know.

15   BY MS. McFADDEN:                                         11:49

16        Q.  So other than voicemails and the one call

17   you referenced, which we're not sure was in that

18   time frame -- well, you said you're not sure about

19   voicemails, but you recall one telephone call, but

20   you're not sure whether it was before or after the     11:50

21   end of 2005.

22        Other than that one call and voicemails,

23   which you're not sure about whether or not there

24   were, any other kind of communications you had with

25   Ms. Kelly during the time frame of September '04       11:50



Aiken & Welch Court Reporters J. Laosiri 4/8/08

86

1   through the end of 2005?  So that would be written

2   communications, letters, emails and so forth.

3       A.  I don't remember.

4       Q.  Okay.  Do you remember receiving any

5   emails at all from Ms. Kelly during the time frame        11:50

6   of September 2004 and the end of 2005?

7       A.  I don't remember.

8       Q.  During the time frame of September '04

9   through the end of 2005, did anybody at Applera

10  talk to you about Ms. Kelly's status?                      11:51

11      A.  I don't remember.

12      Q.  Do you have any knowledge about

13  Ms. Kelly's physical condition in terms of her

14  ankle during the time frame of September 2004

15  through the end of 2005?                                   11:51

16      A.  I do, but again, I don't know is it early

17  2006 or is it 2005.  I don't know the time line.

18  But I know about her conditions.  I spoke to her on

19  the phone.

20      Q.  Okay.  Well, we'll talk about that phone      11:51

21  call in a little bit.  But let's talk about prior

22  to that first.

23          So the reinjury was in 2004, correct?  And

24  I know you don't know the exact date, but -- well,

25  it was in 2004.  You know that?                           11:51

87

1      A.  Yes.

2      Q.  Okay.  All right.  Did you have any

3  information -- let's just focus on the time frame

4  of September 2004 through mid 2005.

5          Did you have any information about how she     11:52

6  was doing, whether her condition was improving and

7  so forth?

8      A.  I don't remember.

9      Q.  Okay.  So at some point, did you come to

10  learn that Ms. Kelly wanted to return to work at     11:53

11  Applera after having been out on a leave of absence

12  for the reinjury?

13      A.  Yes.

14      Q.  Okay.  And when is it that you first came

15  to learn that Ms. Kelly wanted to come back to     11:53

16  Applera after having been out on a leave of absence

17  for her reinjury?

18      A.  I spoke to her on the phone.

19      Q.  Okay.  So speaking to her on the phone is

20  the very first you ever heard anything about     11:53

21  Ms. Kelly wanting to return to work after having

22  been out on a leave of absence for her reinjury?

23      A.  Yes.

24      Q.  All right.  So when was this telephone

25  conversation?     11:53

88

1      A.  Oh, I don't remember.

2      Q.  Can you give me an estimate?

3      A.  No.

4      Q.  Can you say whether it was January 2006?

5      A.  I can't remember.                                    11:53

6      Q.  Was it between December 2005 and February

7  of 2006?

8      A.  Could be.

9      Q.  Okay.  Who initiated the call?

10     A.  She left me a voicemail, and I called her      11:54

11  back.

12     Q.  Okay.  Did you call her back the same day?

13     A.  I don't remember.

14     Q.  So you're not sure if you called her back

15  the same day?                                              11:54

16     A.  No, I don't remember.

17     Q.  What did the voicemail to you say?

18     A.  I don't remember.

19     Q.  You have no idea what it said?

20         MR. PAETKAU:  No, he doesn't remember.         11:54

21  BY MS. McFADDEN:

22     Q.  You don't remember anything at all about

23  it?

24     A.  Yeah, I don't remember.  The voicemail she

25  left me, I don't remember what the voicemail say.    11:54

89

1      Q.  Okay.  And I'm not looking for anything

2  exact.  You know, it's a long time ago and so

3  forth.  But I just want to know if you recall

4  anything at all about what she -- what the

5  voicemail said.                                    11:55

6      A.  No.

7      Q.  Okay.

8      A.  But -- but I call her back.  Must be

9  something in there that's pretty important.

10     Q.  Okay.  And you said you're not sure when   11:55

11  you called her back.

12         Was it within at least a couple of days

13  when she left you the voicemail?

14     A.  God, I don't remember.

15     Q.  Okay.  And in between the time she left    11:55

16  you the voicemail and the time you called her back,

17  did you have any discussions with anybody else at

18  Applera about Ms. Kelly?

19     A.  I did, but I don't know if it's before I

20  call her back or -- you know what, I did, after I   11:55

21  spoke to her on the phone.

22     Q.  Okay.  So right now I just want to focus

23  on before you spoke with her on the phone.

24         Do you have any recollection of -- in

25  between the time she left you the voicemail and the 11:55



Aiken & Welch Court Reporters J. Laosiri 4/8/08

1    time you called her, any recollection of talking to

2    anybody at Applera about Ms. Kelly?

3        A.  Don't remember.

4        Q.  Okay.  All right.  So the conversation

5    that you had with her, you initiated that call,          11:55

6    right?

7        A.  She left me a voicemail, and I call back.

8        Q.  Okay.  Was it just you and she

9    participating in this conversation?

10       A.  Yes.                                              11:56

11       Q.  How long was the conversation?

12       A.  I don't remember.

13       Q.  Okay.  Can you give me an estimate?  Less

14   than five minutes?

15       A.  Between five and ten minutes.                     11:56

16       Q.  Five to ten minutes.

17           So tell me everything that you recall

18   saying during the conversation.

19       A.  I call her back, probably asking how she's

20   doing and I got her message, and try to get -- you       11:56

21   know, "What is the status of your injury?"

22           And then she goes and tell me that -- she

23   told me that she has been released by the doctor,

24   but she still could not walk or drive on her own.

25           So I told her, "Well, I'll contact the           11:57

91

1  safety people and will have them get back to you."

2      Q.  Do you specifically remember her saying

3  those exact words, she could not walk --

4      A.  Yes.

5      Q.  -- or drive?                                    11:57

6      A.  Yes.

7          MR. PAETKAU:  You have to wait again.  I

8  know we're kind of in conversation mode, but so the

9  court reporter can make a clean record.

10         MS. McFADDEN:  Okay.                             11:57

11 BY MS. McFADDEN:

12     Q.  So you're certain she said she could not

13 walk at all?

14     A.  Yes.

15     Q.  Okay.  What else did Megan tell you?          11:57

16     A.  That her doctor released her.

17     Q.  What did she tell you about the doctor's

18 release?

19     A.  Say that again.

20     Q.  Well, what is it she told you in terms of      11:57

21 the doctor's release?

22     A.  That's it.  She told me she's been

23 released by the doctor.

24     Q.  She didn't tell you what the restrictions

25 were that the doctor gave her?                          11:58

92

1    A.  No.

2    Q.  Did you ask her what they were?

3    A.  No.

4    Q.  Why didn't you ask her what they were?

5    A.  Because she told me she could not drive,    11:58

6    could not walk.  So basically, to me is, you know,

7    I need to consult an expert, the safety people, you

8    know, to evaluate what -- can we or can we not

9    accommodate her.

10    Q.  Did she tell you anything about her doctor    11:58

11    limiting the number of hours she could work, during

12    that phone call?

13    A.  I don't remember.

14    Q.  Did she tell you anything in that phone

15    call about any other physical limitations on her    11:58

16    work?

17    A.  No, just besides she can't walk or she

18    can't drive.

19    Q.  Did she say anything about she needed to

20    sit down every hour for ten minutes?    11:58

21    A.  No.

22    Q.  Did she tell you anything that she

23    couldn't lift over 20 pounds?

24    A.  I don't remember.

25    Q.  Is it possible she said those things and    11:59



93

1   you're just not remembering?

2      A.   Could be.

3      Q.   Anything else you remember Ms. Kelly

4   telling you during this telephone call?

5      A.   No.                                          11:59

6      Q.   Did you ask her for any additional

7   information?

8      A.   No.

9      Q.   Okay.  So you've told me now everything

10  you remember Ms. Kelly saying during this phone     11:59

11  call?

12     A.   I think so.

13     Q.   Okay.  And anything else you remember

14  telling Ms. Kelly during this phone call other than

15  what you've already told me about?                  11:59

16     A.   No.

17     Q.   No.  Okay.  So I've got the complete

18  conversation, to your recollection?

19     A.   I think, from what I remember.

20     Q.   Okay.  So what's the first thing you did   11:59

21  after having this telephone call with Ms. Kelly?

22     A.   I emailed -- I think it's Merte -- about

23  the situation, what I learned from talking to

24  Megan.  And I also -- I think that I also had told

25  her my concerns of having, you know, someone in     12:00

94

1    that condition come in and work, because it becomes

2    a safety issue because we are dealing with

3    flammable materials.

4        Q.  Okay.  So when you say you told Merte, did

5    you -- you said you first -- when I asked you                12:01

6    what's the first thing you did, you said you

7    emailed Merte.

8        A.  Yes.

9        Q.  Then you gave some testimony about you

10   told Merte.                                                   12:01

11       A.  In the email.

12       Q.  Okay.  So when you say "told," you mean

13   you told her in the email?

14       A.  Correct.

15       Q.  Did you send this email to Merte the same         12:01

16   day you had this conversation with Ms. Kelly?

17       A.  I don't remember.

18       Q.  Was it within a day or two of the

19   conversation with Ms. Kelly?

20       A.  Probably, because it's pretty important.         12:01

21       MS. McFADDEN:  Okay.  We'll mark this next

22   in order.  This will be Exhibit 4.

23       The court reporter will mark this and give

24   you a copy to look at.

25       (Plaintiff's Exhibit No. 4 marked for

98

1    Q.  Okay.  All right.  Well, let's look at

2  this again.

3        And do you believe this to be accurate?

4  Is that the email you sent?

5    A.  Yeah.                                        12:08

6    Q.  Okay.  So the email says that you spoke to

7  her this morning.  Per the doctor's request, she

8  was released to work only 12 hours a week.

9        So now that you've read this email, does

10  that refresh your recollection that, in your call    12:08

11  with Ms. Kelly, she told you she could return 12

12  hours a week?

13    A.  I don't remember, but must be.

14    Q.  Okay.  And as you're looking at this

15  email, does that refresh your recollection about     12:08

16  anything else Ms. Kelly told you during that

17  telephone call?

18    A.  No.

19    Q.  Okay.  And looking at the email, it says

20  "I received a call from Megan Kelly today."          12:08

21        So looking at the email date of 1/24/06,

22  does that refresh your recollection that the call

23  with Ms. Kelly was on January 24th?

24    A.  Yeah.

25    Q.  Okay.  And that's the only call you've had   12:08

99

1   with Ms. Kelly?

2        A.  Yes.

3        Q.  Okay.  All right.  So let's look at the

4   last line of this email.  It says "She spoke with

5   someone in HR Direct, and I'm waiting to hear from          12:09

6   them."

7        Okay.  And the "she" is referring to

8   Ms. Kelly, right, in that last sentence?

9        A.  Yes.

10       Q.  Okay.  So during the telephone               12:09

11  conversation with Ms. Kelly, did she tell you about

12  having spoken to somebody in HR Direct?

13       A.  She must have; otherwise, I wouldn't have

14  write it down.

15       Q.  And as we sit here today, any               12:09

16  recollection, now that you're looking at this

17  email, about what she told you in terms of talking

18  to somebody in HR Direct?

19       A.  I don't remember.

20       Q.  Okay.                                         12:09

21       MR. PAETKAU:  I think she's asking if this

22  refreshes your memory.

23       THE WITNESS:  No.

24  BY MS. McFADDEN:

25       Q.  Okay.  Well, you wouldn't have put it down   12:09

144

1    STATE OF CALIFORNIA    )

2                          )

3    COUNTY OF ALAMEDA      )

4

5        I, CAROL SCHILP, do hereby certify:

6        That JONATHAN LAOSIRI, in the foregoing

7    deposition named, was present and by me sworn as a

8    witness in the above-entitled action at the time

9    and place therein specified;

10       That said deposition was taken before me at

11   said time and place, and was taken down in

12   shorthand by me, a Certified Shorthand Reporter of

13   the State of California, and was thereafter

14   transcribed into typewriting, and that the

15   foregoing transcript constitutes a full, true and

16   correct report of said deposition and of the

17   proceedings that took place;

18       IN WITNESS WHEREOF, I have hereunder

19   subscribed my hand this 21st day of April 2008.

20

21

22

23       _____
         CAROL SCHILP, CSR No. 9648
24       State of California

25

Aiken & Welch Court Reporters J. Laosiri 4/8/08

**EXHIBIT 5**

**Applera**
Corporation

850 Lincoln Centre Drive
Foster City, CA
94404 USA

October 30, 2006

Megan Kelly
2009 McGee, No. 2
Berkeley, CA 94703

Dear Ms. Kelly,

Our records indicate that your last day at work with Applied Biosystems was September 21, 2004. On September 22, 2004 you were placed on a Leave of Absence.

On January 3, 2007 you will have exhausted all available leave of absence time and it is our intention to process a termination effective that date.

Beginning February 1, 2007, you will be eligible to continue insurance coverage under COBRA. You will receive a packet in the mail explaining your continuation options along with COBRA enrollment instructions and forms.

Please contact HR Direct at (866) 654-3411 if you have any questions.

Sincerely,

Stefan Lazar
Employee Relations Mgr.
Applera Corporation

**KELLY 0185**



EXHIBIT
13

# EXHIBIT 6

# LAW OFFICES OF MAUREEN E. MCFADDEN

819 Bancroft Way
Berkeley, CA 94710
www.mcfaddenlaw.net

December 22, 2006

Ph (510) 845-5203
Fax (510) 868-0976
maureen@mcfaddenlaw.net

**VIA FEDERAL EXPRESS**

Administrator/HR Client Services
Applied Biosystems/Applera Corporation
850 Lincoln Centre Drive
Foster City, CA 94404

        Re:    *Megan Kelly/Applied Biosystems*

To Whom It May Concern:

    Please be advised that this office represents Megan Kelly as to her employment-related claims against Applied Biosystems, and direct all future communications to my attention. Enclosed is a request for Ms. Kelly's personnel file and related documents. Please forward these documents to me at your earliest opportunity.

    Our demand letter will follow shortly.

                Very Truly Yours,

                LAW OFFICES OF MAUREEN E. MCFADDEN

                Maureen E. McFadden

Encl.

cc.    Client

KELLY 0190

Pursuant to Labor Code § § 432 and 1198.5, I hereby request a copy of the following documents:

- My personnel file
- Any other documents pertaining to my performance.
- Any other documents I signed at any time relating to my employment with Applied Biosystems.

Please direct these documents to the attention of my attorney:

MAUREEN E. McFADDEN
LAW OFFICES OF MAUREEN E. McFADDEN
819 Bancroft Way
Berkeley, CA 94710
Ph (510) 845-5203
Fax (510) 868-0976

_____          _____
Megan Kelly                                Date

KELLY 0191

# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

MEGAN KELLY,                )

                             )

           Plaintiff,  )

                             )

       vs.             ) No. C-07-3002 MMC

                             )

APPLERA CORPORATION,     )

                             )      **CERTIFIED COPY**

          Defendant.  )

_____)

DEPOSITION OF

ANDREW HASKELL, M.D.

PALO ALTO, CALIFORNIA

MAY 30, 2008

REPORTED BY: JANE H. STULLER, CSR NO. 7223, RPR

(409740)

**M E R R I L L   L E G A L   S O L U T I O N S**

135 Main Street, 4th Floor           415.357.4300 Tel

www.merrillcorp.com/law  San Francisco, CA 94105

ANDREW HASKELL, M.D.   May 30, 2008

1      Q.  Okay.  Have you reviewed any documents in

2   preparation for this deposition?

3      A.  I reviewed my clinic notes.

4      Q.  Okay.  And do you have those with you here

5   today?

6      A.  I do.

7      Q.  Okay.  Did you speak with anyone about this

8   deposition today?

9      A.  No.

10     Q.  Have you spoken with Ms. McFadden about this

11  deposition?

12     A.  No.

13     Q.  Okay.  Have you spoken with Ms. Kelly recently?

14     A.  No.

15     Q.  When was it the last time?  Was it your last --

16     A.  My last clinic visit.

17     Q.  -- office visit?

18         Okay.  I'm going to be showing you the records

19  that your office produced in response to a subpoena from

20  my office.  And these are numbered, Dr. Haskell,

21  starting with No. 1 through about 147.

22         Do you recognize these documents in this

23  format?

24     A.  They look like our clinic notes.

25     Q.  Okay.  How are these notes created?

8

ANDREW HASKELL, M.D.    May 30, 2008

1          Do you dictate them verbally and then someone

2   types them?

3       A.   Typically I dictate them verbally, and someone

4   types them.   Occasionally we will type them in

5   ourselves.

6       Q.   Okay.   And if you dictate them verbally,

7   typically how long -- within how much times does

8   somebody type them?

9       A.   Typically within a week.

10       Q.   Okay.   And who typically types them?

11       A.   A service provided to us.   I don't know who

12   that person is.

13       Q.   Okay.   And is it your belief that everything

14   that's typed up in these records is true and correct?

15       A.   I believe so.

16       Q.   How did Ms. Kelly come to be in your care?   Did

17   someone refer her?

18       A.   I'm not sure --

19       Q.   Okay.

20       A.   -- how she came to see me.

21       Q.   Okay.

22       A.   Perhaps -- I sent my first note to another

23·  doctor in the clinic -- Barry Rose.   It may be that he

24   sent them, but I can't be sure.

25       Q.   Okay.   Are you aware that Ms. Kelly, through

9

```
 1                CERTIFICATE OF REPORTER

 2

 3        I, JANE H. STULLER, a Certified Shorthand Reporter,

 4   hereby certify that the witness in the foregoing

 5   deposition was by me duly sworn to tell the truth, the

 6   whole truth and nothing but the truth in the

 7   within-titled cause;

 8        That said deposition was taken down in shorthand by

 9   me, a disinterested person, at the time and place

10   therein stated, and that the testimomy of said witness

11   was therefore reduced to typewriting, by computer, under

12   my direction and supervision;

13        That before completion of the deposition, review of

14   the transcript [   ] was [X] was not requested.  If

15   requested, any changes made by the deponent (and

16   provided to the reporter) during the period allowed was

17   appended hereto.

18        I further certify that I am not of counsel or

19   attorney for either or any of the parties to the said

20   deposition, nor in any way interested in the event of

21   this cause, and that I am not related to any of the

22   parties thereto.

23        DATED June 9, 2008.

24        _____

25        JANE H. STULLER, CSR 7223, RPR
```

# EXHIBIT 8

Feb 14 07 11:53a     Alyna                    510 845 7636              p.1

 *Palo Alto Medical Foundation*

A Sutter Health Affiliate                **Fremont Center**        3200 Kearney Street
Fremont, CA 94538
(510) 490-1222
www.pamf.org

February 13, 2007

To Whom It May Concern:

Megan Kelly has been under my care regarding her bilateral wrist injuries and is able to return to work on 2/15/07. She will need to work with her wrist splints on and will need to avoid heavy lifting of 5 lbs or more.

Remarks: Bilateral TFCC tears, wrists.

Sincerely,

Josef Maier MSPA-C.

**EXHIBIT 9**

# LAW OFFICES OF MAUREEN E. MCFADDEN

· 819 Bancroft Way
Berkeley, CA 94710
www.mcfaddenlaw.net

February 23, 2007

Ph (510) 845-5203
Fax (510) 868-0976
maureen@mcfaddenlaw.net

<u>VIA FEDERAL EXPRESS</u>

Veronica Jones
Senior Manager, Employee Relations
Applied Biosystems
850 Lincoln Centre Drive
Foster City, CA 94404

Re:    <u>Megan Kelly v. Applied Biosystems</u>

Dear Ms. Jones:

This letter is written pursuant to Evidence Code § 1152, in an effort to settle Megan Kelly's employment-related claims against Applied Biosystems.

Ms. Kelly commenced employment as an Associate Production Chemist with Applied Biosystems in February 2002. Her performance was excellent. She received strong reviews, and agreeably worked the long hours often demanded. Throughout her time with Applied Biosystems, Ms. Kelly was a valued employee.

On July 6, 2004, Ms. Kelly tripped and sprained her ankle. After a short medical leave and a course of physical therapy, Ms. Kelly was released to return to work in September 2004. As part of her release to work, Ms. Kelly was supposed to be able to sit down whenever she needed to. However, Applied Biosystems was extraordinarily busy during this timeframe, and short-handed. Ms. Kelly, who generally worked alone, was pressured to get orders done quickly. As a result, she was seldom able to sit down.

On September 21, 2004, while moving about extensively and attending to multiple tasks at the same time, Ms. Kelly re-injured her right ankle. Emergency room physicians diagnosed Ms. Kelly with another ankle sprain, and she was again taken off of work. The re-injury was quite serious, in that Ms. Kelly's ankle did not heal well, and she continued to experience serious instability in her right ankle. Several subsequent falls have further aggravated the injury, and Ms. Kelly has also sustained wrist injuries in those falls.

Ms. Kelly has been under the care of numerous physicians while out on leave from Applied Biosystems. Throughout her leave, Ms. Kelly regularly left telephone messages with her immediate supervisor, Jonathon Laosiri, regarding her status and the progress of her recovery. Ms. Kelly also faxed doctor's notes to Applied Biosystems, to Mr. Laosiri's attention. Neither Mr. Laosiri nor anyone else from Applied Biosystems ever responded to Ms. Kelly's telephone messages, or communicated with her in any manner regarding her continued leave.

In January 2006, Ms. Kelly's physicians determined that she was well enough to return to work, albeit with restrictions as the to number of hours she could work, a restriction on lifting any more than 20 lbs, and a requirement that she sit down every hour for at least 10 minutes. Ms. Kelly provided

–2–                                    February 23, 2007

Applied Biosystems with a doctor's note authorizing her to work, and specifying these restrictions. Ms. Kelly's supervisor, Jonathon Laosiri, continued to fail to respond to her. Ms. Kelly then called Applied Biosystem's HR department directly, and again explained that she was authorized to return back to work, and the nature of her work restrictions. Applied Biosystems made no effort to get Ms. Kelly back to work. Instead, the company summarily informed Ms. Kelly that she could not return to work unless she either had no restrictions at all and/or could work at least 20 hours per week.

Applied Biosystem's above-described conduct is in clear violation of California law. Ms. Kelly's ankle condition constitutes a "physical disability" within the meaning of the Fair Employment and Housing Act, in that it is a physiological condition that limits (i.e. makes more difficult) her achievement of the major life activity of work. Govt. Code § 12926(k). As such, Ms. Kelly is entitled to all the protections afforded under the law for individuals with disabilities. In particular, when an employee with a known physical disability requests accommodation, the employer is then obligated to engage in a timely good faith "interactive process." Govt. Code § 12940(n). Ms. Kelly's presentation of the January 2006 doctor's note to Applied Biosystems triggered its obligation to engage in the interactive process with her.

The "interactive process" refers to the back and forth dialogue and exchange of information between an employer and employee that is needed to determine what type of accommodation will aid an employee. As one court has explained of the interactive process: "Employers should meet with the employee who requests accommodation, request information about the condition and what limitations the employee has, ask what he or she specifically wants, and offer and discuss available alternatives when the request is burdensome." Taylor v. Phoenixville School Dist., 184 F.3d at 317. Because Applied Biosystems summarily dismissed Ms. Kelly's January 2006 request for accommodation, without making any effort whatsoever to analyze her work restrictions, or to explore options that would have enabled her to return to work, it will be held liable on a claim for failure to engage in the interactive process. See Claudio v. Regents of the University of California (2005) 134 Cal.App.4th 224.

Applied Biosystems will also be held liable on a separate claim for failure to accommodate, pursuant to Govt. Code § 12940(m). Employers have an affirmative duty to accommodate disabled workers. Ms. Kelly was not requesting anything extraordinary. The Fair Employment and Housing Act specifically identifies "offering part-time or modified work schedules" as a potential reasonable accommodation. Govt. Code § 12926(n); 2 Cal. Code Regs. § 7293.9(a). Allowing an employee to sit down and/or take breaks more often than is typical is also a well-accepted and common reasonable accommodation. If this matter is litigated, we are confident the evidence will show that Applied Biosystems could have accommodated Ms. Kelly's disability.

Ms. Kelly took pride in her job with Applied Biosystems, and was crushed at the company's unwillingness to assist in getting her back to work. Applied Biosystem's conduct is particularly despicable in light of the fact that Ms. Kelly's October 2004 re-injury was a workplace accident, which may have been caused in part by the company's inadequate accommodation of her original July 2004 sprained ankle. Ms. Kelly has experienced significant emotional distress arising out of Applied Biosystem's conduct. She has also sustained a substantial economic loss, including more than a year's work of salary and associated benefits.

–3–                              February 23, 2007

Applied Biosystem's outrageous conduct towards Ms. Kelly may also warrant punitive damages. A sampling of recent disability discrimination verdicts demonstrates that juries take these claims seriously, and don't hesitate to award large emotional distress and punitive damages awards:

| Case | Economic Damages | Emotional Distress | Punitives | Total Jury Verdict |
|------|------------------|--------------------|-----------|--------------------|
| Martin v. Arrow Electr. (2006) | $1M | | $500K | $1.5M |
| Carr v. Wash. Mutual (2006) | $118K | $682K | | $800K |
| McGee v. Tucoemas (2005) | $542K | $1.5M | $1.2M | $3.2M |
| Welch v. Anaheim (2005) | $215K | $5M | | $5.2M |
| Roby v. McKesson (2004) | $1.3M | $2.7M | $15M | $19M |
| Wrysinski v. Agilent (2004) | $850K | $117K | $3.8M | $4.8M |
| Green v. State (2003) | $597K | $2M | | $2.6M |
| McMurray v. Burbank (2003) | $997K | $537K | | $1.5M |
| Tousignant v. San Bernardino (2002) | $445K | $1M | | $1.4M |

Ms. Kelly wants to move on with her life, and will agree to settle all past disability and related claims against Applied Biosystems for $75,000. She also wants her job back. Ms. Kelly hereby demands that Applied Biosystems promptly engage in the interactive process with her, and offer such reasonable accommodations as will allow her to return to work as quickly as possible. Towards that end, Ms. Kelly's current work restrictions are enclosed with this letter.

Please provide a response within one week of the date of this letter. If we do not hear from you by that time, we will commence litigation.

Very Truly Yours,

LAW OFFICES OF MAUREEN E. MCFADDEN

Maureen E. McFadden

Encl.   Current work restrictions
        DFEH Complaint and right to sue letter

# EXHIBIT 10



**Applera**
Corporation

301 Merritt 7
Norwalk, CT 06851

March 28, 2007

*VIA E-MAIL AND U.S. MAIL*

Maureen E. McFadden, Esq.
819 Bancroft Way
Berkeley, CA 94710

    Re:   *Megan Kelly*

Dear Ms. McFadden:

    Applera's Human Resources Department recently attempted to contact Ms. Kelly to set up a meeting regarding her return to work. The Company has not heard from her. May I ask you to contact your client and let us know when she desires to discuss her return.

                       Sincerely,

                       Charles J. Heinzer
                       Senior Director, Attorney

cc: V. Jones

**KELLY 0147**

T (203) 840-2000
www.applera.com

Case 3:07-cv-03002-MMC   Document 27.2   Filed 03/04/2008   Page 32 of 49
AB Applied Biosystems

# EXHIBIT 11

Apr 30 07 12:01p      Alyn                        510 845 `_.6                      p.1



**Palo Alto Medical
Foundation**

. A Sutter Health Affiliate          **Fremont Center**          3200 Kearney Street
                                                                 Fremont, CA 94538
                                                                 (510) 490-1222
                                                                 www.pamf.org

Megan Kelly
2009 Mcgee Ave
Apt 2
Berkeley, CA 94703

April 25, 2007

MRN# 15221641

To Whom It May Concern:

My patient, Megan Kelly, is currently under my care for her wrists. She may return to work with restrictions. She should not lift more than 2 lbs with either hand. She should avoid repetitive movements with either hand/wrist for prolonged periods, no longer than 15 mintues at a time. She may file and pour liquids with these limitations.

If you have any questions, please feel free to call my office at (510) 490-1222.

Sincerely,

Barry Rose, MD
Orthopedic Surgeon
Fremont Clinic

**KELLY 0146**

# EXHIBIT 12

May 14 07 12:31p    Alyna                    510 845 .636                P.2



**Palo Alto Medical Foundation**

A Sutter Health Affiliate

Fremont Center    3200 Kearney Street
Fremont, CA 94538
(510) 490-1222
www.pamf.org

Megan Kelly
2009 Mcgee Ave
Apt 2
Berkeley, CA 94703

May 9, 2007

MRN# 15221641

To Whom It May Concern:

My patient, Megan Kelly, is currently under my care for her wrists. She was seen and evaluated in the office today, May 9, 2007. She may return to work with restrictions. She should not lift more than 2 lbs with either hand. She should avoid repetitive movements with either hand/wrist for prolonged periods, no longer than 15 mintues at a time. She may file and pour liquids with these limitations.

If you have any questions, please feel free to call my office at (510) 490-1222.

Sincerely,

Barry Rose, MD
Orthopedic Surgeon
Fremont Clinic

**KELLY 0143**

# EXHIBIT 13

May 25 07 02:30p     Alyna                          510 845     36                    p.2



**Palo Alto Medical Foundation**

A Sutter Health Affiliate

Fremont Center

3200 Kearney Street
Fremont, CA 94538
(510) 490-1222
www.pamf.org

May 24, 2007

Megan Kelly
2009 Mcgee Ave
Apt 2
Berkeley, CA 94703

To Whom It May Concern:

Megan Kelly was seen and evaluated in clinic today.   She may return to part-time work with limited repetitive activities.

If you have any questions, please do not hesitate to call my office at (510) 490-1222.

Sincerely,

Barry A. Rose, M.D.
Palo Alto Medical Foundation
Fremont Center
3200 Kearney Street
Fremont, CA 94538

KELLY 0140

# EXHIBIT 14

May 29 07 02:16p     Aly                    510 84_ 7636                    P.1



# PACIFIC
Orthopaedic & Sports Rehabilitation

5/25/07

To Whom It May Concern:

Megan Kelly is currently receiving physical therapy care s/p arthroscopic surgery for right wrist TFCC tear. She presents with pain, weakness, decreased ROM and decreased functional use of her right hand as a result. Megan wears a wrist splint during the day for activities of daily living to preserve her recovery and prevent injury. We recommend the following work restrictions to continue promoting her full recovery.

Regarding her job description:

1. Regularly, and as needed, assemble MicroRNA boxes, requiring bending, stooping, and lifting.

   *Megan is limited to only 5 pounds of weight maximally at this time and must take breaks to rest the right wrist/hand every 20 minutes.*

2. Regularly inspect CORE packaging, including reconstitution of vibrating plates.

   *Megan may not subject the wrist and hand to repeated pressure and vibration; should avoid reconstituting the vibration plates.*

3. Redline SOPs using standard writing implements and or personal computer.

   *Megan must take a 10 minute break from typing, after 20 minutes, for rest or change of task.*

4. Regularly assist operators with total preventive maintenance, which requires wiping down instruments and workbenches with wipes; returning tools to their designated location; and performing visual checks on instruments.

   *Megan needs to wear her wrist brace at all times while working and must avoid extreme positions of wrist flexion or extension during this task.*

5. Routinely perform data collection for OEE, which requires manipulating Excel spreadsheets and performing simple calculation using standard keyboard and mouse.

   *Megan must take a 10 minute break from typing, after 20 minutes, for rest or change of task.*

6. Coordinate training for operators, which may involve any or all of the activities listed above.

   *See above.*

Sincerely,

Azuka Nwigwe, DPT

**KELLY 0138**

5915 Bldg. A Hollis Street • Emeryville, California 94608 • Tel: 510.923.0700 • Fax: 510.923.0500

# EXHIBIT 15



**Palo Alto Medical Foundation**

A Sutter Health Affiliate                    Fremont Center        3200 Kearney Street
Fremont, CA 94538
(510) 490-1222
www.pamf.org

Megan Kelly
2009 Mcgee Ave
Apt 2
Berkeley, CA 94703

May 31, 2007

MRN# 15221641

To Whom It May Concern:

Megan Kelly  was seen and evaluated in clinic today.   She may return to part-time work, which is 20 hours a week, with limited repetitive activities.

If you have any questions, please do not hesitate to call my office at (510) 490-1222.

Sincerely,

Barry A. Rose, M.D.
Palo Alto Medical Foundation
Fremont Center

**KELLY 0134**

# EXHIBIT 16

 

Kelly, Megan (MR # 15221641)                                    Encounter Date: 04/11/2006

**Encounter Messages**

No Messages in this encounter

**Allergies**

Allergies as of     (Not on File)
10/11/2006

**Orders Placed This Encounter**

Pended Orders                              ** None **

**Patient Instructions History**

| Patient Instructions Revisions | | Status | Date&Time | By User |
|---|---|---|---|---|

**Administrative Information**

| | IDX Visit Number | IDX Visit Type |
|---|---|---|
| | PA18228496 | RETURN OFFICE VISIT [644] |

Encounter    Closed by IFC, PA IDX SCHED on 10/6/06 at 2:05 PM
Status

                    Scanned Document (PA HIM)

15221641  Kelly,Megan
Additional Progress Notes:
Scan on: 10/10/06  by: PATIENT CORRESPONDENCE [10001181]
Scan on: 10/10/06  by: PATIENT CORRESPONDENCE [10001181]

---

**Office Visit**                                   Megan Kelly (MR# 15221641)

| | Date | Time | Department | Provider | Encounter # |
|---|---|---|---|---|---|
| Visit Information | 10/10/2006 | 1:45 PM | Fremont Orthopedics | Barry A Rose MD, MD | 75205904 |

**Diagnosis**

| Diagnoses | Visit Diagnosis |
|---|---|
| | PAIN IN LIMB [729.5] |

**Reason For Visit**

Reason for    Reason for Visit
Visit         Follow Up [180]
                    Comment: R ankle and both wrists

              Reason For Visit History Recorded

**Transcription**

| Transcription | Type | ID | Date and Time | Author |
|---|---|---|---|---|
| | First Clinic Note | 5790966 | 10/11/2006 2:01 PM | ROSE MD, BARRY A. |

**Dr. Haskell_0095**

Kelly, Megan (MR # 15221641).                          Encounter Date: 04/11/2006

This document has not been authenticated

**Document Text**
Kelly, Megan
152-21-64-1 Home Base:
10/10/2006
Dr. Rose (ORS)
I saw the patient back today.  She's been seen for lateral ankle reconstructions
which are going to be set up some time in the future. She's also been seen by
myself.  We reviewed Dr. Basso's notes and her MRIs which show a TFCC tear on the
left wrist and a normal MRI on the right wrist, and her EMGs that were done show
no EMG abnormalities.  I do think she probably will need a diagnostic arthroscopy
of the left wrist.  She's got bilateral upper extremity symptoms.  In fact, she
can hardly walk and uses a cane, crutches, etc., and falls on both wrists.  She's
got a fair amount of pain everywhere in both forearms, but they are actually over
the ulnar aspect of both wrists also, especially on the left.  So I do think a
diagnostic wrist arthroscopy and her TFCC debridement would be reasonable but
after her ankles are done.  We'll set this up for her sometime in the future but
will await Dr. Haskell's reconstructive surgery, and I will reevaluate her again
in the near future, and when she's ready, we'll set this up.
Document #:  5790966
T:  10/11/2006  2:01 P/edx
cc:

Display transcription (5790966) on 10/11/2006 2:01 PM by ROSE MD, BARRY A. only

---

## Progress Notes

**Progress Notes**

## Online Encounter

**Encounter Messages**
No Messages in this encounter

## Allergies

**Allergies as of**       (Not on File)
10/10/2006

## Orders Placed This Encounter

**Pended Orders**                                    ** None **

## Patient Instructions History

**Patient Instructions Revisions**        **Status**    **Date&Time**        **By User**

## Level of Service

**Level Of     Level of Service**
**Service**    OV EST PT LEV 3 [99213]

## Administrative Information

**IDX Visit Number**                      **IDX Visit Type**
PA18228673                                OFFICE VISIT SHORT [558]

**Encounter**    Closed by ROSE MD, BARRY A. on 10/10/06 at 1:54 PM.
**Status**

---

**Office Visit**                                   Megan Kelly (MR# 15221641)

Dr. Haskell_0096

**EXHIBIT 17**

Kelly, Megan (MR # 15221641)                                    Encounter Date: 04/11/2006

| Visit Information | Date | Time | Department | Provider | Encounter # |
|---|---|---|---|---|---|
| | 09/20/2006 | 8:45 AM | Palo Alto Orthopedics | Andrew Haskell MD, MD | 73088173 |

### Diagnoses

**Diagnoses**   Visit Diagnoses
SPRAIN ANKLE NEC [845.09]
ARTHROPATHY NEC-ANKLE [716.87]

### Reason For Visit

**Reason for Visit**   Reason for Visit
Preop [739]
        Comment: discuss right foot surgery

### Transcription

**Transcription**   

| Type | ID | Date and Time | Author |
|---|---|---|---|
| New PA Clinic Note | 5772837 | 9/21/2006 3:47 PM | HASKELL MD, ANDREW |

**This document has not been authenticated**

**Document Text**
Kelly, Megan
    152-21-64-1
09/20/2006
Dr. A. Haskell (ORS)
CHIEF COMPLAINT:  The patient returns for further discussion of her possible
upcoming surgery.  Recall, she is a 28-year-old woman who had an inversion injury
to the right ankle a number of years ago, tripping on a curb.  She had immediate
swelling.  She had numerous interventions, including bracing, anti-inflammatory
medications, physical therapy and casting.  Nothing has provided lasting relief.
She has had numerous other soft tissue injuries related to this, including
bilateral wrist pain and an eye injury from a fall on the unstable ankle.  The
ankle feels like it will give out on her, even when standing and currently it is
her worse orthopedic issue.  The pain rates 7/10.  It is primarily over the
anterior lateral ankle and is sharp.
PHYSICAL EXAMINATION:  The patient is generally well-appearing, in no acute
distress.  Stated height and weight, 5'5 , 190 pounds.  She has a neutral lower
extremity alignment and an antalgic gait on the right.  She is tender to
palpation over the anterior ATFL and anterior lateral gutter, mildly along the
peroneals.  There is pain with varus stress, which is 2+ with a soft end point.
Anterior drawer is 1+ to 2+.  The foot is plantigrade. The ankle and hindfoot
are supple. Skin is intact.  She distally neurovascularly intact.   The heel is
neutrally aligned.  She does have some mild subjective numbness in both feet,
which she attributes to her hypothyroid medications, and 4+ DP pulses.  No
dysesthesias, color or temperature changes in the feet.
IMAGING:  By her report, x-rays taken outside the clinic were negative. MRI shows
an ATFL and CFL tear with mild tenosynovitis of the FHL and posterior tibial
tendon.
ASSESSMENT AND PLAN:  Right ankle chronic instability and anterior lateral
impingement, possible peroneal tendinopathy.
I have discussed the nature of this problem with the patient and feels she has
maximized conservative therapy.  I have once again had a long discussion with her
regarding the surgical intervention for this problem, which would consist of an
ankle arthroscopy and debridement, followed by lateral ligament repair (modified
Brostrom).  I have also discussed with her again that I am concerned with her
hyperesthetic response to any injury, and that she may have difficulty with
recovery from this type of surgery, though the results typically are quite good.
We have discussed various postoperative medications and she has not tolerated
Vicodin, Darvocet or Tylenol No. 3.  She has Percocet at home, but has never
tried them.  I have asked her to try one to make sure she tolerates this. Or
alternatively, Ultram may be an option.  In addition, she does take ibuprofen,
which seems to be okay.
She may also be a good candidate for a regional block, and as she is reluctant to

**Dr. Haskell_0097**

Kelly, Megan (MR # 15221641)                                      Encounter Date: 04/1 1/2006

have general anesthesia, I have asked for an anesthesia consult so she could
discuss these issues with them before the day of surgery.  She is also interested
in surgical estimated costs, as she has been on disability and unable to work for
a couple of years.  We will have my nurse help facilitate all of these
arrangements.  We will set up the procedure at her convenience.
mt
Document #:  5772837
cc:

Display transcription (5772837) on 9/21/2006 3:47 PM by HASKELL MD, ANDREW only

**Progress Notes**

Progress Notes  Pre and postop instructions given.

**Online Encounter**

Encounter Messages

No Messages in this encounter

**Allergies**

Allergies as of   (Not on File)
09/20/2006

**Orders Placed This Encounter**

Pended Orders                          ** None **

**Patient Instructions History**

| Patient Instructions Revisions | Status | Date&Time | By User |
|---|---|---|---|

**Level of Service**

Level Of      Level of Service
Service       OV EST PT LEV 3 [99213]

**Administrative Information**

IDX Visit Number              IDX Visit Type
PA18089768                    RETURN OFFICE VISIT [644]

Encounter    Closed by HASKELL MD, ANDREW on 9/20/06 at 10:06 AM
Status

Scanned Document (PA HIM)

15221641  Kelly,Megan
Additional Progress Notes:
Scan on: 9/11/06  by: ROI FORMS FOR RELEASE OF OUR RECORDS [1001176]

**Office Visit**                                    Megan Kelly (MR# 15221641)

| Visit | Date | Time | Department | Provider | Encounter # |
|---|---|---|---|---|---|

Dr. Haskell_0098

Kelly, Megan (MR # 15221641) Printed by DEDIC HIM, CORRYNE [DEDICC] at 11... Page 92 of 127

**EXHIBIT 18**



**UNUMPROVIDENT**

## CLAIMANT'S SUPPLEMENTAL STATEMENT

The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843    Fax: 1-800-447-2498



0287500078017680

The Claimant is responsible for completion of all portions of this form without expense to the UnumProvident Corporation subsidiaries.

### CLAIMANT'S STATEMENT (PLEASE PRINT)

**Your reply by _____ is appreciated and enables us to provide timely consideration of your claim.**

**1. Claimant's Name** (last, first, middle)
Kelly, Megan L

**Residence Address** (Street, City, State, Zip)
2009 McGee #2 Berkeley CA 94703

**Social Security Number**
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

**Home Phone** (510) 845 2636    **Cell Phone** ( )

**Mailing Address** (if different than residence address) (Street, City, State, Zip)

**Business Phone**

RECEIV
OCT 28 2
12

**2. Policy Number(s):** 588097

**3. Have you been at any of your places of business, or engaged in any work activity for payment, profit, or other compensation during your claimed period of disability?** ☐ Yes ☑ No  If yes, please give dates, hours worked, duties performed, and indicate how you were compensated.
Did work 9/8/04 - 9/21/04 → did not claim this period for disability

If yes, weekly or monthly earned income before taxes $

If you have not returned to work, when do you expect to return to work?    **Part Time:** UNKNOWN    **Full Time:** UNKNOWN

What specific job duties are you unable to do as a result of your sickness/injury? Walking. Cannot write or type for very long. Cannot carry chemicals. Have trouble w/ grasp them. Cannot drive myself. Lose sight periodically. tend to drop things w/o realizing cannot

**4. When was the last date you were treated by or consulted with a medical practitioner?** 10/10/06 - 10/12/06
Name of medical practitioner: Dr. Barry Rose, Dr. Kendra Haskell, Dr. James Parse

**5. Describe your present activities:** Reading, or watching TV. Therapy exercises. If alone I reheat meals & attempt to keep things clean. If someone is staying w/ me, then I can save my wrists recently. If I get a ride to gym I try to do light swimming or ankles and try for a walk. I still use cane because ankle ☑ Yes ☐ No vertical exercise in a pool.

Other than as described above, have there been any other changes in your daily activities or your condition since your last report? ☑ Yes ☐ No If yes, describe.
Loss of sight periodically makes it hard to do what reduced activities I have left. Loss of anything mobility makes it harder to do any lift/carry. I never know when things will Harder to do fine work when hands numb.

**6. Does your current condition prevent you from caring for yourself?** ☑ Yes ☐ No
Do you use an assistive device(s)? ☑ Yes ☐ No If yes to any of these questions, please explain. ☑ Yes ☐ No
Does someone provide assistance?
I have been left w/o the care to problems w/ wrist's ankle. Since then I have also begun having vision problems. I need a carrier for doctors appts and such. I have problems grasping things slips and drops have barred me from cooking/dishwashing - I have someone else cook for me so all I have to do is reheat - bad chances of hurting myself that way. I use a cane, splints in both wrists, splint on ankle

**7. Have you applied for or begun to receive any other Disability, Workers Compensation, Unemployment, Social Security, Retirement, or Pension benefits?** ☑ Yes ☐ No If yes, please provide us with detailed information for each benefit in the space provided below. Please also report any changes to previously reported benefits.

| Source of Income | Name of Insurance Carrier (if applicable) | Policy or ID No. | Benefit Amount Weekly/Monthly | Date claim was filed | Date payments began | Date payments ended |
|---|---|---|---|---|---|---|
| Disability | UNUM Provident | | you have | all | this information | |

If you have been approved or denied for any of these benefits, please submit a copy of Award or Denial letter(s).

**8. Are you currently employed by another employer?** If yes, please advise the name and telephone number of that employer. No
I have read and understand the fraud notices on page 3 of this form.
The above statements are true and complete to the best of my knowledge and belief. (Your signature is required for benefit consideration.)

Signature _____    Date 10/14/06

1338-99-SC (10/05)

Confidential. Do Not Share. if misdirected
please call 510 845 7636 & then shred

Unum_0626

 **UNUMPROVIDENT**

## CLAIMANT'S SUPPLEMENTAL STATEMENT

The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843    Fax: 1-800-447-2498

0287500078017680?

### CLAIMANT'S STATEMENT — Physician/Medication List (PLEASE PRINT)

To avoid delay please answer all questions as completely as possible. Please attach additional pages if needed.

| Claimant's Full Name | Policy No. |
|---|---|
| Kelly, Megan L | 588097 |

Please list ALL treatment providers with whom you are currently treating.

1) Dr James Tearse
**Provider Name**
Ophthamology
**Specialty**
**Frequency of Treatment**
Mailing Address: 805 Veterans Blvd, Str 125 Redwood City 94063
City CA    State    Zip
Date of Last Visit: 10/12/06
Telephone No. (650) 368 3934
Fax No. (650) 368 0270

2) Dr Andrew Haskell
**Provider Name**
Orthopedic - ankle specialty
**Specialty**
**Frequency of Treatment**
Mailing Address: Palo Alto CA
City    State    Zip
Date of Last Visit: 10/12/06
Telephone No. (650) 321 4181
Fax No. (   )

3) Dr Barry Rose
**Provider Name**
Orthopedic - wrists
**Specialty**
waiting til after ankle surgery to sched. wrist surgery
**Frequency of Treatment**
Mailing Address: Fremont CA
City    State    Zip
Date of Last Visit: 10/10/06
see extra page - Sussi Welkloh
Telephone No. (510) 490 1222
Fax No. (   )

Please list any recent hospital confinements.

1) PLANNED OUTPATIENT SURGERY
**Hospital** Palo Alto SurgeCenter
**Procedure** Ankle Arthroscopy + Ligament Repair
Address: Palo Alto CA
City    State    Zip
Dates of Confinement: 11/03/06

2) **Hospital**
**Procedure**
Address
City    State    Zip
Dates of Confinement

Please list all current medications.

| Prescription Name | Dosage | Prescribing Physician |
|---|---|---|
| 1) Methimazole | 12½ mg/day | Dr. Michael O'Connor; endocrinologist |
| 2) metformin xr (NOT Diabetic) | 1500 mg | Dr. Mary Davenport, OB-GYN |
| 3) | | |
| 4) | | |
| 5) | | |
| 6) | | |
| 7) | | |
| 8) | | |
| 9) | | |

1385-99-SC (10/05)

CONFIDENTIAL

Claimant Name: Megan L Kelly    Claim #:  1718010